DORSEY & WHITNEY LLP
Sri K. Sankaran (SBN 236584)
555 California Street, Suite 1000
San Francisco, CA 94104-1513
Telephone: (415) 781-1989
Facsimile: (415) 398-3249

Devan V. Padmanabhan (Admitted *pro hac vice*)
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600

Attorneys for Defendant
Sproqit Technologies, Inc.

E-FILING

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| Visto Corporation <br><br> Plaintiff, <br><br> v. <br><br> Sproqit Technologies, Inc. <br><br> Defendant. | CASE NO.: 04-0651 EMC <br><br> Before the Honorable Edward M. Chen <br><br> **SPROQIT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

**Hearing Date:** January 18, 2005
**Time:** 10:30 a.m.
**Courtroom:** Courtroom C, 15th Floor
**Judge:** Edward M. Chen

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

FACTS ..................................................................................................................................1

LEGAL STANDARDS .........................................................................................................2

ARGUMENT .......................................................................................................................3

I.     Visto Is Not Likely To Succeed On The Merits Of Infringement .........................3

     A.     In The Sproqit System There Is No "Copy" Of A "Workspace Element" On A Smart Phone ................................................................4

          1.     Visto Treats The Complete E-Mail As The "Workspace Element" ...........................................................................4

          2.     A "Copy" Must Include All Components Of The Original ............5

          3.     There Is No Copy Of A Workspace Element In The Sproqit System.................................................................................6

     B.     The Sproqit System Does Not "Compare" First And Second Version Information.................................................................................8

          1.     "Comparing" Means That Items Are Brought Together For Evaluation ...........................................................................8

          2.     The Sproqit System  Does Not Perform The Comparison Required By Claim 10 ....................................................8

II.     Visto Is Not Likely To Succeed On Validity.........................................................11

     A.     Coda Renders Claim 10 Obvious...............................................................12

     B.     Lotus Notes Renders Claim 10 Obvious...................................................14

III.     The Doctrine Of Intervening Defeats Visto's Motion .........................................15

     A.     Sproqit Developed Its Technology After Concluding That The '192 Patent As Originally Issued Was Invalid And Would Not Be Infringed.....................................................................................16

     B.     Claim 10 Was Substantively Amended In Re-Examination.....................16

     C.     Sproqit Has A Strong Defense Of Equitable Intervening Rights .............18

IV.     Visto Will Not Be Irreparably Harmed In The Absence Of A Preliminary Injunction...........................................................................................20

V.     The Balance Of Hardships Favors Sproqit .........................................................21

VI.     The Public Interest Favors Sproqit .....................................................................21

CONCLUSION....................................................................................................................22

**TABLE OF AUTHORITIES**
**FEDERAL CASES**

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343 (Fed. Cir. 2001) ........3, 11

*Atlas Powder Co. v. Ireco Chemicals*, 773 F.2d 1230 (Fed. Cir. 1985) ...........................3

*Bloom Engineering Co. v. N. Amer. Manufacturing Co.*, 129 F.3d 1247
  (Fed. Cir. 1997)......................................................................................15, 17, 18, 19

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120
  (Fed. Cir. 2000) ...........................................................................................12

*In re Dow Chemical Co.*, 837 F.2d 469 (Fed. Cir. 1988) ...................................11

*Gerhardt v. Kinnaird*, 162 F. Supp. 858 (E.D. Ky. 1958) ...............................18

*Graham v. John Deere Co.*, 383 U.S. 1 (1966) ..................................................12

*Hybritech Inc. v. Abbott Laboratories*, 849 F.2d 1446 (Fed. Cir. 1988) ...........................2

*Intel Corp. v. ULSI System Technology, Inc.*, 995 F.2d 1566 (Fed. Cir. 1993),
  *cert. denied*, 510 U.S. 1092 (1994)......................................................................2

*Mine Safety Appliances Co. v. Becton Dickinson & Co.*, 744 F. Supp. 578
  (S.D.N.Y. 1990)......................................................................................18, 19

*New England Braiding Co. v. A.W. Chesterton Co.*, 970 F.2d 878
  (Fed. Cir. 1992)......................................................................................19

*Nutrition 21 v. Untied States*, 930 F.2d 867 (Fed. Cir. 1991)..............................3

*Richardson-Vicks Inc. v. Upjohn Co.*, 1996 WL 31209 (D. Del. 1996),
  *aff'd*, 122 F.3d 1476 (Fed. Cir. 1997) ...........................................................18

*Shockley v. Arcan, Inc.*, 248 F.3d 1347 (Fed. Cir. 2001)..................................15

*Seattle Box Co. v. Industrial Crating & Packing Inc.*, 756 F.2d 1574
  (Fed. Cir. 1985)......................................................................................15

*Seattle Box Co. v. Industrial Crating & Packing Inc.*, 731 F.2d 818
  (Fed. Cir. 1984)......................................................................................19

*Slimfold Manufacturing v. Kinkead Industrial*, 810 F.2d 1113 (Fed. Cir. 1987) .............17

*T.J. Smith & Nephew Ltd. v. Consolidated Medical Equip., Inc.*, 645 F. Supp. 206
  (N.D.N.Y. 1986), *aff'd*, 821 F.2d 646 (Fed. Cir. 1987) .................................19

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996)...............................5

*Westvaco Corp v. International Paper Co.*, 991 F.2d 735 (Fed. Cir. 1993)....................15

ii

**FEDERAL STATUTES**

35 U.S.C. § 103(a) ...................................................................................................11

35 U.S.C. § 252 ........................................................................................................15

35 U.S.C. § 307(b) ...................................................................................................15

SPROQIT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

**INTRODUCTION**

Visto's motion for preliminary injunction should be denied.  All of the preliminary injunction factors favor Sproqit.  First, Visto is not likely to succeed on its claim of infringement because the Sproqit system is fundamentally different from the system of Claim 10.  Second, Claim 10 is likely to be found invalid as obvious in view of prior art that was not considered by the Patent Office.  Third, the doctrine of intervening rights defeats Visto's motion.  Sproqit developed the accused technology after evaluating the claims of the '192 Patent as originally issued, and concluding that they were invalid and would not be infringed.  On re-examination, the Patent Office agreed that Claim 10 was invalid and Visto substantially amended the claim to overcome the Patent Office's rejection.  Fourth, Visto has failed to show that it would suffer any significant, let alone irreparable, harm in the absence of a preliminary injunction.  Fifth, while Visto would not be harmed in the absence of a preliminary injunction, such an injunction would devastate Sproqit.  Finally, the public interest favors Sproqit.

