1  **MANATT, PHELPS & PHILLIPS, LLP**
   RONALD S. KATZ (State Bar No. 85713)
2  ROBERT D. BECKER (State Bar No. 160648)
   BRUCE J. MCCUBBREY (State Bar No. 38817)
3  1001 Page Mill Road, Building 2
   Palo Alto, CA  94304-1006
4  Telephone:     (650) 812-1300
   Facsimile:     (650) 213-0260
5
   *Attorneys for Plaintiff*
6  VISTO CORPORATION

7

8                  UNITED STATES DISTRICT COURT

9                     NORTHERN DISTRICT

10                  SAN FRANCISCO DIVISION

11 VISTO CORPORATION,                    Case No. C 04-0651 EMC

12        Plaintiff                      **VISTO CORPORATION'S REPLY BRIEF
                                         IN SUPPORT OF ITS MOTION FOR
13        v.                             PRELIMINARY INJUNCTION**

14 SPROQIT TECHNOLOGIES, INC.,           Hearing Date:    January 18, 2006
                                         Time:            10:30 a.m.
15        Defendant                      Courtroom:       C, 15th Floor
                                         Judge:           Hon. Edward M. Chen
16

17

18

19

20

21

22

23

24

25

26

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

1

**TABLE OF CONTENTS**

2

Page

3   I.   INTRODUCTION .......................................................................................................... 1

4   II.  ARGUMENT ................................................................................................................. 2

5        A.   SPROQIT'S NON-INFRINGEMENT ARGUMENT IS WITHOUT
              MERIT .................................................................................................................. 2

6             1.   It is Indisputable That Sproqit's System Utilizes An "Independently
                   Modifiable Copy Of A First Workspace Element"................................... 2

7             2.   The Sproqit System Generates A Preferred Version By Comparing
                   First and Second Version Information ...................................................... 4

8                  a.   Dr Head's Rebuttal Experiment Confirms That The Sproqit
                        System Compares Version Information to Generate a
9                       Preferred Version ......................................................................... 5

10       B.   SPROQIT HAS FAILED TO REBUT THE PRESUMPTION THAT
              CLAIM 10 OF THE '192 PATENT IS VALID .................................................... 6

11            1.   The Coda and Lotus Notes Prior Art Were Previously Considered
                   By The Patent Office.................................................................................. 7
12
              2.   Sproqit Has Failed To Demonstrate That Claim 10 Is Obvious in
13                 View of Coda or Lotus Notes .................................................................... 8

14                 a.   Coda Does Not Teach Or Suggest All The Limitations Of
                        Claim 10........................................................................................ 8

15                 b.   Lotus Notes Does Not Teach Or Suggest All The
                        Limitations of Claim 10 ............................................................... 8
16
         C.   THE DOCTRINE OF INTERVENING RIGHTS DOES NOT
17            AUTHORIZE THE RELIEF REQUESTED BY SPROQIT ................................ 9

              1.   The Doctrine of Absolute Intervening Rights Does Not Allow The
18                 Infringer To Made Additional Copies...................................................... 10

19            2.   Sproqit Has No Absolute Intervening Rights .......................................... 10

              3.   Sproqit Has No Equitable Intervening Rights.......................................... 11
20
         D.   SPROQIT HAS FAILED TO REBUT THE PRESUMPTION THAT
21            VISTO WILL BE IRREPARABLY HARMED FROM SPROQIT'S
              PATENT INFRINGEMENT ................................................................................ 13

22       E.   NO COGNIZABLE HARDSHIP CAN COME TO SPROQIT AS A
              RESULT OF BEING ENJOINED FROM PATENT INFRINGEMENT ........... 14
23
         F.   ENFORCEMENT OF VISTO'S PATENT RIGHTS IS IN THE PUBLIC
24            INTEREST .......................................................................................................... 15

     III. CONCLUSION ........................................................................................................... 15

25

26

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

i

VISTO'S REPLY BRIEF IN SUPPORT OF ITS MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. C 04-0651 EMC

# TABLE OF AUTHORITIES

Page

## CASES

*Al-Site Corp v. VSI Int'l Inc.*,
174 F.3d 1308 (Fed. Cir. 1999)........................................................................ 1, 7

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001)............................................................................ 1

*ATD Corp. v. Lydall, Inc.*,
159 F.3d 534 (Fed. Cir. 1998)............................................................................. 9

*Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*,
132 F.3d 701 (Fed. Cir. 1997)............................................................................ 14

*BIC Leisure Prods. v. Windsurfing Int'l*,
1 F.3d 1214 (Fed. Cir. 1993).......................................................................... 10, 11

*Bloom Engineering Co. v. N. Amer. Mfg. Co.*,
129 F.3d 1247 (Fed. Cir. 1997)...................................................................... 10, 11

*Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*,
134 F.3d 1085 (Fed. Cir. 1998)........................................................................... 6

*Genentech, Inc. v. Novo Nordisk A/S*,
108 F.3d 1361 (Fed. Cir. 1997)........................................................................... 6

*Gerhardt v. Kinnaird*,
162 F. Supp. 858 (E.D. Ky. 1958) ....................................................................... 9

*H.H. Robertson, Co. v. United Steel Deck, Inc.*,
820 F.2d 384 (Fed. Cir. 1987).......................................................................... 6, 13

*Halliburton*,
10 U.S.P.Q.2D (BNA) at 1983............................................................................ 12

*Henkel Corporation v. Coral Inc.*,
754 F. Supp. 1280 (N.D. Ill. 1991) .................................................................... 13

