1
**MANATT, PHELPS & PHILLIPS, LLP**
RONALD S. KATZ (State Bar No. 85713)
2   ROBERT D. BECKER (State Bar No. 160648)
EUGENE L. HAHM (State Bar No. 167596)
3   1001 Page Mill Road, Building 2
Palo Alto, CA  94304-1006
4   Telephone:     (650) 812-1300
Facsimile:      (650) 213-0260
5
*Attorneys for Plaintiff and Counterdefendant*
6   VISTO CORPORATION

7

8                  **UNITED STATES DISTRICT COURT**

9                 **NORTHERN DISTRICT OF CALIFORNIA**

10                    **SAN FRANCISCO DIVISION**

11

| | |
|---|---|
| 12  VISTO CORPORATION, | Case No.  C 04-0651 EMC |
| 13      Plaintiff, | **DECLARATION OF DR. SABIN HEAD IN SUPPORT OF VISTO'S  REPLY BRIEF IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION** |
| 14      v. | |
| 15  SPROQIT TECHNOLOGIES, INC., | Hearing Date:   January 18, 2006 |
| 16      Defendant. | Time:               10:30 a.m. |
| 17 | Courtroom:     C, 15th Floor |
| | Judge:            Hon. Edward M. Chen |
| 18 | |
| 19  AND RELATED COUNTER-ACTION | |

20   I, Sabin Head declare as follows:

21          1.      I, Sabin Head, make this declaration in support of Plaintiff Visto Corporation's

22   ("Visto") Reply Brief in Support of its Motion for Preliminary Injunction.  The statements set

23   forth herein are based upon my own knowledge and I would testify as set forth if called as a

24   witness at trial.

25          2.      Previously, I submitted a declaration in support of Visto's Motion For Preliminary

26   Injunction, which statements I fully incorporate by reference herein.

27

28

1        3.     I in preparation for this declaration I have reviewed Sproqit's Opposition to

2   Visto's Motion for Preliminary Injunction, the declarations of Mr. Roitblat and Dr. Weinstein, the

3   demonstration experiments carried out by Mr. Roitblat, supporting exhibits and claim charts

4   attached to their respective declarations and the prior art literature cited by Sproqit.

5        **Infringement Of Claim 10 of the '192 Patent**

6        4.     In my Declaration in Support of Visto's Motion For Preliminary Injunction I

7   described a series of experiments which I carried out using the Accused Products to demonstrate

8   how the Sproqit System in its usual and normal operation synchronized workspace elements as

9   described in claim 10 of the '192 patent.  These observations are confirmed by Sproqit's own

10  documents which are cited in my previous infringement analysis.

11       5.     Sproqit's expert, Dr. Weinstein argues that there are no "copies" of workspace

12  elements on the Smart Phone. [*See* Weinstein Decl. ¶ 16-27].  In support of this theory, Dr.

13  Weinstein proposes that a "workspace element" is an individual e-mail and that the

14  "independently modifiable copy" of the workspace element requires that the copy of the

15  workspace element on the smart phone include all e-mail fields which are present in the user's

16  Outlook at the desktop behind the firewall, as well as others maintained at the Exchange Server

17  itself, including ones that the user's version of Outlook may not utilize. I disagree with Dr.

18  Weinstein's construction of the phrase "independently modifiable copy of the first workspace

19  element."  Dr. Weinstein, using an e-mail as an example of a workspace element, limits his

20  definition of a copy to require the presence of all fields of that e-mail.  However, the definition of

21  a workspace element is much broader. The Texas court has defined a workspace element as: "<u>a</u>

22  <u>subset of workspace data</u>, such as an e-mail, file, bookmark, calendar, or applications program

23  which <u>may include version information</u>." (emphasis added) [*See* Khaliq Decl. in Support of

24  Visto's Motion For Preliminary Injunction, Ex. A ("Claim Construction Order), at 20]

25  Workspace data is defined by the Court as: "<u>data, including corresponding version information</u>,

26  which may <u>include e-mail data</u>, file data, calendar data, user data, etc.  Workspace data may also