In support of this memorandum, Sproqit submits the Declarations of Peter Mansour, Barry Roitblat, Stephen Weinstein, and Sri Sankaran.

**FACTS**

The key facts are summarized in this section and addressed in greater detail below and in the supporting Declarations.  The Sproqit system includes a server (such as a desktop computer) and a handheld device such as a PDA (personal digital assistant), with the two communicating by a wireless link.  See Roitblat Decl. ¶6.  In the system of Claim 10, a "workspace element" exists on a server and an "independently modifiable copy" of it exists on a smart phone.  Given that the original and the copy may be independently modified, Claim 10 recites a particular method by which "version information" is compared to generate a "preferred version" from the original and the copy.

In the Sproqit system, there is no copy of a workspace element, and no need to compare version information to generate a preferred version.  Weinstein Decl. ¶¶11-40; Roitblat Decl. ¶¶6-23.  Instead, the workspace element exists only on the server, and the hand held device acts essentially as a remote control.  Weinstein Decl. ¶14; Roitblat Decl. ¶¶6-7.  If a remote user

wants to make a change in a document located on the server, that change "event" is queued and transmitted automatically to the server.  Weinstein Decl. ¶¶32-40; Roitblat Decl. ¶¶9-11.  This approach long predates the '192 Patent.  Weinstein Decl. ¶¶12-13.  Claim 10, as construed by Visto, is obvious in view of prior art systems not considered by the Patent Office – the Coda system employed at Carnegie Mellon University in the early 1990s, and the Lotus Notes system sold in the early 1990s.  Weinstein Decl. ¶¶ 41-56 & Exs. B & C.

Sproqit concluded, in the early stages of development, that the '192 Patent claims as originally issued were invalid and would not be infringed, and invested approximately $8,000,000 and 60,000 to 80,000 man hours relying on the original claim scope.  Mansour Decl. ¶¶7-11, 16; Roitblat Decl. ¶3.  Visto substantially amended Claim 10 during re-examination and altered the scope of Claim 10.  Weinstein Decl. ¶ 57.  Sproqit is a small company with limited commercial operations which pose no threat of irreparable harm to Visto.  Mansour Decl. ¶17-20.  A preliminary injunction, however, would devastate Sproqit.  Mansour Decl. ¶21.

## LEGAL STANDARDS

Federal Circuit law governs the issuance of preliminary injunctions in patent cases. Hybritech Inc. v. Abbott Laboratories, 849 F.2d 1446, 1451, n.12 (Fed. Cir. 1988).  Consistent with Hybritech, the court should consider four factors:

      1.    Whether Visto is likely to succeed on the merits;

      2.    Whether Visto  will suffer irreparable harm if a preliminary injunction is not granted;

      3.    The balance between the harm to Visto if injunctive relief is denied and the harm to Sproqit if injunctive relief is granted; and

      4.    The public interest.

Hybritech, 849 F.2d at 1451.

A preliminary injunction is a "drastic and extraordinary remedy that is not to be routinely granted."  Intel Corp. v. ULSI System Technology, Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993),

cert. denied, 510 U.S. 1092 (1994).  Because of the "extraordinary nature" of the relief sought on a motion for preliminary injunction, Visto "carries the burden of showing likelihood of success on the merits with respect to the patent's validity, enforceability, and infringement."  Nutrition 21 v. Untied States, 930 F.2d 867, 869 (Fed. Cir. 1991).  Visto must make a "clear showing" that it is likely to succeed on each of these issues.  Id. at 870 (quoting Atlas Powder Co. v. Ireco Chems., 773 F.2d 1230, 1233 (Fed. Cir. 1985)).

Recognizing the limits inherent in responding to such a motion, the Federal Circuit has imposed a lesser standard on defendants in preliminary injunction cases.   A defendant may defeat a motion for preliminary injunction on the basis of evidence that would be insufficient to support a verdict in defendant's favor at trial.  Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1358-60 (Fed. Cir. 2001) (reversing grant of preliminary injunction where evidence was sufficiently "serious" and "cast enough doubt" on patent validity).  As the Federal Circuit noted in Amazon.com "[v]ulnerability is the issue at the preliminary injunctions stage, while validity is the issue at trial."  Id. at 1359.  If the defendant raises a substantial question as to infringement or validity, then the patentee must show that the defenses lack substantial merit; otherwise the motion for preliminary injunction should be denied.  Id. at 1350-51.

## ARGUMENT

## I.     Visto Is Not Likely To Succeed On The Merits Of Infringement

Visto is not likely to succeed on the merits for a number of reasons, only a few of which will be addressed in this motion.

Visto is not likely to succeed on its claim of infringement because the Sproqit system is fundamentally different from the system of Claim 10.  The '192 Patent is entitled "System and Method for Securely Synchronizing Multiple Copies of a Workspace Element in a Network."  As its title suggests, the patent is focused on the challenge of maintaining consistency when multiple users are simultaneously making changes to different copies of a document:

Data consistency is a significant concern for computer users. For example, when maintaining **multiple independently-modifiable copies of a document**, a user risks using an outdated version.