*Hilgraeve Corp. v. Symantec Corp.*,
265 F.3d 1336 (Fed. Cir. 2001)........................................................................... 4

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
381 F.3d 1352 (Fed. Cir. 2004)........................................................................... 3

*Hybritech, Inc. v. Abbott Laboratories*,
849 F.2d 1446 (Fed. Cir. 1988)....................................................................... 1, 14

*Illinois Tool Works, Inc. v. Grip-Pak, Inc.*,
906 F.2d 679 (Fed. Cir. 1990)........................................................................... 14

*In re Vaeck*,
947 F.2d 488 (Fed. Cir. 1991)............................................................................. 8

*Kaufman Co. v. Lantech, Inc.*,
807 F.2d 970 ..................................................................................................... 7

*Laitram Corp. v. NEC Corp.*,
163 F.3d 1342 (Fed.Cir. 1998)........................................................................... 10

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

ii

**TABLE OF AUTHORITIES**
(continued)

Page

*Plastic Container Corp. v. Cont'l Plastics of Okla,*
   607 F.2d 885 (Fed. Cir. 1979) .......................................................................................... 11, 12

*Polymer Technologies v. Bridwell,*
   103 F.3d 970 (Fed. Cir. 1996) ................................................................................................ 13

*Seattle Box Co. v. Indus. Crating & Packing,*
   756 F.2d 1574 (Fed. Cir. 1985) ...................................................................................... 11, 12

*Shockley v. Arcan,*
   248 F.3d 1349 (Fed. Cir. 2001) ............................................................................................. 11

*Smith Int'l, Inc. v. Hughes Tool Co.,*
   718 F.2d 1573 (Fed. Cir. 1983), *cert. denied*, 464 U.S. 996 (1983) ...................................... 15

*Sontag Chain Stores Co. v. National Nut Co.,*
   301 U.S. 281 (1940) .............................................................................................................. 13

*T.J. Smith & Nephew Ltd v. Consolidated Med. Equip., Inc.,*
   645 F. Supp. 206 (N.D.N.Y. 1986) ......................................................................................... 9

*Wayne-Gossard Corp. v. Sondra, Inc.,*
   434 F. Supp. 1340 (E.D. Pa. 1977), *aff'd,* 579 F.2d 41 (3rd Cir. 1978) ................................. 12

**STATUTES**

35 U.S.C. § 252 ............................................................................................................... 10, 11

35 U.S.C. §§ 301-307 ............................................................................................................. 7

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

iii

VISTO'S REPLY BRIEF IN SUPPORT OF ITS MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. C 04-0651 EMC

## I.      **INTRODUCTION**

Visto's motion for preliminary injunction should be granted.  In its moving papers, Visto introduced substantial and compelling evidence that claim 10 of the '192 patent was both valid and infringed, that Visto was being irreparably harmed by Sproqit's continued infringement, and that the remaining equitable factors favored granting an injunction.

At the preliminary injunction stage, Visto need only establish a reasonable likelihood of success on the merits when the trial court finally adjudicates the dispute.  *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) (emphasis added); *Hybritech, Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1451 (Fed. Cir. 1988).  Visto has demonstrated that it is likely to succeed on the issue of infringement and validity.  Now, Visto need only show that Sproqit's non-infringement and invalidity arguments lack "substantial merit." *See Amazon.com, Inc.,* 239 F.3d at 1350-1351 (Fed. Cir. 2001)  As discussed below, Visto has fully met its burden.

Sproqit's non-infringement arguments are based upon strained claim constructions that have already been considered and rejected by Judge Ward of the Eastern District of Texas in a case involving the same patent.  These arguments do not have substantial merit.

On the subject of validity, Sproqit incorrectly argues that claim 10 of the '192 patent is obvious in view of not considered by the Patent Office.  In fact, the Patent Office recently allowed claim 10 during a reexamination proceeding wherein the Coda system and Lotus Notes are relied on by Sproqit were considered by the examiner. There can be no greater indication that Visto is likely to prevail on the issue of obviousness. *See e.g., Al-Site Corp v. VSI Int'l Inc*., 174 F.3d 1308, 1323 (Fed. Cir. 1999)(defendant's burden of proving invalidity is "especially difficult" when claims are allowed over prior art considered by the PTO).

Finally, reliance on the doctrine of intervening rights is misplaced. That doctrine is not applicable to the facts of this case.  Sproqit not only misconstrues the cited authority but fails to introduce any evidence to support reliance on the doctrine.  On the other hand, Visto correctly demonstrates that Sproqit is not entitled to intervening rights.

Because Visto has demonstrated a likelihood of success on the merits and because the principal value of the patent is its statutory right to exclude, Visto is entitled to a presumption of

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

1

VISTO'S REPLY BRIEF IN SUPPORT OF ITS MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. C 04-0651 EMC

irreparable harm. The balance of hardships and the public interest also decidedly favor granting this preliminary injunction motion.

## II.   ARGUMENT

### A.   SPROQIT'S NON-INFRINGEMENT ARGUMENT IS WITHOUT MERIT

Claim 10 of the '192 patent, which is infringed, describes a system for synchronizing a "workspace element" maintained at a first store with an independently modifiable copy of the workspace element at a second store.  In the Sproqit system, shown below, the first store is maintained behind a firewall on a corporate network and the second store is located on a smartphone running "Sproqit Companion" software.  [Head Declaration In Support of Visto's Motion For Preliminary Injunction, ¶ 14].