27  include other types of data such as applications programs." (emphasis added)[*Id.* at 19].  Finally,

28  an "independently modifiable copy" has been defined as "<u>a copy of workspace element capable</u>

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Palo Alto

DECLARATION OF DR. SABIN HEAD IN
SUPPORT OF VISTO'S REPLY BRIEF
Case No. C 04-0651 EMC

1   of being modified independent of the workspace element. The copy of the workspace element

2   does not have to be in the same format as the workspace element." (emphasis added) [*Id.* at 16].

3   Because a copy of a workspace element can be a "subset of workspace data" which "may include

4   version information," a copy can consist of individual e-mail fields such as the message body,

5   subject line, sender/recipient information, etc.   There is no need for the copy to include all

6   possible e-mail fields and file attributes as Sproqit suggests.  Also, according to the Texas court's

7   definition of "independently modifiable copy," the copy does not have to be in the same format.

8   The removal of e-mail fields from the version of the workspace element displayed and stored on

9   the smart phone does not negate the fact that this version is indeed a "copy," rather it simply

10   demonstrates a change of formatting where certain message attributes are removed for efficiency.

11         6.      In response to my opinion that the Sproqit System has a "means for generating a

12   preferred version" from the first workspace element and from the copy by comparing the first

13   version information and the second version information," Mr. Roitblat and Dr. Weinstein both

14   opine that in the Sproqit System there is "no comparison of version information and no generation

15   of a preferred version involved." [*See* Weinstein Decl. ¶ 34; Roitblat Decl. ¶ 16].   According to

16   Sproqit, changes at the first store and second store are the result of queued "pushing events."

17   Also, according to Sproqit, changes made on the Sproqit Companion and Desktop Agent, when

18   disconnected, are held in queue and pushed sequentially. [*See* Roitblat Decl. ¶ 12, ¶'s 16-17].

19         7.      To support Sproqit's theory that there is no comparison of version information,

20   Sproqit has conducted a series of experiments using the Sproqit System in which sequential

21   changes are made to an e-mail *only in MS Outlook,* which changes are subsequently processed

22   and shown on the Sproqit Companion. [*See* Roitblat Decl. ¶'s 19-22].  However, Sproqit does not

23   conduct any experiments in which sequential changes are made to an e-mail *only on the smart*

24   *phone (via the Sproqit Companion).* Nor does Sproqit show what would happen if changes are

25   made at *both the Sproqit Companion and in MS Outlook (as seen by the Sproqit Agent).*  Sproqit's

26   theory that there is no mechanism for comparisons of version information in order to generate a

27   preferred version, as required by claim 10  (*see* Roitblat Decl. ¶ 12), is clearly erroneous in view

28   of the experiments which I have conducted and which are described in detail below.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