\* \* \*

The problem of data inconsistency is exacerbated when **multiple copies of a document** are maintained at different network locations.

\* \* \*

Therefore a system and method are needed for providing users with data consistency, and more particularly for synchronizing **multiple copies of a workspace element such as a document** in a secure network environment.

'192 Patent, column 1, lines 30-49 (emphasis added). Claim 10 requires (1) an "independently modifiable copy of the workspace element;" and (2) means for "generating a preferred version from the first workspace element and from the copy [of the first workspace element] by comparing" the first and second "version information."

In the Sproqit system, as set forth in more detail below: (1) there is no independently modifiable copy of a workspace element; and (2) there is no comparison of version information to generate a preferred version.

### A.    In The Sproqit System There Is No "Copy" Of A "Workspace Element" On A Smart Phone

Claim 10 requires "an independently modifiable **copy** of the first workspace element at a second store on a smart phone. . . . ."  (emphasis added).  The Sproqit system does not meet this claim limitation literally or under the doctrine of equivalents.  Weinstein Decl. ¶17.

### 1.    Visto Treats The Complete E-Mail As The "Workspace Element"

The '192 Patent defines "workspace element":

**Accordingly, each e-mail, file, calendar, etc. may be referred to as "a workspace element in workspace data."**

'192 Patent, column 3, lines 16-31 (emphasis added).   See Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) (noting that the "specification acts as a dictionary when it expressly defines terms used in the claims").

Consistent with this explicit definition, Visto's infringement analysis is based on a complete e-mail being the workspace element.  See e.g., Visto Brief at page 5, lines 8-9 ("each e-mail, file, calendar, etc. is referred to as 'a workspace element in workspace data.'" (quoting Patent).  Visto's expert Dr. Head bases his opinion on his observation of e-mails on screens of a desktop computer and hand held device.  Visto also relies on Judge Ward's construction of the term in the Texas Litigation as "a subset of workspace data such as an e-mail, file, bookmark, calendar, or applications program which may include version information."  Khaliq Decl. Ex. A, at 22.[1]  Moreover, Judge Ward rejected an argument that "external status indicators" such as flags were not part of the workspace element. Khaliq Decl. Ex. A, at 22.  This construction is also consistent with the patent's definition of the term.  See also Weinstein Decl. ¶¶18-23.

Consequently, Dr. Head defines "e-mail" to include every part of the e-mail:  "The term e-mail refers to the message headers, the message body, status indicators (such as (opened/unopened, deleted/undeleted, and other parameters such as urgency, and other message or system dependent parameters, etc.)."  Head Decl., page 17, lines 5-7.

## 2.    A "Copy" Must Include All Components Of The Original

The patent teaches that a "copy" should include all the elements of the original.  For example, the Patent teaches that a "copy" of workspace data should include all the components of the original:

---

[1]    Visto relies Judge Ward's claim construction from the Texas Litigation.  Judge Ward's construction is not controlling on this court.  While Sproqit intends to raise claim construction issues in this litigation, for the purposes of this motion, Sproqit has employed Judge Ward's claim construction where applicable.

> An independently modifiable copy of the workspace data 185, referred to herein as workspace data 123, is stored on the global server 120 for easy access by a user from the remote terminal 105. Being **a copy**, the workspace data 123 includes independently modifiable copies of **each workspace element in workspace data** 185 and an independently modifiable copy of version information 255 (Fig. 2), referred to herein as version information 124.

'192 Patent, column 3, lines 32-40.  Accordingly, just as the patent teaches that a "copy" of workspace data must include all the components of that workspace data, a "copy" of a workspace element must include all the components of that workspace element.  Weinstein Decl. ¶¶21-23.  Moreover, the normal understanding in the information technology industry is that a copy of a data file is identical in every data bit to the original file.  Id. at ¶23.

In the Texas litigation, Judge Ward considered the meaning of the term "independently modifiable copy."  Khaliq Decl. Ex. A at 16-17.  Judge Ward rejected Visto's proposed definition that "[t]he copy does not have to be an exact copy," finding that "Visto's proposed definition appears to suggest a broader meaning of copy than the claim language supports."  Id. at 17.[2]

### 3.    There Is No Copy Of A Workspace Element In The Sproqit System

In the Sproqit system, there is no copy of a workspace element.  In the Sproqit system, the workspace element – the e-mail in Dr. Head's tests – exists on the server only.  An e-mail consists of a large number of fields.  Only a small, selected subset of those fields is pushed from the server to the hand held.  There is no copy of the e-mail on the hand held device since many fields in e-mail messages are never sent to the hand held device.  One of the e-mail fields that is never forwarded to the hand held device in the Sproqit system is the field for urgency or importance, which Dr. Head specifically identified as being a part of the e-mail.  Head Decl.,

---

[2]    Judge Ward found that the "copy of the workspace element does not have to be in the same format as the workspace element."  Khaliq Decl. Ex. A  at 17.

page 17, lines 5-7.  Other e-mail fields that are never forwarded to the hand held device in the Sproqit system are the fields for flag-for-follow-up, importance, Unique ID, categories and reply to lists.  Changes to any of the fields not pushed to the hand held device will not be pushed to and will never be represented on or written to the hand held.  Weinstein Decl. ¶24; Roitblat Decl. ¶¶6-11 .