### 1.   It is Indisputable That Sproqit's System Utilizes An "Independently Modifiable Copy Of A First Workspace Element"

Sproqit's first non-infringement argument, that the smart phone does not include an independently modifiable copy of a workspace element, is based on two improper claim constructions.  First, Sproqit argues that the "workspace element" must be a complete e-mail [Sproqit Opposition at 6-7].  However, the claim clearly does not include any e-mail limitation, and the claim construction order given by the Texas court, upon which Sproqit relies does not provide that the copy must be an exact copy.

The term a "workspace element" was defined by the Texas court as: "*a subset of workspace data, **such as** an e-mail, file, bookmark, calendar, or applications program which may include version information*." [*See* Khaliq Decl. in Support of Visto's Motion for Preliminary

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

Injunction, Ex. A, "Claim Construction Order" at 20]. "Workspace data" was defined by the court as: "data, *including corresponding version information*, which may *include e-mail data*, file data, calendar data, user data, etc..." [*See Id.* at 19]. There is no requirement that a workspace element be an entire e-mail file as Sproqit suggests.  As can be seen, the "workspace element" can be any subset of workspace data.  [*See* Declaration of Dr. Head in Support of Visto's Reply ("Head Decl.") ¶ 5].  The e-mail and other data items Sproqit acknowledges are on a smart phone qualify as independently modifiable copies of workspace elements.   There is no dispute that the corresponding workspace elements for these copies are found behind the firewall. [*See* Weinstein ¶ 14].

The Texas court also held that "*[t]he copy of the workspace element does not have to be in the same format as the workspace element*" (emphasis added). [*See* Claim Construction Order at 16-17].   Under this definition, an "independently modifiable copy" may include various individual e-mail fields, such as the message body, subject line, sender/recipient information, etc. There is no need for the copy to include all possible e-mail fields and file attributes as Sproqit suggests.[1]  [*See* Head Decl. ¶ 5].

Second, Sproqit argues that the copy must be a complete e-mail.  The specification of the '192 patent does not teach that a copy of a workspace element has to be an exact copy.[2] Absent a clear disavowal or contrary definition in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language.[3]  *See Home Diagnostics, Inc. v. LifeScan, Inc.,*

---

[1]  The Texas court noted that the copy of the workspace element could exist in a different "format" from the workspace element. This implies that the copy is not an exact copy.  The removal of certain e-mail fields on the version of the workspace element displayed on the smart phone does not negate the fact that this version is a "copy," rather it simply demonstrates a change of formatting where certain message attributes are removed for efficiency. [*See* Head Decl. ¶ 5]

[2]  Sproqit draws the court's attention to column 3, lines 32-40 to support its argument that a copy of workspace element must include all attributes of the original. However, this portion of the specification which addresses *workspace data,* simply states that workspace data "includes independently modifiable copies of each workspace element in workspace data and independently modifiable copies of version information."  There is no suggestion or requirement in this portion of the specification, as Sproqit implies, that a copy of an e-mail must contain all possible fields and attributes of the original e-mail file including "urgency," "follow up flags," "importance," etc. [*See* Sproqit Opposition at 7, ll. 1-3].

[3]  Also, the term copy is defined in the dictionary as "an imitation, transcript or reproduction of an original work." [Khaliq Decl. ¶ 2 Ex. A, Webster's Dictionary at 256].  Thus a copy of a workspace element on

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

381 F.3d 1352, 1358 (Fed. Cir. 2004).

There is no dispute that the smart phone includes copies of subsets of workspace data, which is all the claim requires. As can be seen, Sproqit has imported a "complete e-mail" limitation into claim 10 and then introduced an "exact copy" limitation.[4] Both of these constructions are erroneous and contrary to the constructions given by Judge Ward in Texas.

2.  **The Sproqit System Generates A Preferred Version By Comparing First and Second Version Information**

Sproqit further argues that Sproqit does not infringe because the Sproqit Companion acts "underscore{essentially} as a remote control" (brief at 1:28, emphasis added). As described above, the Sproqit System stores independently modifiable copies of workspace elements and, unlike a remote control, these workspace elements can be manipulated on the Companion even in disconnected "offline" mode. As can be seen from the information on Sproqit's own website, even those changes made in offline mode are "automatically reflected", *viz*, synchronized, when the connection is reestablished. [*See* Khaliq Decl. ¶ 3, Ex. B (Sproqit web page)].

### Advantages for Sproqit Users

...

**Real-time Connectivity** - Sproqit's live feed between the Desktop Agent and Sproqit Companion means there is no need to sync the device with your desktop. Changes made on your device are reflected immediately on your desktop and vice versa.

**Online and Offline Use** - Your Sproqit Companion offers full functionality whether you're connected to the network or not. Offline you can read or edit mail, notes, tasks, contacts, or send new emails. All changes are automatically reflected to your desktop the next time you connect.

Sproqit argues that the Sproqit System does not compare version information because

---

a smart phone, for example, means that it can be an imitation or reproduction. This does not imply that it has to be at all times an *exact* duplication of the original file.

[4]Sproqit chooses to narrowly focus its "exact copy" argument by reference to extraneous e-mail fields such as "high importance" and "follow-up flags"—fields which were not even used in Dr. Head's experiments. Dr. Head's e-mail experiments focused on synchronizing only one field of the e-mail (read/unread status) which was clearly present and visible on the copy of the workspace element on the smart phone. [*See* Head Decl. In Support of Visto's PI Motion ¶ 16-20, Tests 1-7]. Sproqit's attempt to show non-infringement by demonstrating that additional fields are not present on the copy of the workspace element on the smart phone has no bearing on an infringement analysis. Visto need only demonstrate that a reasonable operation of defendant's product satisfies the limitations of the claim. *See Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343 (Fed. Cir. 2001) ("an accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations.")