DECLARATION OF DR. SABIN HEAD IN
SUPPORT OF VISTO'S REPLY BRIEF
CASE NO. C 04-0651 EMC

- 3 -

8.     In order to show that the Sproqit System compares version information of a workspace element and its copy residing on the smart phone (as specified in claim 10), I conducted an experiment in which I made multiple sequential but conflicting changes to a single calendar entry at both the first store (MS Outlook/Exchange Server) and at the second store (smart phone).  Such frequent scheduling changes are a common occurrence in the real world. I have made them artificially orderly only to demonstrate the comparisons and synchronization events more clearly: I labeled the event "Mtg_1" and then numbered the versions and noted which side modified the text and time for each. I carried out the modifications to the calendar entry on each of the two sides separately in staggered order while the Sproqit Companion was disconnected from the Sproqit Agent, reconnecting only after multiple changes had been made to each side.  What I observed was that the last change made on the Sproqit Companion was selected as the preferred version and stored at both ends.  This occurs despite the fact that the last change to the calendar entry (as well as the first)  was made to the workspace element in MS Outlook at the Desktop PC.  Even if a change to the copy of that calendar entry on the Sproqit Companion took place *before* that workspace element was modified in MS Outlook, the last change on the Sproqit Companion was selected as the preferred version when the device was reconnected and the conflicting changes were reconciled.   This directly refutes Sproqit's claim that the Sproqit System is simply a "queue" and "push" system (i.e., a blind push).  If such were the case, then the latest change which took place at the Desktop PC would have been propagated to the smart phone.  Instead, the last change made on the smart phone was selected as the preferred version.  Thus in order to select between competing independent modifications to a workspace element and its copy, the Sproqit Agent must compare the respective version information of the workspace element and its copy before selecting one as the preferred version. Sproqit asserts that a queue does not represent version information. Clearly the contrary is in fact the case: the position in a queue is an implicit version ordering, earlier versions being positioned before later versions in a simple linear order, and the queue in which it resides (one maintained by the Companion or one maintained by the Agent) contains further version information, and clearly both are used to determine the final preferred version. This experiment demonstrates that the

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

DECLARATION OF DR. SABIN HEAD IN
SUPPORT OF VISTO'S REPLY BRIEF
CASE NO. C 04-0651 EMC

1    simple pushing of queued items, as claimed by Sproqit, is not what the Sproqit system actually

2    does.

3         9.      Below is a series of screen shots which demonstrates this experiment:

4    Step 1: Create a 12 p.m. calendar entry at the first store using MS Outlook, titled "Mtg_1".
Calendar entry is synchronized with Smart Companion. Both copies agree in time and text. Note

5    that the "antenna" symbol on the Sproqit Companion shows the two sides are connected:

 

17    Now disconnect the Smart Phone (Work Offline):

18    Step 2: Note the "antenna" symbol has changed to a "disconnected" symbol on the Sproqit

19    Companion (a red circle with a bar through it). Modify the meeting at Desktop PC to change
meeting from 12 pm to 12:30 pm and add "Ver_1 (PC)" to the text to identify the change as

20    having been made on the desktop. Note the modified event is now shown on the PC (first store)
but the original event is still shown on the Smart Phone (second store):

DECLARATION OF DR. SABIN HEAD IN
SUPPORT OF VISTO'S REPLY BRIEF
CASE NO. C 04-0651 EMC

1
2
3
4
5
6
7
8
9
10
11

 

12   Step 3: Modify the meeting on Sproqit Companion to 1 pm and add "Ver_2 (SD)" to the text to
     identify the change as having been made at the phone or smart device . Note: Note these now both
13   differ in time and text from each other and from the original event time and text:

14
15
16
17
18
19
20
21
22
23
24
25

 

26   Step 4: Modify meeting entry "Mtg_1" on the Desktop PC to 1:30 pm and change "Ver_1 (PC)"
     to "Ver_3 (PC)." Note the two remain different from each other but now the PC version has
27   changed from its last version while the version on the Sproqit Companion retains its former edit:

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

1
2
3
4
5
6
7
8
9
10
11

 

12   Step 5: The meeting time for "Mtg_1" is again modified, this time on the Sproqit Companion to 2
pm and change "Ver_2 (SD)" to "Ver_4 (SD)". Note the two still differ from each other but now
13   the one on the Sproqit Companion has changed with respect to its prior version while the one on
the PC has not:
14

15
16
17
18

 

19
20
21
22
23
24
25

26   Step 6: Mtg_1 is again modified on the Desktop PC and now changed to 2:30 pm and "Ver_3
27   (PC)" to "Ver_5 (PC)."  Note the versions remain different from each other and that only the
version on the PC has changed from the last step. Note also that this version is the last change of
28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

DECLARATION OF DR. SABIN HEAD IN
SUPPORT OF VISTO'S REPLY BRIEF
CASE NO. C 04-0651 EMC

1   the series taken as a set. Note also that the Sproqit Companion still shows the "disconnected"
2   symbol (barred red circle):

3

4
5
6
7
8
9
10
11
12
13

14   Now reconnect (go back online) and allow the two sides to synchronize.

15   Step 7: Reconnect Sproqit Companion. Note the "antenna" symbol at the bottom of the user
16   interface now shows connected status. The first store and second store are now synchronized.
    However, the last change made on the Sproqit Companion (changing the meeting time of
17   "Mtg_1" to 2 pm) is selected as the preferred version even though the later change was made at
    the Desktop PC, modifying the meeting time that had been set to 2:30 pm in Step 6.