Dr. Head's screen shots appear to confirm that there is no copy of the workspace element on the hand held device – the screen shots from his desktop computer show a flag, but that flag does not appear in any of the screen shots from the hand held device.  Exhibit A to the Roitblat Declaration similarly confirms that in the Sproqit system, importance and flag-for-follow-up fields that exist and are displayed on the desktop computer are not forwarded and are not shown on the handheld device.  When an e-mail message is marked as "urgent" or is "flagged-for-follow-up," those indicators appear in Microsoft Outlook on the desktop computer.  But that data is not pushed to the hand held device and the urgency and flag-for-follow-up icons do not appear on the hand held device.  Weinstein Decl. ¶25; Roitblat Decl. ¶8 & Ex. A.

To support his conclusion that this claim limitation is met in the Sproqit system, Dr. Head relies on his Test 3.  Head Decl., page 18, line 25 – page 19, line 1.  In his Test 3, Dr. Head starts with the hand held device disconnected.  A message is received at the inbox on the desktop PC.  Dr. Head then connects the hand held device and observes that an unopened e-mail icon appears on both the PC and on the hand held device.  Dr. Head assumes incorrectly that because an e-mail icon appears on the hand held that a copy of the e-mail exists on the hand held device.  Rather, as described above, just a few fields from the e-mail have been pushed to the hand held device.  Weinstein Decl. ¶26; Roitblat Decl. ¶7.

The Sproqit system does not infringe because Claim 10 requires a copy of a workspace element on a second store at a smart phone, and in the Sproqit system there is no such copy and nothing substantially equivalent to such a copy.  Weinstein Decl. ¶27.

### B.   The Sproqit System Does Not "Compare" First And Second Version Information.

Claim 10 requires "means for generating a preferred version from the first workspace element and from the copy by **comparing** the first version information and the second version information."   The Sproqit system does not meet this claim limitation literally or under the doctrine of equivalents.  Weinstein Decl. ¶28.

### 1.   "Comparing" Means That Items Are Brought Together For Evaluation

The patent teaches that "comparing" first and second version information means, at a minimum, that the first and second version information are brought together and their similarities or differences are evaluated.  Weinstein Decl. ¶¶29-31.  A number of software modules are described and claimed in Claim 10 for performing this comparison:  the synchronization start module initiates the general synchronization module and the synchronization agent; the synchronization agent forwards second version information to the general synchronization module.  '192 Patent, column 1, line 60 – column 2, line 10.  The comparison is performed by the general synchronization module:

> The general synchronization module 425 further includes routines **for comparing the version information 124 and the version information 255** to determine if only one or both versions of a particular workspace element have been modified and routines for performing an appropriate synchronizing responsive action.

'192 Patent, column 5, lines 55-61 (emphasis added).

### 2.   The Sproqit System  Does Not Perform The Comparison Required By Claim 10

The Sproqit system does not compare version information as required by Claim 10.  Claim 10 requires means for generating a preferred version from the first workspace element and the copy by comparing first and second version information.  In the Sproqit system, there is no comparison of first and second version information to generate a preferred version.  Rather, events are queued and pushed from the remote device to the desktop computer and vice versa.

The Sproqit system does not compare version data to decide whether an original and a copy are different or to generate a preferred version.  Rather, changes or events are automatically pushed as they happen, and are acted upon by the recipient.  Weinstein Decl. ¶32; Roitblat Decl. ¶¶6, 14, 18-20.  This is one of the oldest architectures used in computing, and a different approach from that taken in Claim 10.  Weinstein Decl. ¶11; Roitblat Decl. ¶6.

To support his opinion that this limitation is met in the Sproqit system, Dr. Head relies on his Tests 6 and 7.  In Dr. Head's Test 6, he disconnects the Sproqit hand held and marks an e-mail as unread on the computer.  He observes that the e-mail now appears as unread on the computer, and as read on the disconnected hand held.  In Test 7, Dr. Head reconnects the hand held and notes that the change from read to unread "has been propagated to the Sproqit Companion."  From these observations, Dr. Head inferred incorrectly that "software modules within the Sproqit Desktop Agent compare the first and second version information and generate a preferred version which replaces the version of that e-mail on the Sproqit Companion." Weinstein Decl. ¶33.

In fact, all that happened in Dr. Head's Tests 6 and 7 is that an event was queued at the desktop during the time that the hand held was disconnected.  When the hand held was reconnected, the computer pushed that event to the hand held.  In particular, the desktop sent a message to the hand held instructing the hand held to set the icon for that message to the picture of a sealed envelope.  There was no comparison of version information and no generation of a preferred version involved.  All of Dr. Head's tests are the result of the operation of the Sproqit system as described.  All of Dr. Head's observations are the result of pushing "events" that are in the queue.  Weinstein Decl. ¶34; Roitblat Decl. ¶¶16-17.

Dr. Head observed a single change from read to unread, noted that this change was "propagated" from desktop to handheld, and assumed that version information was compared to achieve this result.  The Roitblat Declaration describes two further experiments which show that Dr. Head is incorrect.  The experiments performed by Mr. Roitblat involve the operation of the Sproqit system when multiple changes are made to the same message when the hand held is

disconnected, and show that no comparison and no synchronization or generation of a preferred version is involved.  Weinstein Decl. ¶35.

In the first experiment (shown in the video file "Demo1.exe" on Exhibit B to the Roitblat Declaration) a message initially appears as unread in both the desktop and the hand held.  The hand held is disconnected.  On the desktop the message is marked as read then unread in sequence a number of times, ending as unread.  As each change is made, an event is queued at the desktop for transmission to the hand held.  The hand held is reconnected.  Instead of comparing the two "versions" — the last "version" from the hand held and the current "version" on the desktop —  and selecting a preferred version, the Sproqit system simply processes the events in sequence.  As each event is pushed to the hand held, the message icon on the hand held device changes.  In this example, the message on the hand held starts as unread (a sealed envelope icon) then changes to read (an open envelope icon), when the first queued event arrives.  As the subsequent queued events arrive the icon cycles between read and unread icons, ending at unread when the last queued event arrives.  Events are pushed and acted on, but there is no comparison or generation of a preferred version.  The icon started as "unread" and after a number a cycles ends as "unread."  Weinstein Decl. ¶36; Roitblat Decl. ¶21 & Ex. B.