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

4

VISTO'S REPLY BRIEF IN SUPPORT OF ITS MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. C 04-0651 EMC

"events are queued and pushed from the remote device to the desktop computer and vice versa," [*See* Sproqit Opposition at 8-9].[5]  This argument is specious.  The so called "events" include version information.  Each event represents a change to the original and/or the independently modifiable copy.  The events are placed in queues, and these queues are by definition stacks of versions organized by time (in this case from least recent to most recent).  The system  processes the "events" so that the most recent version is selected as the preferred version. When changes are made on both ends, the system selects the last version modified on the handheld. [*See* Head Decl. ¶'s 8-11].

a.   <u>Dr Head's Rebuttal Experiment Confirms That The Sproqit System Compares Version Information to Generate a Preferred Version</u>

Sproqit's argument that the "comparison" step is not met is belied by the very evidence that Sproqit relies upon.  Claim 10 merely requires "means for generating a preferred version from the first workspace element and from the copy by comparing the first version information and the second version information."  In the case where changes are made on both the desktop and the handheld smart phone during disconnected operation, the events are placed in a queue on each respective device.  [*See* Roitblatt ¶ 23].  When the system is reconnected, the queues are transmitted to each other simultaneously and acted upon. *Id.*  These queuing actions do, in fact, involve the processing of version information. As Dr. Head's experiments show, the system always picks the last version from the hand held when confronted with competing versions. [*See* Head Decl. ¶'s 8-11 (Dr. Head's experiments)].  The system therefore undoubtedly compares versions in the queues and identifies whether "if only one or both versions of a particular workspace element have been modified" and includes routines for cycling through each change so that the last version is selected and synced as the preferred version on both memory stores. [*See* Weinstein Decl. ¶ 30].

---

[5]  To support this theory, Sproqit relies on the experiments of Mr. Roitblatt who runs two demos, one showing numerous changes to the read/unread status of  workspace element in MS Outlook (at the first store), which changes are sent to the smart phone (second store) and processed in sequence. The second demo is similar to the first, except changes are made to the content of an e-mail at MS Outlook.  Sproqit argues that these experiments demonstrate that the Sproqit System does not compare version information.

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

5

VISTO'S REPLY BRIEF IN SUPPORT OF ITS MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. C 04-0651 EMC

1

2    In order to demonstrate that the Sproqit System compares version information in

3    generating a preferred version, Dr. Head has conducted an experiment where a workspace

4    element (MS Outlook calendar entry), is modified sequentially at both the first store (Desktop

5    PC) behind the firewall, and at the second store (smart phone) in offline mode. [*See* Head Decl.,

6    ¶'s 8-9]. Dr. Head's experiments show that upon reconnection of the Sproqit Companion to the

7    Sproqit Agent, the latest change made on the Sproqit Companion is selected as the preferred

8    version and stored on both sides, even if that change is made *before* the last change was made at

9    the Desktop PC. [*See* Head Decl. ¶ 8]. This directly refutes Sproqit's argument that changes are

10   simply sent as they are queued because in this scenario, changes on the Sproqit Companion are

11   selected as preferred, even though later changes were made to the same workspace element on the

12   Desktop PC. Thus, in order to select between incongruous modifications to a workspace element

13   and its copy, the Sproqit Agent must compare the respective version information of the

14   workspace element and its copy before selecting one as the preferred version. [*See* Head Decl. ¶'s

15   8, 10].

16   **B.     SPROQIT HAS FAILED TO REBUT THE PRESUMPTION THAT CLAIM 10 OF THE '192 PATENT IS VALID**

17

18   A patent is presumed valid, and this presumption exists at every stage of the litigation. *See*

19   *Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1088 (Fed. Cir. 1998). A party

20   challenging validity must prove invalidity by clear and convincing evidence. *See Genentech, Inc.*

21   *v. Novo Nordisk A/S,* 108 F.3d 1361, 1364 (Fed. Cir. 1997). Thus, where the challenger fails to

22   identify any persuasive evidence of invalidity, the very existence of the patent satisfies the

23   patentee's burden on the validity issue. *See H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820

24   F.2d 384, 388 (Fed. Cir. 1987) (stating that a preliminary injunction is determined "in the context

25   of the presumptions and burdens that inhere at trial on the merits"). Sproqit has failed to

26   introduce any clear and convincing evidence sufficient raise a substantial question on the issue of

27   validity.

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

6

VISTO'S REPLY BRIEF IN SUPPORT OF ITS MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. C 04-0651 EMC

1.      **The Coda and Lotus Notes Prior Art Were Previously Considered By The Patent Office.**

Defendant's burden of demonstrating invalidity is "especially difficult" when, as is the present case, the infringer attempts to rely on prior art that was before the patent examiner during prosecution. *See Al-Site Corp v. VSI Int'l Inc.*, 174 F.3d 1308, 1323 (Fed. Cir. 1999). This is particularly true in the case where a patent has undergone a thorough reexamination.   *See Kaufman Co. v. Lantech, Inc.,* 807 F.2d 970:

> ...the challenger's burden of proof imposed by that presumption, as an evidentiary matter, is usually more difficult to sustain. Where, as here, the patent in suit has been reexamined under 35 USC §§ 301-307, the presumption of validity again remains unaltered. The challenger, as usual, must not only come forward with evidence of a prima facie case of invalidity but ultimately prove facts, under a clear and convincing standard, that support a conclusion that the patent is invalid.