18
19

20
21
22
23
24
25
26
27
28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

DECLARATION OF DR. SABIN HEAD IN
SUPPORT OF VISTO'S REPLY BRIEF
CASE NO. C 04-0651 EMC

- 8 -




10.     What this experimental series has shown is that version information is clearly preserved in the queue organization on each device, with multiple versions shown as multiple queue entries separately on each device. This series is similar to Roitblat's email experiment except that it shows the missing other half, which demonstrates that a comparison is indeed made and the preferred version is not simply the result of blindly pushing changes in the sequence in which they were made but is the result of making an intelligent choice between which version on which queue is to become the final preferred  version. This cannot be done without comparing the ordering and sources of the changes, which together comprise version information. This contradicts Roitblat's claim that his experiment showed the system only does blind pushes. While such a mechanism might be consistent with his experiment, which modified the version information in only one queue, such a mechanism cannot explain the results of the current experimental series, which modified the version information in both queues independently. It is my opinion that simple blind push is definitely not in fact the mechanism in operation but that what actually takes place is undeniably the selection of a preferrerd version based on comparison of version information from both sides.

11.     I have run the same experiments using email drafts, tasks, and contacts with the same result: in each case. No matter the actual sequence of changes, how many changes, which comes first, which comes last, and on which device, the result is always the same: if there is any change on the Sproqit Companion, all changes made in Outlook on the PC are lost and the preferred version actually selected is the most recent modification made on the Sproqit Companion, The only case where the most recent modification made on the PC becomes the preferred version (which case is consistent with a blind push mechanism) is when no changes are made on the Sproqit Companion . This latter case was the only one shown by Roitblat's one-sided experiment, which did not show how the actual mechanism handles independent modifications at both stores

### Validity of Claim 10 Of The '192 Patent

12.     In my opening declaration I opined that claim 10 of the '192 patent was neither anticipated or obvious in view of the extensive prior art that I have reviewed in connection with

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

DECLARATION OF DR. SABIN HEAD IN
SUPPORT OF VISTO'S REPLY BRIEF
CASE NO. C 04-0651 EMC

- 9 -

1  another Visto patent case (*Visto v. Seven*, case: 2:03-cv-00333), prior art cited during the original

2  prosecution and reexamination of the '192 patent, and based on my own knowledge in this field.

3         13.     The Coda and Lotus Notes literature was raised against Visto's patents by another

4  defendant, Seven Networks Inc., in the Texas litigation. Having conducted an extensive validity

5  analysis of Visto's patents in view of the Coda and Lotus Notes, which analysis is documented in

6  expert reports and declarations submitted with my opening declaration in support of Visto's

7  Motion for Preliminary Injunction, I have concluded that Visto's patents, including the '192

8  patent (originally) and as reexamined is neither anticipated or obvious in view of these references.

9  These references do not teach or suggest all the limitations of any claim of the '192 patent or any

10  other claim of Visto's patents in suit. Visto's idea of providing access and means of

11  synchronizing PIM data behind a corporate firewall with data on a remote device was a novel

12  idea in 1995. Lotus Notes and Coda are completely different systems which do not address the

13  invention underlying claim 10 of the '192 patent. Therefore Sproqit's suggestion that these

14  references could be combined with knowledge available to one of ordinary skill in the art in 1995

15  to render Visto's invention's obvious constitutes impermissible hindsight.