In the second experiment, (shown in the video file "Demo2.exe" on Exhibit B to the Roitblat Declaration), an open e-mail appears on both the desktop computer and the handheld. The hand held is disconnected, and a series of changes is made to the content of the e-mail on the desktop computer.   The content of the message is changed from "1.  This is the original message" to "2.  This is the message after a change" and saved.  Then, the content of the message is changed from "2.  This is the message after a change"  to "3.  This is the message after yet another (second) change" and saved.  Then, the content of the message is changed from "3.  This is the message after yet another (second) change" and to "4.  This is now the message after the third and final change" and the hand held is reconnected.  With each change a return was added for ease of viewing.  The video file shows the content of the message on the handheld

cycle through the values as it processes the change events as they are received.  Weinstein Decl. ¶37; Roitblat Decl. ¶22 & Ex. B.

These demos highlight the event-driven nature of the Sproqit architecture.  In both cases, multiple changes are made to an e-mail message while the hand held is disconnected from the desktop computer.  In a synchronization environment as outlined in the '192 Patent, one would expect the synchronization engine to compare the current state of the messages at the time the desktop computer and hand held reconnect and synchronize them by writing the "preferred version" to both places.  From these demos, however, one can see that there is no comparison/synchronization taking place.  Instead, each of the changes is causing an event to be queued.  Each event is then processed at the other end.  Weinstein Decl. ¶38; Roitblat Decl. ¶¶20, 23.

As shown in these demonstrations, the Sproqit system does not generate a preferred version by comparing version information.  Weinstein Decl. ¶39.

The Sproqit system does not infringe Claim 10 because the Sproqit system does not have means for comparing first and second version information to generate a preferred version, or anything substantially equivalent to such means.  Weinstein Decl. ¶40.

## II.   Visto Is Not Likely To Succeed On Validity

Visto is not likely to succeed on validity.  Claim 10 is made obvious by art that was not considered by the Patent Office.  As the Federal Circuit noted in Amazon.com, validity is an issue to be ultimately resolved at trial, while on a motion for preliminary injunction the issue is whether Claim 10 is vulnerable to a validity challenge.  Amazon.com, 239 F.3d at 1359.  Claim 10 is vulnerable to a validity challenge and Sproqit has made a substantial case for invalidity.  Amazon.com, 239 F.3d at 1355-51.

Two separate prior art systems — the Coda System and Lotus Notes — make claim 10 of the '192 Patent obvious.  A patent claim is obvious if it "would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103(a);  In re Dow Chem. Co., 837 F.2d 469, 473 (Fed. Cir. 1988).

Obviousness is a determination of law based on the totality of the circumstances.  Brown & Williamson Tobacco Corp. v. Philip Morris Inc., 229 F.3d 1120, 1124 (Fed. Cir. 2000).  This totality of the circumstances inquiry includes "underlying factual inquiries such as: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of nonobviousness."  Id. (citing Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966)).   Secondary factors of nonobviousness to consider include: (1) commercial success; (2) long-felt but unsolved needs; and (3) failure of others.  Brown & Williamson, 229 F.3d at 1129 (citing Graham, 383 U.S. at 17).

Obviousness requires "a showing of a suggestion, teaching, or motivation to combine prior art references."  Brown & Williamson, 229 F.3d at 1124-25 (internal citation omitted).  It "does not require absolute predictability of success . . . .  [A]ll that is required is a reasonable expectation of success.'"  Id. (citing In re O'Farrell, 853 F.2d 894, 903-04 (Fed. Cir. 1988)).

The Coda system and Lotus Notes are prior art under Section 102(b), because both the Coda system and Lotus Notes were described in a printed publication and were in use in the United States more than one year prior to the filing date of the application that issued as the '192 Patent, as described below.

**A.     Coda Renders Claim 10 Obvious**

As shown in Exhibit B to the Weinstein declaration, the Coda system and the level of ordinary skill in the art make claim 10 obvious.  The Coda system discloses the following: a communications channel through a firewall – which in the case of Coda is a authentication server to ensure access to authorized personnel;

- set of programs at the server – inside the firewall – to examine version information and to determine whether a document has been modified;

- software on a remote unit – which can be of any size including a smart phone[3] - with an independently modifiable copy of one or more documents and the software provides version information to indicate whether the copy has been modified;

- software at the server to initiate synchronization when a predetermined criteria is satisfied: when a log called a "replay log" is shipped to the server.

- software at the server then compares version information and has algorithms to select a preferred version; and

- software to ensure that this preferred version is stored at the remote unit and at the server.

See Weinstein Decl. ¶¶ 41-50 & Ex. B.

The only element of claim 10 that is arguably not explicitly disclosed is the use of "an HTTP port or an SSL port" to tunnel through the firewall.  Coda discloses one technique for communicating through a firewall.  As such Coda would suggest to a person of ordinary skill in the art to use other known methods to communicate through a firewall including use of an HTTP or SSL port, thereby making such a modification obvious.  Use of an HTTP or SSL port would have been well known to one of ordinary skill in the art at the time of invention.  As shown by the protocol published on the Internet, at the time of the invention, use of an HTTP or SSL port was a well-known technique for communicating through a firewall.  See Weinstein Decl. ¶50.