The '192 patent issued over the prior art (Coda and Lotus Notes) cited by Sproqit. Because this same art was previously and thoroughly considered by the patent office it has no bearing on the validity of either the original or the reexamined '192 patent claims.[6]

The Coda prior art, related to the Andrew File System (AFS)[7] was specifically discussed in a reference considered by the examiner during prosecution of the original '192 patent. [*See* Khaliq Decl. ¶ 4, Ex. C ('192 cited references) and ¶ 5, Ex. D (Braun et. al.)].  Moreover, during reexamination <u>six Coda references, including those specifically relied on by Sproqit's expert, Dr. Weinstein, and two AFS references were considered by the examiner</u> before allowing the '192 claims as patentable over these references. [*See* Khaliq Decl. ¶ 6 Ex. E (IDS)]

Regarding Notes, <u>twenty-two separate Lotus Notes references including references now cited by Sproqit</u> were considered by the examiner before allowing the reexamined claims of the '192 patent. [*See Id.*]  Moreover, in parallel Texas litigation, Lotus Notes prior art was raised in a

---

[6] In rendering an opinion that claim 10 is obvious in view of Coda and Lotus Notes, Sproqit's expert Dr. Weinstein incorrectly states that "[n]either of these appear to have been considered by the Patent Office." This statement is preceded by Dr. Weinstein's sworn testimony that he has "reviewed the '192 patent ... the file history and the cited references; as well as claim 10 as issued during re-examination and certain parts of the reexamination file history."  However, contrary to Dr. Weinstein's assertions, this prior art was expressly considered by the patent office during prosecution of the '192 patent. [*See* Khaliq Decl. ¶ 6, Ex. E ('192 Patent Reexamination Information Disclosure Statements)]

[7] Dr. Weinstein asserts that the "Andrew" File System was renamed to "Coda," which were both originally developed at Carnegie Mellon University. [*See* Weinstein Declaration ¶ 42].

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

7

VISTO'S REPLY BRIEF IN SUPPORT OF ITS MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. C 04-0651 EMC

1  summary judgment motion by the defendant seeking to invalidate claims of the '192 patent.  That

2  motion  was subsequently denied. [*See* Khaliq Decl. ¶ 7, Ex. F (Judge Ward's Order Denying SJ

3  Motion)].

### 2. Sproqit Has Failed To Demonstrate That Claim 10 Is Obvious in View of Coda or Lotus Notes

To establish a prima facie case for obviousness, three basic criteria have to be met: (1)
there must be some suggestion or motivation, either in the references themselves or in the
knowledge generally available to one of ordinary skill in the art to modify the reference or
combine reference teachings; (2) there must be a reasonable expectation of success; and (3) the
prior art references (or references when combined) must teach or suggest all the claim limitations.
*See In re Vaeck,* 947 F.2d 488 (Fed. Cir. 1991).  At the minimum none of the art cited by Sproqit
shows synchronization with a smart phone through a HTTP or SSL port in a firewall.

### a. Coda Does Not Teach Or Suggest All The Limitations Of Claim 10

Coda does not teach or suggest "a communications channel through a firewall."  The use
of authentication procedures for validating the identity and access rights of an individual does not
constitute a "firewall" to one of ordinary skill in the art. [*See* Head Decl. ¶ 15; *see also* Visto's
Motion For Preliminary Injunction at 8-10].  Second, Coda does not teach the use of an HTTP or
an SSL port. [Head Decl. ¶ 16]. The document relied on by Sproqit, titled, "tunneling SSL WWW
Proxy," does not provide any suggestion for establishing a communications channel through a
firewall, using an HTTP or SSL port to *synchronize* workspace elements as described in claim 10.
[Head Decl. ¶ 16].   Third, Coda does not teach the use of a <u>smart phone</u>.[8] In fact, smart phones
were not even in existence at the time that Coda was developed. [Head Decl. ¶ 17]  Finally, in
Coda, synchronization between servers and clients is *always* initiated by the client ("Venus"
component), not from within a firewall as required by claim 10. [*See* Head Decl. ¶ 18]

### b. Lotus Notes Does Not Teach Or Suggest All The Limitations of Claim 10

Notes is not designed to communicate over an HTTP or SSL port, (port 80 and port 443,

---

[8]  Smart phone is used in the '192 patent and is commonly understood to refer to a device that
integrates computing capabilities and telephone capabilities in the same device, such as a
PDA. [See '192 patent, col. 3, ll. 58-60].

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

8

VISTO'S REPLY BRIEF IN SUPPORT OF ITS MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. C 04-0651 EMC

respectively).  Lotus Notes uses port 1352, a completely separate port which usually requires making changes to most corporate firewalls, changes that would not be necessary when using HTTP or SSL ports. [*See* Head Decl. ¶ 20].  Second, Notes does not teach or suggest a "general synchronization module for operating within a first firewall."  Sproqit relies on a Notes document, Fig. 6 of Ex. I, at 16 to Dr. Weinstein's declaration as disclosing a general synchronization agent.  However, this document simply shows how web pages can be created and posted on a Notes Web Server, where a Notes Server is replicating documents *in one direction* to the Web Server through a firewall.  There is no bi-directional synchronization of workspace elements taught or suggested in this document as required by claim 10.  Third, Notes was never designed or implemented with "smart phones." It is impermissible hindsight for Sproqit to suggest that Notes could be extended to use with smart phones.  *See ATD Corp. v. Lydall, Inc.,* 159 F.3d 534, 546 (Fed. Cir. 1998)("Determination of obviousness cannot be based on the hindsight combination of components selectively culled from the prior art to fit the parameters of the patented invention.").  Finally, there is no "synchronization start module for operating within the first firewall" as required by claim 10.  In Notes, replication between a client and a server is *always* initiated by the client. [*See* Head Decl. ¶ 23].