16         14.     Andrew and Coda are different systems that deal with different problems from the

17  systems envisioned by Visto's patents. Coda was designed for file sharing in local networks that

18  is typical of academic and research environments at universities. For example, the Coda

19  reference states:

20         Coda is designed for an environment consisting of a large collection of untrusted
       Unix clients and much smaller number of trusted Unix file servers. The design is
21         optimized for the access and sharing patterns typical of academic and research
       environments. It is specifically not intended for applications that exhibit highly
22         concurrent, fine granularity data access.

23  [*See* Weinstein Declaration, Ex. D at 2]. Claim 10 of the '192 patent addresses an entirely

24  different invention—providing data access and synchronization capabilities between a smart

25  phone (such as a PDA) and a computer behind a firewall using an HTTP or SSL port, features

26  which are plainly absent in the teachings of Andrew and Coda. Also, in Coda synchronization

27  between clients and servers is always initiated by the client, unlike the system described in claim

28  10.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

DECLARATION OF DR. SABIN HEAD IN
SUPPORT OF VISTO'S REPLY BRIEF
CASE NO. C 04-0651 EMC

15. Coda does not teach or suggest "a communications channel through a firewall." The use of authentication procedures for validating the identity and access rights of an individual does not constitute a "firewall" to one of ordinary skill in the art.

16. Coda does not teach the use of an HTTP port or an SSL port. The document relied on by Sproqit, titled, "tunneling SSL WWW Proxy," does not provide any suggestion for establishing a communications channel through a firewall, using an HTTP or SSL port to *synchronize* workspace elements as described in claim 10.

17. Coda does not teach the use of a <u>smart phone</u>.[1] In fact, smart phones were not even in existence at the time that Coda was developed.

18. In Coda, synchronization between servers and clients is *always* initiated by the client ("Venus" component), not from within a firewall as required by claim 10.

19. Lotus Notes provides a set of development tools that allows a Notes trained developer to design and build customized solutions desired by the client. The Notes product includes replication features that allow it to replicate documents between Notes servers, as well as between Notes servers and Notes clients. However, unlike Visto's invention, the replication features are limited to replicating only between Notes based systems using the native Notes file format (NSF). Notes, largely a homogenous product, was never designed or implemented to replicate or synchronize data with smart phone devices.

20. Notes is not designed to communicate over an HTTP or SSL port, (port 80 and port 443, respectively). Lotus Notes uses port 1352, a completely separate port which usually requires making changes to most corporate firewalls, changes that would not be necessary when using HTTP or SSL ports.

21. Notes does not teach or suggest a "general synchronization module for operating within a first firewall." Sproqit relies on a Notes document, Fig. 6 of Ex. I, at 16 to Dr. Weinstein's declaration as disclosing a general synchronization agent. However, this document simply shows how web pages can be created and posted on an InterNotes Web Server, where a

---

[1] Smart phone is used in the '192 patent and is commonly understood to refer to a device that integrates computing capabilities and telephone capabilities in the same device, such as a PDA. [See '192 patent, col. 3, ll. 58-60].

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

Notes Server is replicating documents *in one direction* to the InterNotes Web Server through a firewall. There is no bi-directional synchronization of workspace elements taught or suggested in this document as required by claim 10.

22.  Notes was never designed or implemented with "smart phones." It is impermissible hindsight for Sproqit to suggest that Notes could be extended to use with smart phones.

23.  In Notes there is no "synchronization start module for operating within the first firewall" as required by claim 10. In Notes, replication between a client and a server is *always* initiated by the client.

24.  Coda and Notes and Notes do not provide the requisite teachings or suggestions to render claim 10 of the '192 patent obvious. Nor would one of ordinary skill in the art have thought to combine Notes or Coda with any other reference to derive the patented invention. To suggest so would be impermissible hindsight on the part of Sproqit.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signed this 4th day of January, 2006 at Palo Alto, California.

_____
Sabin Head, Ph.D.