---

[3]   Visto does not explicitly define "a smart phone."  However, unless Visto differentiates a smart phone from a PDA or other handheld computers, Coda explicitly addresses a file system designed to handle disconnected operation with "powerful, lightweight and compact laptop computers."  Weinstein Decl. Ex. D at 7.  A "smart phone" is simply an extension of the same "powerful, lightweight and compact laptop computers" described and used in the Coda system.  Even if, a smart phone is not explicitly disclosed in Coda, extending Coda to include "smart phones" would be obvious to a person of ordinary skill in the art given that the authors of Coda recognize that Coda may be extended to "environments were connectivity is intermittent . . . [including environments] that use wireless technologies such as packet radio."  Weinstein Decl. Ex. D at 23.

**B.      Lotus Notes Renders Claim 10 Obvious**

As shown by the claim chart attached as Exhibit C to the Weinstein Declaration, Lotus Notes and the level of ordinary skill in the art make claim 10 obvious.  Lotus Notes is a program that runs on computer systems to allow multiple users to work on documents that are stored at a central server.  Lotus Notes discloses the following:

- a communications channel through a firewall using HTTP or SSL protocol;
- set of programs at the server – inside the firewall – to examine version information and to determine whether a document has been modified;
- software on a remote unit with an independently modifiable copy of one or more documents and the software provides version information to indicated whether the copy has been modified;
- software at the server to initiate synchronization when a predetermined criteria is satisfied – the predetermined criteria being elapsed time.
- software at the server then compares version information and has algorithms to select a preferred version; and
- software to ensure that this preferred version is stored at the remote unit and at the server.

See Weinstein Decl. ¶¶51-56 & Ex. C.

The only element arguably not explicitly disclosed by Lotus Notes is the use of a "smart phone."  However, Visto does not define a smart phone.  If a smart phone covers a PDA and other hand held devices, then Lotus Notes covers smart phones.  Even if Lotus Notes does not disclose the use of a smart phone, such an extension would be obvious to a person of ordinary skill in the art, because Lotus Notes was used with portable computers.  It would be obvious to a person of ordinary skill in the art to use a smart phone, which is in essence a portable computer. Weinstein Decl. ¶56.

1

**III.     The Doctrine Of Intervening Defeats Visto's Motion**

2       Intervening rights is a statutory doctrine that applies when a patentee seeks to enforce a

3  patent claim that was substantively changed after issuance in a reexamination proceeding.  See

4  35 U.S.C. § 252; 35 U.S.C. § 307(b) (incorporating standard of § 252 in context of

5  reexamination); Bloom Engineering Co. v. N. Amer. Mfg. Co., 129 F.3d 1247, 1249 (Fed. Cir.

6  1997); Westvaco Corp v. Int'l Paper Co., 991 F.2d 735, 743 (Fed. Cir. 1993) ("Once a

7  determination is made that the claims are not 'identical' . . . the defense of intervening rights . . .

8  can be raised.").

9       The doctrine of intervening rights applies even when the claim has been narrowed,

10  because intervening rights are meant to "shield those who deem an adversely held patent to be

11  invalid; if the patentee later cures the infirmity by reissue or reexamination, the making of

12  substantive changes is treated as an irrebuttable presumption that the original claims were

13  materially flawed."  Bloom Engineering, 129 F.3d at 1249.  As a result, intervening rights not

14  only immunize a defendant from damages for alleged infringement occurring before the re-

15  examined patent issues, but intervening rights can also allow the allegedly infringing conduct to

16  continue even after the re-examined patent issues.  Seattle Box Co. v. Indus. Crating & Packing

17  Inc., 756 F.2d 1574, 1579 (Fed. Cir. 1985) ("Seattle Box II") (noting that "a person should be

18  able to make business decisions secure in the knowledge that those actions which fall outside the

19  original patent claims are protected.").

20       There are two kinds of intervening rights:  absolute and equitable.  35 U.S.C. § 252.

21  Absolute rights apply to the "specific thing" – i.e., a tangible article – that was produced and

22  existed prior to the reissue or reexamination of the patent.  Shockley v. Arcan, Inc., 248 F.3d

23  1347, 1359 (Fed. Cir. 2001).  Equitable intervening rights extend to a broader range of activity

24  and protect products not yet in existence at the time of reexamination, thus allowing for the

25  continued manufacture and use of accused products.  Id. at 1360.

26

27

28

SPROQIT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### A. Sproqit Developed Its Technology After Concluding That The '192 Patent As Originally Issued Was Invalid And Would Not Be Infringed

In the present case, Sproqit evaluated the '192 Patent as it originally issued, and concluded that it was invalid and would not be infringed by the technology that Sproqit planned to develop.  Sproqit became aware of the '192 patent in June 2003, while its technology was still in the early stages of development.  Mansour Decl. ¶ 7.  Sproqit considered the '192 Patent and decided to proceed with development only after concluding that all claims of the '192 Patent were invalid, and would not, in any event, be infringed by the technical approach that Sproqit intended to pursue.  Id. ¶¶8-11; Roitblat Decl. ¶3.  After reaching that conclusion, Sproqit invested approximately $8,000,000 and 60,000 to 80,000 man hours developing and bringing to market its technology and Sproqit Personal Edition and Sproqit Work Group Edition, relying on the scope of the '192 Patent claims at issue.  Mansour Decl. ¶16.

Visto is quite familiar with Sproqit's technology having attempted to acquire Sproqit at least 3 times.  Id. ¶ 15.  In discussing a possible acquisition, Sproqit told Visto many times that Sproqit's technology was not covered by Visto's patents; during those discussions Visto never disputed Sproqit's assertion of noninfringement.  Id.