## C.   THE DOCTRINE OF INTERVENING RIGHTS DOES NOT AUTHORIZE THE RELIEF REQUESTED BY SPROQIT

There is no support for Sproqit's invocation of intervening rights as a basis for the denial of a preliminary injunction.  In advancing this argument, which lacks any legal foundation or precedent, Sproqit mischaracterizes several cases which do not even remotely support this proposition.[9]

---

[9] In *Gerhardt v. Kinnaird,* 162 F. Supp. 858, 865 (E.D. Ky. 1958), the court denied an injunction because the court found evidence that plaintiff broadened the claims in reissue in response to defendant's actions in designing a non-infringing product and therefore possible fraud on the PTO had been committed because the reissue was not properly sought to cure an error without deceptive intent as required by statute.

Sproqit also cites to *T.J. Smith & Nephew Ltd v. Consolidated Med. Equip., Inc.,* 645 F. Supp. 206, 211 (N.D.N.Y. 1986) for same proposition. However, in this case, the court denied the injunction because plaintiff failed to meet its burden on demonstrating a likelihood of success on the merits, which was irrelevant to any intervening rights defense that defendant had raised.  Regarding intervening rights, the court simply noted that it would address that issue upon the availability of additional evidence.  *Id.* at 211.

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

9

VISTO'S REPLY BRIEF IN SUPPORT OF ITS MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. C 04-0651 EMC

1.     **The Doctrine of Absolute Intervening Rights Does Not Allow The Infringer To Made Additional Copies**

As Sproqit admits, absolute intervening rights, where applicable, apply only to tangible articles that were produced prior to the reissue or reexamination.  [Opposition Brief at 15].  The doctrine, therefore, is consistent with the relief Visto seeks here, which includes enjoining Sproqit from making any new copies of its software or selling any copies created after the date of reexamination.  *BIC Leisure Prods. v. Windsurfing Int'l,* 1 F.3d 1214, 1220 (Fed. Cir. 1993)

2.     **Sproqit Has No Absolute Intervening Rights**

An accused infringer may raise the defense of intervening rights only if (1) none of the infringed claims of the reissue (or reexamined) patent were present in the original patent; and (2) even when applicable, the doctrine only allows for the continued use or sale of infringing products *previously made before the date of reexamination issuance*. *See* 35 U.S.C. § 252; *BIC Leisure Prods. v. Windsurfing Int'l,* 1 F.3d 1214, 1220 (Fed. Cir. 1993); *see also Laitram Corp. v. NEC Corp.,* 163 F.3d 1342, 1346-47 (Fed.Cir. 1998).

The doctrine of absolute intervening rights only applies if claims from the reexamined patent which were also present in the original patent are not infringed. Sproqit has not met its burden in showing that it is entitled to an intervening rights defense, because claims from the original patent which are also in the reexamined patent are both valid and infringed, and Sproqit has not introduced any evidence to the contrary. Claims 6-8 of the '192 patent (also at issue in this case) were infringed before reexamination.[10] Claims 6-8 were originally dependent claims but were rewritten into independent form during reexamination proceedings to include all the

---

Another case cited by Sproqit for the proposition that an intervening rights defense precludes granting a preliminary injunction is *Bloom Engineering Co. v. N. Amer. Mfg. Co.,* 129 F.3d 1247 (Fed. Cir. 1997).  In that case, the Court simply affirmed the district court's holding that the plaintiff was not entitled to damages before the grant of the reexamination certificate because the claims were substantively changed during reexamination (and defendant did not also infringe claims of the original patent that were present in the reissue). *Id.* at 1251.

[10] Claims 6-8 also contain several of the same elements as claim 10 (as reexamined). These claims were allowed over Lotus Notes and Coda without substantive changes.  Thus, Sproqit was adequately advised as to the full scope of the '192 patent even before reexamination.  For example, the amendment to claim 10 in the fifth element, "wherein if only one of the first workspace element and the copy has been modified..." is also present in claim 8. Thus the only limitations that were previously not in *any* of the original patent claims are "smart phone" and "HTTP and SSL port." Sproqit has not introduced any evidence that it would have designed around these limitations.

1  elements of the original claim from which they depend. Dependent claims amended during

2  reexamination to include all the elements of the original claim are not "substantively amended"

3  and are entitled to their full retroactive effect.  *Bloom Eng'g Co. v. North Am. Mfg. Co.*, 129 F.3d

4  1247, 1250 (Fed. Cir. 1997).  This alone is enough to defeat any intervening rights defense.  *See*

5  *BIC Leisure Prods,* 1 F.3d at 1220.