### B. Claim 10 Was Substantively Amended In Re-Examination

During re-examination, the Patent Office concluded – as Sproqit had previously – that Claim 10 of the '192 Patent as originally issued was invalid.  Office Action of February 7, 2005 (included in Exhibit D to the Head Declaration).  Visto was forced to make substantial amendments to Claim 10 in order to overcome the Patent Office's rejection.   Visto's amendments to Claim 10 are set forth below, with additions underscored and deletions struck through:

> 10.    A system comprising:
>
> a communications channel through a firewall comprising one of an HTTP port and an SSI port; a general synchronization module for operating within  the first firewall and for examining first version

SPROQIT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

information to determine whether ~~a~~ the first workspace element <u>at</u>

<u>a first store</u> has been modified;

a synchronization agent for operating outside the first firewall and

for forwarding to the general synchronization module second

version information which indicates whether an independently

modifiable copy of the first workspace element <u>at a second store</u>

<u>on a smart phone</u> has been modified;

a synchronization-start module for operating within the first

firewall and for initiating the general synchronization module and

the synchronization agent when predetermined criteria have been

satisfied;

means for generating a preferred version from the first workspace

element and from the copy by comparing the first version

information and the second version information<u>; wherein if only</u>

<u>one of the first workspace element and the copy has been modified,</u>

<u>then the means for generating selects the one as the preferred</u>

<u>version</u>; and

means for storing the preferred version at the first store and at the

second store.

Visto's amendments to Claim 10 are substantive and significantly alter the scope of the claim as originally issued.  Weinstein Decl. ¶57.  See <u>Bloom Engineering</u>, 129 F.3d at 1251 ("The British patent was newly cited prior art, and the claims were narrowed and limited in view of that patent.  The district court correctly viewed this as a substantive change in claim scope.");  <u>Slimfold Mfg. v. Kinkead Indus.</u>, 810 F.2d 1113, 1116 (Fed. Cir. 1987) (noting that amendment to a claim is "substantive" unless the scope of the new claim is "substantially identical" to the scope of the original claim).

C.      **Sproqit Has A Strong Defense Of Equitable Intervening Rights**

Sproqit has established a strong defense of equitable intervening rights, and Visto's motion should be denied for that reason alone.  Because Visto now accuses Sproqit of infringing Claim 10, which was substantially modified during re-examination, Sproqit's technology is protected by the doctrine of intervening rights.  See Bloom Engineering, 129 F.3d at 1249 (intervening rights "shield those who deem an adversely held patent to be invalid . . . ."); Seattle Box II, 756 F.2d at 1580 (finding it highly relevant that defendant was aware of plaintiff's original patent and designed around it).  Although some claims of the '192 Patent were reissued without amendment, Visto chose to base its motion for a preliminary injunction solely on Claim 10.

In Gerhardt v. Kinnaird, 162 F. Supp. 858, 860-61 (E.D. Ky. 1958), the plaintiff had a patent concerning the design of beverage trucks.  The defendant had for some time built trucks pursuant to a license agreement with the plaintiff, but he eventually stopped making royalty payments.  Id.  This was based on his decision, on the advice of counsel, that "the patent on which [the license] was based was invalid and not subject to infringement."  Id. at 862.  In response, the plaintiff sought to have the patent reissued in order to cure the invalidity arguments raised by the defendant.  After the patent reissued, the plaintiff sued to enjoin the defendant from continuing to infringe the reissued patent.

The court refused to enter an injunction.  It noted that the doctrine of equitable intervening rights allowed the accused infringer "to continue to use" the accused device "even though there might otherwise be clear evidence of an infringement of the new or amended claims."  Id. at 863.  Accordingly, the court found that the defendant "should be permitted to continue to manufacture and sell the article which is the subject of this action."  Id. at 865.  See also Richardson-Vicks Inc. v. Upjohn Co., 1996 WL 31209 (D. Del. 1996), aff'd, 122 F.3d 1476 (Fed. Cir. 1997) ("The court concludes that the threshold test of intervening rights properly has been met . . . ."); Mine Safety Appliances Co. v. Becton Dickinson & Co., 744 F. Supp. 578, 581 (S.D.N.Y. 1990) (applying equitable intervening rights).

Because Claim 10 was substantively changed through reexamination, there is an irrebuttable presumption that Sproqit was correct in its belief that the original claim was invalid. <u>Bloom Engineering</u>, 129 F.3d at 1249.  The doctrine of intervening rights shields Sproqit from Visto's claim for preliminary injunctive relief.  <u>Id.</u>  Sproqit has established a substantial case of intervening rights, and the motion for preliminary injunction should be denied.

While the Court has broad discretion to fashion an equitable remedy to accommodate equitable intervening rights, a motion for preliminary injunction is not the proper context in which to undertake that intensely fact-laden inquiry.  <u>See</u> <u>Seattle Box Co. v. Indus. Crating & Packing Inc.</u>, 731 F.2d 818, 830 (Fed. Cir. 1984) ("<u>Seattle Box I</u>") (noting that to determine the proper arrangement going forward, the court "must carefully weigh the standard equitable considerations" and remanding for detailed findings on issue of equitable intervening rights). The proper course of action is to deny the motion for preliminary injunction and reserve precise contours of equitable remedy for an evidentiary hearing after discovery or for trial.  <u>T.J. Smith & Nephew Ltd. v. Consolidated Med. Equip., Inc.</u>, 645 F. Supp. 206,  211 (N.D.N.Y. 1986), <u>aff'd</u>, 821 F.2d 646 (Fed. Cir. 1987) (denying preliminary injunction because "[t]here is not sufficient evidence before the court for a thorough and accurate determination on the issue of intervening rights to be made"); <u>Mine Safety</u>, 744 F. Supp. at 580 (noting that "the Court's inquiry is in two stages," first, "whether intervening rights apply," and second, "under what terms it will be equitable for the alleged infringer to continue to exploit its intervening rights").