6  Second, Sproqit has not introduced any evidence that it has an inventory of accused

7  products or made offers to sell any tangible products in existence before the grant of the

8  reexamination certificate.[11]  *See* 35 U.S.C. § 252 (absolute intervening rights protects only

9  "specific things so made"); *see also Shockley v. Arcan,* 248 F.3d 1349 (Fed. Cir. 2001)(the

10  Federal Circuit held that absolute intervening rights does not apply to products offered for sale

11  but not yet manufactured).  Even if Sproqit does have an inventory of software, it has no right to

12  make new products or copies.

13  **3.      Sproqit Has No Equitable Intervening Rights**

14  The doctrine of equitable intervening rights is a discretionary doctrine which authorizes

15  courts to fashion a remedy to allow for the continued manufacture, use, or sale of a patented

16  product or process in order to protect investments and business commenced before reissue or

17  reexamination based on the theory that the infringer relied on the original claims of a patent

18  before developing the infringing products.  *See* 35 U.S.C. § 252, 2nd. ¶; *see also Seattle Box Co.*

19  *v. Indus. Crating & Packing,* 756 F.2d 1574, 1576 (Fed. Cir. 1985).   However, equitable

20  intervening rights does not protect an infringer from being enjoined from selling infringing

21  products indefinitely.  *See Plastic Container Corp. v. Cont'l Plastics of Okla,* 607 F.2d 885, 902

22  (Fed. Cir. 1979) ("Continental seeks to continue to infringe the Hall Reissue and even expand its

23  operations throughout the remainder of the life of the Hall Reissue without royalty fees or

24  damages. This would effectively extinguish the patentee's rights under the guise of protecting the

25  investment of an infringer.").

26

27  ───────────────────

[11]  The Accused Products are software products which can be easily manufactured at little cost. Sproqit has
      not shown that it has an inventory of software products that is created before the '192 reexamination
28    certificate issued.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

11

VISTO'S REPLY BRIEF IN SUPPORT OF ITS MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. C 04-0651 EMC

1    Courts have looked at various factors when balancing the equities of intervening rights:

2  (1) whether substantial preparation was made before the reissue, *Seattle Box Co. v. Indus. Crating*

3  *& Packing*, 756 F.2d 1574, 1579 (Fed. Cir. 1985); (2) whether the infringer continued

4  manufacturing before reissue on advice of its patent counsel, *Id.*; (3) whether there were existing

5  orders or contracts, *Id.*; (4) whether non-infringing goods can be manufactured from the inventory

6  used to manufacture the infringing product and the cost of conversion, *Id.*; (5) whether there is a

7  long period of sales before the patent reissued for which damages cannot be assessed, *Wayne-*

8  *Gossard Corp. v. Sondra, Inc*., 434 F. Supp. 1340, 1363 (E.D. Pa. 1977), *aff'd,* 579 F.2d 41 (3rd

9  Cir. 1978); and (6) whether the infringer has made profits sufficient to cover its investment,

10  *Plastic Container,* 607 F.2d at 903. The only investment considered is that made after the

11  issuance of the original patent and before the reissue.  *Halliburton*, 10 U.S.P.Q.2D (BNA) at

12  1983; *Plastic Container*, 607 F.2d at 902.  These factors clearly weigh in favor of Visto.

13    First, any preparation, investment or expenditure that Sproqit claims it made before the

14  issuance of the reexamination certificate based on purported reliance on the scope of the original

15  claims is completely specious given the fact that Sproqit infringes several other claims of the '192

16  patent which were not substantively amended, as well as claims from other patents in suit.[12]

17    Second, Sproqit has failed to introduce any evidence, such as advice of patent counsel, to

18  support its defense that it concluded that the original claims were invalid and not infringed before

19  making investments and developing the Accused Products.  Aside from its conclusory statements

20  that it believed that the original '192 patent claims were either invalid or not infringed, Sproqit

21  has not introduced any tangible evidence to support this claim other than a single casual remark

22  from its CEO, Mr. Mansour in an e-mail inquiry regarding Visto's patents.  [*See* Mansour Decl.

23  Ex. B][13].   The evidence cited by Sproqit is particularly weak. There was no advice of counsel and

---

[12] Visto does not concede Sproqit's assertion that claim 10 of  the '192 patent was substantively amended.

[13] Mr. Wilson:  "Do you know if the Sproqit Active clients might be in violation of [*sic*] an[y] of these patents [referring to Visto's patents]." Mr. Mansour: "Nope! we hare [*sic*]in GREAT shape. We're the only ones who have a completely different architecture." [Mansour Decl. Ex. B].  This  statement, which is not made by patent counsel and which is not supported by any analysis, fails to meet Sproqit's burden in demonstrating that it determined that the original claims were invalid or not infringed before proceeding with development of the Sproqit System.

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

12

VISTO'S REPLY BRIEF IN SUPPORT OF ITS MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. C 04-0651 EMC

1    no prior art is mentioned.  Indeed, no claims are patents are mentioned and no basis for non-

2    infringement is given.

3          Finally, regarding factors three to five, Sproqit has not introduced any evidence whether it

4    had existing orders and contracts for the Accused Products before the reexamination certificate

5    issued;   whether non-infringing goods can be manufactured from the inventory used to

6    manufacture the infringing product and the cost of conversion; and whether there was a long

7    period of sales before the patent reexamination certificate issued for which damages cannot be

8    assessed.  Only factor six, lack of any profits sufficient to cover its purported investment of

9    $8,000,000 and 60,000-80,000 man hours, ostensibly favors Sproqit.  Since on balance, these

10   factors favor Visto, Sproqit's claim to equitable intervening rights should be denied.

11         Moreover, only an "innocent infringer is entitled to the protection provided by intervening

12   equitable rights."  *Sontag Chain Stores Co. v. National Nut Co.*, 301 U.S. 281, 293 (1940).

13   "Equitable intervening rights protect parties who in good faith innocently develop and

14   manufacture an invention not claimed by an original patent." *Henkel Corporation v. Coral Inc.*,

15   754 F. Supp. 1280, 1320 (N.D. Ill. 1991).  Given that Sproqit is unable to show any infringement

16   or validity analysis and continues to infringe valid claims from the original patents, Sproqit is not

17   entitled to intervening rights.

18         **D.      SPROQIT HAS FAILED TO REBUT THE PRESUMPTION THAT VISTO**
            **WILL BE IRREPARABLY HARMED FROM SPROQIT'S PATENT**
19          **INFRINGEMENT**

20         A strong showing of likelihood of success on the merits coupled with continuing

21   infringement raises a presumption of irreparable harm to the patentee.  *H.H. Robertson,* 820 F.2d

22   at 390.  Absent a finding clearly negating irreparable harm, such as that future infringement is no

23   longer likely; that the patentee is willing to forgo its right to exclude by licensing the patent, or

24   that the patentee has delayed in bringing suit, there is no basis for finding that the presumption of

25   irreparable harm has been overcome.  *See Polymer Technologies v. Bridwell,* 103 F.3d 970, 976

26   (Fed. Cir. 1996).

27         Sproqit argues that since it has limited sales of its product, Sproqit's continued existence

28   poses no threat to Visto.  [*See* Opposition at 20].  It is well recognized, however, that the principal

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Palo Alto

13                    VISTO'S REPLY BRIEF IN SUPPORT OF ITS MOTION
                      FOR PRELIMINARY INJUNCTION
                      CASE NO. C 04-0651 EMC

1    value of the patent grant is its statutory right to exclude, thus the very nature of the patent grant

2    weighs against finding that monetary damages can suffice to make the patentee whole.

3    *Hybritech, Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1456-1457 (Fed. Cir. 1988).  In previously

4    denying Sproqit's motion for a continued stay of this case, This court recognized this very fact:

5    "[a]lthough, should Visto prevail on the merits of its infringement claims, it will be entitled to

6    monetary damages, uncertainty and imprecision in the valuation of damages and consequential

7    effects of infringement may render such an award less than completely adequate." [*See* Docket

8    No. 96 (Order Denying Sproqit's Motion For a Further Stay)].     The fact that Sproqit itself

9    acknowledges that it is nearly insolvent (*see* Mansour Decl. ¶ 19) makes it more than likely that

10   Sproqit will be unable to compensate Visto in monetary damages should Visto prevail at trial.

11   **E.     NO COGNIZABLE HARDSHIP CAN COME TO SPROQIT AS A RESULT OF BEING ENJOINED FROM PATENT INFRINGEMENT**

12

13        The hardship on a patentee denied an injunction after showing a strong likelihood of

14   success on validity and infringement can result in serious hardship to the patentee's limited right

15   to exclude competitors in the marketplace.  *Illinois Tool Works, Inc. v. Grip-Pak, Inc*., 906 F.2d

16   679, 683 (Fed. Cir. 1990).  A defendant, accused of infringing a valid patent, cannot claim a

17   legitimate hardship simply because it is a small company and has no revenue sources apart from

18   the accused products.  *See Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys*., 132 F.3d

19   701, 708 (Fed. Cir. 1997).

20        Sproqit's argument that an injunction will have a devastating impact on Sproqit because it

21   will have to essentially cease operations in the U.S. if it cannot sell its only product is not

22   legitimate hardship of which Sproqit can complain of under the law.  Sproqit has no right to sell

23   infringing products, regardless of whether it has no other revenue sources apart from the Accused

24   Products. Visto has invested tremendous resources and energy in obtaining and enforcing its

25   intellectual property.  Sproqit's continued infringing presence in the marketplace is a deprivation

26   of not only Visto's statutory right to exclude, but also makes it increasingly difficult for Visto to

27   distinguish itself from the competition and establish itself as a market leader.

28

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Palo Alto

14

VISTO'S REPLY BRIEF IN SUPPORT OF ITS MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. C 04-0651 EMC

**F.     ENFORCEMENT OF VISTO'S PATENT RIGHTS IS IN THE PUBLIC INTEREST**

"[P]ublic policy favors protection of the rights secured by valid patents." *Smith Int'l, Inc. v. Hughes Tool Co*., 718 F.2d 1573, 1581 (Fed. Cir. 1983), *cert. denied*, 464 U.S. 996 (1983). Since Visto has made a clear showing of the validity and enforceability of the patent at issue and of Sproqit's infringement of the asserted claim, the public interest favors granting Visto's Motion for Preliminary Injunction.

**III.     CONCLUSION**

For the reasons discussed herein, and in Visto's opening papers, Visto respectfully requests that its Motion For Preliminary Injunction be granted.

Dated: January 4, 2006                    Respectfully submitted,


                                          MANATT, PHELPS & PHILLIPS, LLP


                                          /s/ Robert D. Becker
                                          Ronald S. Katz
                                          CA State Bar No. 085713
                                          Robert D. Becker
                                          CA State Bar No. 160648

                                          1001 Page Mill Road, Building 2
                                          Palo Alto, CA  94304
                                          Telephone:  650-812-1300
                                          Facsimile:  650-213-0260

                                          *Attorneys for Plaintiff*
                                          *Visto Corporation*

20149692.1

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

15