Visto's motion for a preliminary injunction should be denied because Sproqit has raised a substantial defense of intervening rights.  Visto cannot meet its burden to show that Sproqit's intervening rights defense "lacks substantial merit."   <u>New England Braiding Co. v. A.W. Chesterton Co.</u>, 970 F.2d 878, 883 (Fed. Cir. 1992).   Thus, Visto has not demonstrated a likelihood of success on the merits of its case, and its motion for a preliminary injunction should be denied.

**IV.     Visto Will Not Be Irreparably Harmed In The Absence Of A Preliminary Injunction**

To support its claim of irreparable harm Visto repeats, over and over again, its unsubstantiated allegation of infringement.   For example, Visto claims that Sproqit has "misappropriated Visto's intellectual property," is selling "infringing product[s]," is "utilizing the fruits of intellectual property misappropriation," is "leveraging the fruits of Visto's innovation without paying for it," is "copying Visto's innovations" and "taking a 'free ride'" Visto Brief at 20-21.  As shown above, Sproqit's technology is fundamentally different from the system of Claim 10.  Because Visto has not established a likelihood of success on the merits, it is not entitled to a presumption of irreparable harm.

Visto will not be irreparably harmed in the absence of a preliminary injunction.  Sproqit is a small company with limited resources.  Sproqit's continued existence poses no threat of irreparable harm to Visto.  To date, the vast majority of Sproqit's efforts have been devoted to getting a workable technology in place. Mansour Decl. ¶18.  Sproqit's budget for product marketing in the United States is essentially zero.  Id. ¶19.  Although Sproqit Personal Edition is still shown on Sproqit's web page, Sproqit is not actively marketing that product.  Id.  To date, Sproqit's primary customer for that product is Bell Mobility, located in Canada.  Id. Approximately 200 of Bell Mobility's customers in Canada use Sproqit Personal Edition.  Id. The total revenues to Sproqit from the Bell Mobility account are approximately $3,000.  Id. Sproqit's efforts to promote the Sproqit Work Group Edition in the United States have been extremely limited.  Id. at ¶20.  Sproqit only has one employee dedicated to marketing Sproqit Work Group Edition and she spends only about 20% of her time on that task.  Id.  Sproqit's efforts to market Work Group Edition in the United States have been limited to a few prospects in the state of Washington  Id. To date, fewer than a half dozen customers, all of them relatively small scale, including the Seattle firefighters and Visto's expert Dr. Head, have purchased the Sproqit Work Group Edition.  Id.  There have been no other sales of Sproqit Work Group Edition, and there are no prospective sales currently on the horizon.  Id.

SPROQIT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Visto acknowledges that where a patentee licenses its patents, it can be "comparatively easy" to compute damages, but contends that it does not license its patents. Visto Brief at page 20, lines 24-28. In fact, however, it appears that Visto has entered into at least one license for these patents. See Sankaran Decl. Ex. A.

**V.     The Balance Of Hardships Favors Sproqit**

As demonstrated above, the denial of Visto's motion would have minimal impact on Visto's operations; Sproqit poses no threat of harm to Visto. Visto appears to be thriving even without preliminary injunctive relief from this Court. Visto recently acquired another $70,000,000 in funding. See Sankaran Decl., Ex. B.

The grant of an injunction, however, would have a devastating impact on Sproqit. Visto seeks to enjoin Sproqit's only products. Mansour Decl. ¶21. A preliminary injunction would force Sproqit to lay off most of its employees and essentially cease operations in the United States. Id. Although Sproqit has few customers, one of them, the Seattle firefighters, uses the Sproqit technology in the course of performing important public service roles. Id. An injunction would prevent Sproqit from serving the Seattle firefighters and Sproqit's other customers. Id. Moreover, as a fledgling company, Sproqit relies heavily on outside investors to fund its operations. Id. A preliminary injunction would cast such a cloud over Sproqit that it would be extremely difficult and very likely impossible for Sproqit to raise additional funding. Id. As a result, even if the Seattle firefighters were excluded from a preliminary injunction, a preliminary injunction could very well leave Sproqit unable to continue to provide the firefighters with service. Id. Sproqit is in talks with a third party interested in acquiring Sproqit. Id. A preliminary injunction would likely kill those acquisition talks, further and irreparably injuring Sproqit. Id.

The balance of hardships favors Sproqit and warrants denial of Visto's motion.

**VI.     The Public Interest Favors Sproqit**

Visto's assertion that Sproqit "misappropriated technology "without . . . even attempting to avoid Visto's intellectual property," Visto Brief at 23, is false. Sproqit's technology is non-

1   infringing, and there is no public interest in allowing Visto to use its patent as a weapon to stifle

2   lawful competition.  Moreover, Sproqit developed its technology after evaluating the '192 Patent

3   as originally issued and concluding that all claims of that patent were invalid and would not, in

4   any event, be infringed by the technology Sproqit intended to pursue.  Patents serve an important

5   public notice function.  See Sage Products, Inc. v. Devon Industries, Inc., 126 F.3d 1420, 1425

6   (Fed. Cir. 1997).  Sproqit, like any member of the public, has a right to rely on patents as issued

7   by the Patent Office.  Seattle Box II, 756 F.2d at 1579 (Fed. Cir. 1985).

8          The public interest favors Sproqit and warrants denial of Visto's motion.

9                                         **CONCLUSION**

10          For the reasons stated above, Visto's motion for a preliminary injunction should be

11   denied.

12                                              Respectfully submitted,

13

14                                              DORSEY & WHITNEY LLP

15

16   Dated:  December 28, 2005                  _____/s/_____
                                                Sri K. Sankaran
17                                                   Attorneys for Defendant
                                                     Sproqit Technologies, Inc.
18

19

20

21

22

23

24

25

26

27

28

SPROQIT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION