UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

VISTO CORPORATION,

        Plaintiff,

    v.

SPROQIT TECHNOLOGIES, INC.

        Defendant.

_____/

No. C-04-0651 EMC

**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND OVERRULING PLAINTIFF'S OBJECTIONS**

**(Docket Nos. 97, 124)**

    Plaintiff Visto Corporation ("Visto") has filed a motion for a preliminary injunction.  Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel and good cause appearing therefor, the Court hereby DENIES the motion.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

    Visto owns several patents, including U.S. Patent No. 6,085,192 (the '192 patent) which concerns technology that allows wireless communications between firewall-protected local area networks ("LAN"s) and remote clients, such as smart phones, outside the firewall.  Visto originally filed suit against Sproqit Technologies ("Sproqit") on February 15, 2004, alleging infringement of the '192 patent.  On March 9, 2004, Sproqit filed a motion to dismiss or, in the alternative, stay or transfer based on litigation taking place in the District of Minnesota.  *See* Docket No. 5.  After the District of Minnesota transferred the case to this District, this Court denied Sproqit's motion to dismiss as moot on November 12, 2004.  *See* Docket No. 38.

United States District Court

For the Northern District of California

1        Subsequently, Sproqit filed its answer to Visto's complaint and asserted several

2  counterclaims seeking declaratory relief with respect to Visto's '192 and '708 patents.  The Court

3  dismissed Sproqit's state law claims for torious interference and defamation without prejudice.  *See*

4  Docket Nos. 41, 72.  On February 16, 2005, Sproqit filed a motion to stay this case pending

5  reexamination of the '192 patent, which the Court granted on April 20, 2005.  *See* Docket Nos. 60,

6  82.  Prior to entry of the stay, Visto amended its complaint pursuant to stipulation of the parties and

7  order of the Court.  *See* Docket No. 81.

8        On November 7, 2005, Sproqit filed a motion seeking a further stay pending a reexamination

9  of the '708 patent, which the Court denied on November 16, 2005.  On November 22, 2005, the PTO

10  issued the certificate of reexamination on the '192 patent, lifting the stay.  *See* Khaliq Decl., Ex. C.

11  Visto filed the instant motion for preliminary injunction on November 22, 2005.

12        For the purposes of this Motion for Preliminary Injunction, Visto limits its infringement

13  claims to accuse the Sproqit Personal Edition and Sproqit Workgroup Edition (the "Accused

14  Products") of infringing Claim 10 of the '192 Patent.

**II.**  <u>**DISCUSSION**</u>

16  A.    <u>Legal Standard</u>

17        As the moving party, Visto is entitled to a preliminary injunction if it succeeds in showing

18  the following four factors: (1) a reasonable likelihood of success on the merits; (2) irreparable harm

19  if an injunction is not granted; (3) a balance of hardships tipping in its favor; and (4) the injunction's

20  favorable impact on the public interest.  *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d

21  1343, 1350 (Fed. Cir. 2001) (vacating grant of preliminary injunction).[1]  "'These factors, taken

22  individually, are not dispositive; rather the district court must weigh and measure each factor against

23  the other factors and against the form and magnitude of the relief requested.'"  *Id.* (citing *Hybritech,*

24  *Inc. v. Abbott Labs*, 849 F.2d 1446, 1451 (Fed. Cir. 1988).  "The burden is always on the movant to

25  show entitlement to a preliminary injunction."  *Reebok International Ltd. v. J. Baker, Inc.*, 32 F.3d

26  1552, 1555 (Fed. Cir. 1994).

---

28       [1] Neither party disputes the applicable standard is that set forth in *Amazon.com*.

The Federal Circuit has cautioned that "a preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted." *Intel Corp. v. ULSI System Technology*, 995 F.2d 1566, 1568 (Fed. Cir. 1993) (vacating the grant of preliminary injunction). Visto cannot be granted a preliminary injunction unless "it establishes *both* of the first two factors, *i.e.,* likelihood of success on the merits and irreparable harm." *Amazon.com,* 239 F.3d at 1350.  "Irreparable harm is presumed when a clear showing of patent validity and infringement has been made." *Id.*

B.     Likelihood of Success

       In order to demonstrate likelihood of success on the merits, Visto must show that in light of the presumptions and burdens that will inhere at trial on the merits, (1) it will likely prove that Sproqit infringes the patent, and (2) Visto's infringement claim will likely withstand Sproqit's challenges to the validity and enforceability of the patent. *Id.*  On a motion for preliminary injunction, the presumption of validity under 35 U.S.C. § 282[2] does not shift the burden of proof; the movant carries the burden of establishing it will likely succeed on all disputed liability issues at trial. *New England Braiding Co., Inc. v. A.W. Chesterton Co.*, 970 F.2d 878, 882 (Fed. Cir. 1992) (affirming denial of preliminary injunction).

       The Federal Circuit has held that the moving party must make a fairly robust showing.  The moving party must demonstrate a "*substantial* likelihood of success" on the merits.  *Amazon.com*, 239 F.3d at 1355-56 (emphasis added).  If the opponent "raises a substantial question concerning either infringement or validity, *i.e.*, asserts an infringement or invalidity defense that the patentee cannot prove 'lacks substantial merit,' the preliminary injunction should not issue." *Amazon.com,*

---

       [2] Section 282 provides, in pertinent part, as follows: "A patent shall be presumed valid. . . . The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."  35 U.S.C. 282 (2002).  "The presumption acts as a procedural device which places the burden of going forward with evidence and the ultimate burden of persuasion of invalidity at trial on the alleged infringer." *New England Braiding*, 970 F.2d at 882.  On a motion for preliminary injunction, however, the trial court does not resolve the validity question but assesses the persuasiveness of the challenger's evidence "'on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.'"  *Id.* at 882-83 (quoting *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)).

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  239 F.3d at 1350-51.[3]  For the reasons set forth below, the Court concludes that on the present

2  record, Sproqit has raised substantial questions concerning infringement.

3       1.    Infringement Analysis

4       An infringement analysis involves two steps: "the claim scope is first determined, and then

5  the properly construed claim is compared with the accused device to determine whether all of the

6  claim limitations are present either literally or by a substantial equivalent." *Amazon.com,* 239 F.3d

7  at 1351.

8            a.    Claim Construction

9       The first step is to determine the meaning and scope of each claim.  The properly construed

10  claim is then compared with the accused device to determine whether all of the claim limitations are

11  present.  *Id.*  "Only when a claim is properly understood can a determination be made whether the

12  claim 'reads on' an accused device or method, or whether the prior art anticipates and/or renders

13  obvious the claimed invention.  Because the claims of a patent measure the invention at issue, the

14  claims must be interpreted and given the same meaning for purposes of both validity and

15  infringement analyses."  *Id.*

16       "It is well-settled that, in interpreting an asserted claim, the court should look first to the

17  intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in

18  evidence, the prosecution history."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.

19  Cir. 1996).  Claim terms are generally given their ordinary and customary meaning to a person of

20  ordinary skill in the art at the time of the invention.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13

21  (Fed. Cir. 2005).  "The person of ordinary skill in the art is deemed to read the claim term not only

22  in the context of the particular claim in which the disputed term appears, but in the context of the

23  entire patent, including the specification."  *Id.* at 1313.  Courts may also rely on extrinsic evidence,

24  including expert and inventor testimony, dictionaries, and learned treatises, although such evidence

25  is less valuable than the intrinsic record.  *Id.* at 1317.

26  _____

27       [3]  In some respects, the formulation of the test would appear to be the converse of one of the formulations articulated by the Ninth Circuit in non-patent cases wherein the *movant* need only raise "serious question" on the merits if the balance of hardship tips in its favor.  *A&M Records, Inc. v.*

28  *Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir.2001).

United States District Court

For the Northern District of California

The claim language of the '192 patent was construed in recent litigation in the Eastern District of Texas. *See* Mot. at 6; Khaliq Decl., ¶ 2 and Ex. A (April 20, 2005 Claim Construction Order in *Visto Corp. v. Seven Networks, Inc.*, Civil Action No. 2:03-CV-333 (Ward, J.)). Judge Ward's order is persuasive and highly relevant here, though not issue-preclusive against Sproqit or otherwise binding. *See Verizon California Inc. v. Katz Technology Licensing*, 326 F. Supp.2d 1060, 1069 (C.D. Cal. 2003). For the purposes of the motion for preliminary injunction (and only for purposes of the instant motion), the parties stipulate to adopting Judge Ward's Claim Construction Order, with the exception of the construction of the claim term "firewall."[4] Accordingly, for purposes of this motion, the Court adopts Judge Ward's Claim Construction Order per the stipulation.

As noted above, Visto relies only on Claim 10 in moving for preliminary injunction. As amended upon reexamination, Claim 10 of the '192 patent recites a system comprising the following elements, with claim terms previously construed by the Eastern District of Texas in bold:

    i.    a **communications channel** through a **firewall** comprising one of an HTTP port and an SSL port;

    ii.    a **general synchronization module** for operating within the first **firewall** and for examining first **version information** to determine whether a first **workspace element** at a first **store** has been modified;

---

[4] Visto challenges Judge Ward's construction of the term "firewall" as incomplete for failing to exclude validation and authentication features, which are separate security features from firewalls. Mot. at 8-9. This issue was not raised before Judge Ward in the Eastern District of Texas litigation, but is raised here for the first time. *Id.* at 9 n.14. Visto suggests an alternate construction of the term "firewall" based on the Microsoft Computer Dictionary definition to exclude validation and authentication features. Motion at 10; Khaliq Decl., Ex. E. Sproqit does not oppose Visto's proposed construction or suggest an alternative.

Given there was no opposition in connection with the instant motion to Visto's proposed construction of the claim term "firewall," the Court adopts the following construction of the term:

    software and/or hardware for protecting an organization's network against external threats, such as hackers, coming from another network, such as the Internet. *A firewall prevents computers in the organization's network from communicating directly with computers external to the network and vice versa by routing all communications through a proxy server outside of the organization's network for a determination whether a particular message or file will be permitted to pass through to the organization's network.*

Kahliq Decl., Ex. A ("Claim Construction Order") at 14-15; Mot. at 8, 10; Khaliq Decl., Ex. E (*The Microsoft Computer Dictionary* (3d ed. 1997), p. 197).

United States District Court

For the Northern District of California

iii.   a **synchronization agent** for operating outside the first **firewall** and for forwarding to the **general synchronization module** second **version information** which indicates whether an **independently modifiable copy** of the first **workspace element** at a second **store** on a smart phone has been modified;

iv.   a **synchronization-start module** for operating within the first **firewall** and for initiating the **general synchronization module** and the **synchronization agent** when predetermined criteria have been satisfied;

v.   means for generating a **preferred version** from the first **workspace element** and from the copy by comparing the first **version information** and the second **version information**, wherein if only one of the first **workspace element** and the copy has been modified, then the means for generating selects the one as the **preferred version**; and

vi.   **means for storing the preferred version** at the first **store** and at the second **store**.

Mot. at 7-8.

In brief, Visto's technology allows remote devices, such as smart phones, to communicate wirelessly with a LAN through a firewall by using the existing standard ports for passing HTTP (Hyper-Text Transfer Protocol) encoded messages, namely the HTTP port or SSL (Secure Sockets Layer) port. Head Decl., ¶¶ 10-11. "By using the HTTP or SSL ports, Visto's inventions ensure that no additional ports in the firewall need to be opened." *Id.*, ¶ 11. Visto's technology synchronizes documents by synchronizing modifications made from devices either inside or outside the firewall, so that material inside and outside the firewall are consistent, thereby making it possible to use the remote device as if the user were in his/her own office. *Id.*

      b.   Comparison of Claim with Accused Products

The Sproqit system allows a user to remotely use applications that reside and run on a server (such as a desktop computer) from a handheld device such as a PDA (personal digital assistant) or smart phone, with the two communicating by a wireless link. The Sproqit Personal Edition, for example, allows individual users to remotely access information stored on a computer and corporate network using a PDA, whereas the Sproqit WorkGroup Edition allows multiple users to access applications and networked files. Mansour Decl., ¶ 6. "Sproqit software consists of the Desktop Agent, which is installed and runs on [the] desktop, and the Sproqit Companion, which is installed on [the handheld device]. Once installed, the Desktop Agent and the Sproqit Companion exchange information back and forth via [a] wireless connection. The Desktop Agent asks the Sproqit Companion for the data [and] sends changes for [the] server to make in desktop applications. . . . The Desktop Agent 'pushes' requested information down to the device, where the Sproqit

**United States District Court**
For the Northern District of California

1   Companion displays it in various 'forms.'  Head Decl., Ex. K at 3 (Sproqit Personal Edition User

2   Guide).

3       Visto's expert witness, Dr. Head, describes how each element of Claim 10 reads on the

4   accused products, Sproqit Personal Edition and Sproqit WorkGroup Edition.  Head Decl., ¶¶ 25-32,

5   Ex. B (Claim Chart).  Sproqit challenges the infringement claim for purposes of this motion on the

6   grounds that the Accused Products neither:  (1) create a "copy" of "workspace element" under the

7   third element of Claim 10, nor (2) compare first and second version information in generating a

8   preferred version as required by the fifth element of Claim 10.

9   i.    <u>Communications Channel Through a Firewall</u>

10       The Sproqit Desktop Agent establishes a communications link using an SSL port through a

11   firewall.  Mot. at 11; Head Decl., Ex. F (Sproqit website).  Sproqit currently does not challenge the

12   comparison of its products with this element of Claim 10.

13   ii.    <u>General Synchronization Module</u>

14       Visto contends that the Sproqit Desktop Agent incorporates a general synchronization

15   module, defined as "software routines or code that perform the task of determining whether a

16   workspace element and/or an independently modifiable copy thereof has (or have) been modified,

17   based on one or more criteria."  Claim Construction Order at 16; Mot. at 11-13;  Head Decl., ¶ 28.

18   Sproqit currently does not appear to challenge the comparison of its products with this claim

19   element.

20   iii.    <u>Synchronization Agent/Independently Modifiable Copy</u>

21       The third element of Claim 10 requires a "synchronization agent for operating outside the

22   first firewall and for forwarding to the general synchronization module second version information

23   which indicates whether *an independently modifiable copy of the first workspace element at a*

24   *second store on a smart phone* has been modified" (emphasis added).

25       Judge Ward has defined a "synchronization agent" as "software routines or codes that send at

26   least a portion of second version information to a general synchronization module for purposes of

27   synchronization."  Claim Construction Order at 25.  Visto contends that when the Sproqit

28   Companion connects to the Sproqit Desktop Agent, a copy of the e-mail from the Microsoft

7

United States District Court
For the Northern District of California

Exchange Server (first store) is stored on the smart phone (second store). Visto also contends that the Sproqit Companion installed on the smart phone and/or the Sproqit Server[5] incorporates a synchronization agent which forwards second version information to a general synchronization module. Mot. at 13. Thus, according to Visto, the smart phone stores an independently modifiable "copy" of the first "workspace element," such as an e-mail or file, thereby satisfying the third claim element.

Sproqit contends, on the other hand, that the Sproqit system does not have "a copy of a workspace element on a second store at a smart phone." The focus of its argument centers on the construction and application of the terms "copy" and "a workspace element." Sproqit contends its Companion stores something less than a "copy" of a "workspace element." It contends, for instance, that its Companion does not store the entirety of an e-mail and all its associated fields. More specifically, Sproqit asserts that an e-mail contains many fields, only a subset of which are pushed from the server to the handheld device in the Sproqit system. Opp. at 6. The Sproqit system does not, for example, forward to the handheld device the fields for urgency or importance, flag-for-follow-up, Unique ID, categories and reply to lists. Opp. at 6-7; Weinstein Decl. ¶ 24; Roitblat Decl. ¶¶ 6-11. According to Sproqit, its system does not infringe because the data that is pushed to the handheld device does not include all e-mail fields and therefore does not constitute a "copy" of the "workspace element" -- *i.e.*, the entire e-mail as required by Claim 10.

In sum, Sproqit contends that in Claim 10 "a workspace element" equates to an entire e-mail and all its fields and that a "copy" requires the complete replication of that workspace element.

The '192 specification states that "e-mail data, file data, calendar data and user data are exemplary and collectively referred to herein as 'workspace data.'" '192 Patent, col. 3, ll. 21-25. It further states that "e-mail data, file data, calendar data and user data may each be divided into workspace elements, wherein each workspace element is identified by particular version

---

[5] The Sproqit Server is a server hosted on the internet which "facilitates connections between the Workgroup Agent (installed on a dedicated computer on the network) and the Sproqit Companion (installed on the handheld device)." Head Decl., Exh. G at 4 (Sproqit Workgroup Edition Administrator's Guide). The Sproqit Server "either connects first to each of them and then tells one connection partner how to securely connect to the other, or, if that is not possible, it connects them directly via a new encrypted connection tunneled through the Sproqit Server." *Id.* at 6.

**United States District Court**
For the Northern District of California

information. . . . Accordingly, '*each e-mail, file, calendar, etc. may be referred to as a workspace element in workspace data.*'" '192 Patent, col. 3, ll. 26-32 (emphasis added). Judge Ward in his Claim Construction Order defined a "workspace element" as "a subset of workspace data such as an e-mail, file, bookmark, calendar, or applications program which may include version information." Claim Construction Order at 22. "Workspace data," in turn, is defined as "data, including correspondence version information, which may include e-mail data, file data, calendar data, user data, etc." Claim Construction Order at 20.

Neither the '192 claim language or specification nor Judge Ward's Claim Construction Order addresses the precise question whether a portion of an e-mail can constitute a "workspace element." Sproqit points out that the smallest unit of "workspace element" described in the specification and Claim Construction Order is *e.g.*, an e-mail, not some subpart of an e-mail. This supports its construction of the term. Visto, in response, points out that the specification also contemplates a file as small as a bookmark constitutes a "workspace element." Visto's Supplemental Filing at 2-3. However, even a bookmark constitutes an entire unit. The question is not the size of the file or unit but whether something less than the complete unit can comprise a "workspace element." Visto further argues that the claim contains no limitation on the term "workspace element," and thus it may include any subset of workspace data, not necessarily an entire email file. But the lack of an express limitation does not necessarily obviate the need for construction of a term not defined by the claim.

Although Visto argues with some logical force that a minor omission of *e.g.*, one field out of many should not preclude a finding of "workspace element" and vitiate an infringement claim, the Court concludes Sproqit has raised at least a substantial question concerning infringement on this issue. Sproqit's construction is plausible. It is consistent with the language of the specification. Moreover, even Dr. Head appears to define an e-mail to include "message headers, the message body, status indicators (such as opened/unopened, deleted/undeleted, and other parameters such as urgency, and other message or system dependent parameters, etc.)." Head Decl., ¶ 28 at p. 17. Thus, even if an e-mail with less than complete fields can constitute a "workspace element," it may be argued that at least all significant or important fields of an e-mail such as those described by Dr.

United States District Court

For the Northern District of California

1    Head must be included in order to comprise a "workspace element."  Even under this more moderate

2    construction, it would appear that Sproqit's handheld device does not store all these fields identified

3    by Dr. Head, such as urgency.  Weinstein Decl. ¶ 24, Roitblat Decl. ¶¶ 6-11.

4         As an additional response to Sproqit's argument, Visto contends that the claim requires that

5    the workspace elements be completely "copied."  It points out the claim language does not include

6    any limitation on the term "copy."  Visto argues that the specification of the '192 Patent does not

7    teach that a copy of a workspace element has to be an exact copy, and that it should be entitled to the

8    full scope of its claim language absent a clear disavowal or contrary definition in the specification or

9    prosecution history.  Reply at 3 (citing *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d  1352,

10   1358 (Fed. Cir. 2004)).  In contending that "[t]he copy does not have to be an exact copy," Visto

11   relies on Judge Ward's Claim Construction Order which defined the term "independently modifiable

12   copy" to mean "a copy of a workspace element capable of being modified independent of the

13   workspace element.  The copy of the workspace element does not have to be in the same format as

14   the workspace element."  Claim Construction Order at 17.  Visto then cites Dr. Head's declaration

15   which demonstrates that important elements (though not all) of e-mails are stored, modified and

16   synchronized in Sproqit's Companion.  At oral argument, Visto contended that any copying of a

17   portion of the workspace element satisfies the claim.

18        Sproqit, on the other hand, argues that the '192 Patent teaches that a "copy" must include all

19   the elements of the original.  It cites the specification describing the preferred embodiment:  "An

20   independently modifiable copy of the workspace data 185, referred to herein as workspace data 123,

21   is stored on the global server 120 for easy access by a user from the remote terminal 105.  Being *a*

22   *copy*, the workspace data 123 includes independently modifiable copies of *each workspace element*

23   *in workspace data* 185 and an independently modifiable copy of version information 255 (Fig. 1),

24   referred to herein as version information 124."  Opp. at 5-6 (quoting '192 Patent, col. 3, ll. 32-40)

25   (emphasis added in original).  Sproqit reasons that just as the patent teaches that a copy of

26   workspace data must include all the components of that workspace data, a copy of a workspace

27   element similarly must include all the components of that workspace element.  Opp. at 6.

28

United States District Court

For the Northern District of California

1    The Court concludes that Sproqit has raised a substantial question as to whether the

2    requirement that its Companion store an independently modifiable "copy" is satisfied here.  Its

3    construction of "copy" is plausible.  It is supported by the specification it quotes above.  Moreover,

4    the Court further notes that the dictionary definition of "copy" proffered by Visto (Khaliq Decl. in

5    Support of Reply Brief, Exh. A), states the "copy suggest *duplicating an original nearly as possible*"

6    whereas "IMITATE suggests following a model or a pattern but may allow for some variation."

7    Merriam-Webster's Collegiate Dictionary, 10th Edition, p. 256 (1999) (emphasis added).

8    Judge Ward's Claim Construction Order relied on by Visto does not address the precise issue

9    here.  The issue before Judge Ward focused on the effect of different formats stored in different

10   locations.  Judge Ward concluded that an "independently modifiable copy" does not have to be an

11   exact copy insofar as it does not have to be in the same format.  Judge Ward did not address whether

12   the copy must replicate (in one format or another) *all* elements or fields of the unit, file or data base

13   in question.  In fact, his order seems to caution against a broad or loose definition of "copy;" he held

14   that "[a]lthough the data may be stored in a different format in different locations, Visto's proposed

15   definition appears to suggest a broader meaning of copy than the claim language supports."  Claim

16   Construction Order at 17.

17   In sum, although it has not necessarily demonstrated non-infringement, Sproqit has raised a

18   substantial question as to whether its Accused Products infringe on the third claim element which

19   requires that a "copy" of a "workspace element" be stored on the smart phone.

20                                  iv.    Synchronization-Start Module

21   A synchronization-start module is defined as "software routines or code which initiate the

22   synchronization process."  Claim Construction Order at 26-27.  In Sproqit's system, the

23   synchronization-start module initiates the general synchronization module when an e-mail arrives or

24   changes are made to the user's inbox folder.  Head Decl., ¶ 20, Test 3 & 6.  Sproqit does not appear

25   to challenge the comparison of its products with this claim element at this juncture.

26

27

28

11

United States District Court

For the Northern District of California

v.   Means for Generating a Preferred Version by Comparing First and

Second Version Information

The fifth element requires a "means for generating a preferred version from the first workspace element and from the copy by comparing the first version information and the second version information."  As Judge Ward found, this specification was written in means-plus-function form.[6]  The specification describes the structure that performs the function of generating a preferred version by comparing the first and second version information:

> The general synchronization module 425 further includes routines for comparing the version information 124 and the version information 255 to determine if only one or both versions of a particular workspace element have been modified and routines for performing an appropriate synchronizing responsive action.

'192 Patent, col. 5, ll. 55-61.  Judge Ward concluded that "[t]he corresponding structure for this limitation is the general synchronization module 425."  Claim Construction Order at 30.

This claim element specifically requires "*comparing* the first version information and the second version information."  Sproqit contends that the '192 Patent teaches that the first and second version information are compared by the general synchronization module bringing the two versions together and evaluating similarities or differences.  Weinstein Decl., ¶¶ 29-31, citing '192 Patent, col. 5, ll. 35-61.  It argues that its system does not "compare" the first and second version information to generate a preferred version.  *Id.*, ¶ 32; Opp. at 8-9.  Rather, changes or events are automatically "pushed" as they happen from the remote device to the desktop (and vice versa), wherein events are simply queued.  Opp. at 8-9; Roitblat Decl. ¶¶ 6, 14, 18-20.  It cites the testing done by Dr. Head as simply evidencing the desktop "pushing" events (*i.e.*, modification to version) onto the handheld without any comparing.  According to Sproqit, "There was no comparison of

---

[6]  The means-plus-function claim format is authorized by 35 U.S.C. § 112:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6.

1   version information and no generation of a preferred version involved." Opp. at 9. It cites its own

2   experiments in which sequential modifications made on the desktop are "pushed" in the same

3   sequence onto the handheld. It concludes, "There is no comparison/synchronization taking place."

4   Opp. at 11. In short, "The Sproqit system does not generate a preferred version by comparing

5   version information." *Id.*

6           Visto responds that the queuing function in Sproqit's system does, in fact, generate a

7   preferred version, selecting the latest version as the preferred version on both memory stores. Reply

8   at 5; Head Reply Decl. ¶¶ 8-11. What Sproqit refers to as an "event" constitutes a modification

9   wherein the most recent version is selected as the preferred version. Reply at 5. The queuing

10  actions "do, in fact, involve the processing of version information." *Id.* Moreover, Visto points out

11  that when there are conflicting modified versions between the handheld and the desktop, the Sproqit

12  system selects as the preferred version the latest version stored in the handheld even if it preceded in

13  time the version in the desktop. By picking the last version from the handheld when confronted with

14  competing versions, "[t]he system therefore undoubtedly compares versions in the queues." Reply

15  at 5.

16          The question turns on the construction of the term "comparing." At bottom, the issue is

17  whether the relatively simply queuing function performed in the Sproqit system constitutes

18  "comparing" as that term is used in the fifth element of Claim 10.

19          Based on the record currently before this Court, Judge Ward's Claim Construction Order

20  which is binding on this motion, and the particular arguments advanced by the parties thus far, the

21  Court concludes Sproqit has not raised a "substantial question" on infringement as to this element.

22  While the Sproqit system is arguably "event" driven wherein the preferred version appears to be

23  generated by date and source (desktop v. handheld) of modified versions of a workspace element,

24  and not by a more sophisticated examination and analysis of the content of that element, the Sproqit

25  system does appear to "compare" one version with another in order to determine whether one

26  version has been modified; if such a modification is detected, a selection process based on simple

27  rules informed by time and source is triggered. For instance, in its own experiment, Sproqit

28  demonstrates that changes (such as flipping between "read" and "unread" status) in the unconnected

United States District Court

For the Northern District of California

desktop generates a synchronization process with the handheld when the two are connected. Each modification had to have been detected in order to trigger the synchronization and generation of the preferred (subsequent) version. The detection presumably is made by a comparison process, even if that process was as simple as comparing the date of the first and second version information. In short, the queuing described by Sproqit is presumably triggered by a comparison of version information to see if there has been a modification. If so, an "event" is discerned and queuing occurs; if not, there is no "event" and no queuing ensues. Sproqit has not explained why there is no "comparing" at best in its most literal sense.

Sproqit has not submitted any evidence that the term "comparing" as used in Claim 10 requires anything more than what occurs in detecting a modification in one version. To the contrary, the specification describing synchronization module 425 identified by Judge Ward as the corresponding structure for this limitation speaks of "comparing" as the means "to determine if only one or both versions of a particular workspace element have been modified." '192 Patent, col. 5, ll. 55-60. Thus, even under the relatively simple function of "queuing," "comparing" occurs.[7] Sproqit has failed to raise a substantial question as to the proper construction of "comparing" as the term is used in the fifth element of Claim 10.

_____

[7] To be sure, the '192 Patent specification also describes the function of module 430:

> The content-based synchronization module 430 includes routines for reconciling two or more modified versions in workspace data 123, 185 of the same workspace element. For example, if the original and the copy of a user workspace element have both been modified independently since the last synchronization, the contentbased [sic] synchronization module 430 determines the appropriate responsive action. The content-based synchronization module 430 may request a user to select the preferred one of the modified versions or may respond based on preset preferences, i.e., by storing both versions in both stores or by integrating the changes into a single preferred version which replaces each modified version at both stores.

'192 Patent, col.6, ll. 15-27. Given the linkage between modules 425 and 430 (see '192 Patent, col. 5, l. 55 - col. 6, l. 2), it perhaps could be argued that the specification contemplates that the comparison function described in the fifth element of the '192 Patent entails a more substantive examination of content rather than simple queuing by date or source as the Sproqit system appears to employ. On the other hand, it may be countered that module 430 describes the process of "generating" a preferred version, not the predicate process of "comparing." In any event, Sproqit has not advanced such an argument here.

**United States District Court**

For the Northern District of California

vi.     Means for Storing the Preferred Version

This claim element is also stated as a means-plus-function limitation.  This element recites the "means for storing the preferred version at the first store and at the second store."  The corresponding structure, the general synchronization module 425, is described in the specification:

> The general synchronization module 425 further includes . . . routines for performing an appropriate synchronizing responsive action. . . . Appropriate synchronizing responsive actions may include forwarding the modified version (as the preferred version) of a workspace element in workspace data 185 or forwarding just a compilation of the changes to the other store(s).

Claim Construction Order at 30 (quoting '192 patent, col. 5, ll. 55-65).  Sproqit does not challenge the comparison of the Accused Products with this claim element.

c.     Summary of Infringement Analysis: Sproqit Raises a Substantial Question as to Whether All the Claim Elements Read on the Accused Products

Sproqit has raised substantial questions as to whether the Accused Products make a "copy" of a "workspace element" in the handheld as required by the third element of Claim 10.  Visto therefore has not established that Sproqit's infringement defense "lacks substantial merit."  *Amazon.com*, 239 F.3d at 1350-51.

2.     Challenges to Validity

In determining the likelihood of success, the Court must also consider the likelihood of withstanding the opponent's challenges to the validity and enforceability of the patent.  "[I]n an invalidity analysis, the district court must assess the meaning of the prior art references cited to support the validity challenge."  *Amazon.com,* 239 F.3d  at 1358.  "Validity challenges during preliminary injunction proceedings can be successful, that is, they may raise substantial questions of invalidity, on evidence that would not suffice to support a judgment of invalidity at trial.  The test for invalidity at trial is by evidence that is clear and convincing. . . . In resisting a preliminary injunction, however, one need not make out a case of actual invalidity.  Vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial.  The showing of a substantial question as to invalidity thus requires less proof than the clear and convincing showing necessary to establish invalidity itself."  *Id.* at 1358-59 (citations omitted).

United States District Court

For the Northern District of California

1    "When moving for the extraordinary relief of a preliminary injunction, a patentee need not

2    establish the validity of a patent beyond question.  The patentee must, however, present a clear case

3    supporting the validity of the patent in suit.  Such a case might be supported, for example, by

4    showing that the patent in suit had successfully withstood previous validity challenges in other

5    proceedings.  Further support for such a clear case might come from a long period of industry

6    acquiescence in the patent's validity."  *Id.* at 1359 (citations omitted).  In *Amazon.com*, the Federal

7    Circuit found that Barnesandnoble.com had raised prior art references which taught key limitations

8    of the claims of the patent in suit and sufficiently cast enough doubt on the validity of the patent to

9    avoid a preliminary injunction, saving the final resolution of the validity issue for trial.  *Id.* at 1359-

10   60.

11                    a.       Obviousness Challenge

12           Sproqit contends that Claim 10 is made obvious by two separate prior art systems: the Coda

13   System and Lotus Notes.  Opp. at 11.   Visto conceded at oral argument that neither Coda nor Lotus

14   Notes had been considered by the PTO in issuing the original patent; they were considered only on

15   reexamination of the '192 Patent.  *See* Khaliq Reply Decl., Exh. E ('192 Patent Reexamination

16   Information Disclosure Statement).

17                    i.       Legal Standard for Obviousness

18           The statutory standard for determining obviousness provides that an invention is not

19   patentable "if the differences between the subject matter sought to be patented and the prior art are

20   such that the subject matter as a whole would have been obvious at the time the invention was made

21   to a person having ordinary skill in the art."  35 U.S.C. § 103(a) (2002).  "The ultimate

22   determination of whether an invention would have been obvious is a legal conclusion based on the

23   totality of the evidence, including underlying factual inquiries such as: (1) the scope and content of

24   the prior art; (2) the level of ordinary skill in the prior art; (3) the differences between the claimed

25   invention and the prior art; and (4) objective evidence of nonobviousness."  *Brown & Williamson*

26   *Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1124 (Fed. Cir. 2000) (citing *Graham v. John*

27   *Deere Co.*, 383 U.S. 1, 17-18 (1966)).  Relevant secondary indicators of nonobviousness include (1)

28

United States District Court

For the Northern District of California

1  commercial success; (2) long-felt but unresolved needs; (3) failure of others; and (4) skepticism

2  before the invention, copying, praise, unexpected results, and industry acceptance.  *Id.* at 1129.

3       "The consistent criterion for determination of obviousness is whether the prior art would

4  have suggested to one of ordinary skill in the art that this process should be carried out and would

5  have a reasonable likelihood of success, viewed in the light of the prior art."  *In re Dow Chem.*, 837

6  F.2d 469, 473 (Fed. Cir. 1988).  This standard consists of two requirements: (1) "a showing of a

7  suggestion, teaching, or motivation to combine the prior art references is an 'essential evidentiary

8  component of an obviousness holding.'  This evidence may flow from the prior art references

9  themselves, the knowledge of one of ordinary skill in the art, or, in some cases, from the nature of

10  the problem to be solved."  *Brown & Williamson*, 229 F.3d at 1124-25; (2) "The second requirement

11  is that the ultimate determination of obviousness 'does not require absolute predictability of success.

12  . . . All that is required is a reasonable expectation of success.'"  *Id.* at 1125 (quoting *In re*

13  *O'Farrell*, 853 F.2d 894, 903-904 (Fed. Cir. 1988).

14       Where, as here, the patent in suit has been reissued after consideration by the PTO of art not

15  considered during the original prosecution, "the presumption of validity [under 35 U.S.C. § 282]

16  remains intact, and the challenger's burden of proof imposed by that presumption, as an evidentiary

17  matter, is usually more difficult to sustain."  *Kaufman Co., Inc. v. Lantech, Inc.*, 807 F.2d 970, 973-

18  74 (Fed. Cir. 1986).  "[P]laintiff has the benefit of the deference due the patent office in defending

19  against the charge of invalidity."  *Mezzalingua Assoc. v. Arris International, Inc.*, 298 F. Supp.2d

20  813, 820 (W.D. Wisc. 2003).

21            ii.       Whether Claim 10 is Made Obvious by Coda

22       According to Sproqit's expert, "Coda discloses communicating via a firewall," namely, an

23  authentication server to ensure access to authorized personnel.  Weinstein Decl., ¶ 50 and Ex. B

24  (claim chart); Opp. at 12.  Visto responds that Coda does not teach a communications channel

25  through a firewall, distinguishing a "firewall" from Coda's use of authentication procedures for

26  validating the identity and access rights of an individual.  Reply at 8.

27       In addition to the firewall distinction, Visto finds other differences between Claim 10 and

28  Coda: (a) Claim 10 requires the use of an HTTP or SSL port for establishing a communications

United States District Court

For the Northern District of California

channel through a firewall; Head Reply Decl., ¶ 16; (b) Claim 10 requires the use of a smart phone, which were not in existence at the time Coda was developed; Head Reply Decl., ¶ 17; and (c) under Claim 10, synchronization is initiated from within a firewall, whereas in Coda, synchronization is always initiated by the client ("Venus" component); Head Reply Decl., ¶ 18.  With perhaps the exception the use of a smart phone which is arguably disclosed by Coda's system of handling disconnected operation with "powerful, lightweight and compact laptop computers," Weinstein Decl., ¶ 48 and Ex. D at 7, *id.* ¶¶ 48-49 (opining that person of ordinary skill in the art would understand Coda as disclosing use of a smart phone, similar to "powerful, lightweight and compact laptop computers" described in the Coda system), Sproqit has not shown that the Coda prior art "would have suggested to one of ordinary skill in the art that this process should be carried out and would have a reasonable likelihood of success." *In re Dow Chem.*, 837 F.2d at 473.  The differences appear substantial, and Sproqit has not rebutted the presumption that flows from the PTO's consideration of this prior art upon reexamination.

iii.   Whether Lotus Notes Renders Claim 10 Obvious

According to Sproqit and as summarized in Weinstein's second claim chart, Lotus Notes discloses a communications channel through a firewall using HTTP or SSL protocol and compares version information, as does Claim 10.  Weinstein Decl., ¶¶ 51-56 and Ex. C (claim chart); Opp. at 14.  In opposition, Visto contends that Lotus Notes is not designed to communicate over an HTTP (port 80) or SSL (port 443) port, using instead port 1352 which is a completely separate port, usually requiring changes to most corporate firewalls.  Reply at 9; Head Reply Decl., ¶ 20.  Visto also argues that Notes does not teach or suggest a "general synchronization module for operating within a first firewall," distinguishing Notes' uni-directional replication of documents from the bi-directional synchronization of workspace elements required by Claim 10.  Head Reply Decl., ¶ 21.  Visto further argues that Notes was never designed for smart phones, although Sproqit contends that a smart phone is essentially a portable computer, which Lotus Notes does use. *Compare* Head Reply Decl., ¶ 22 *with* Weinstein Decl., ¶ 56.  Finally, Visto argues that Notes does not have a "synchronization start module for operating within the first firewall," as required by Claim 10;

United States District Court

For the Northern District of California

1    rather, in Notes, replication between a client and server is always initiated by the client.  Head Reply

2    Decl., ¶ 23.

3          Except possibly as to use of smart phones, Visto has shown substantial differences between

4    the claimed invention and the prior art that defeat, on this record, Sproqit's claim of obviousness.

5    Given the PTO's consideration of Lotus Notes, the presumption of validity over that prior art

6    obtains.  Sproqit has not overcome that presumption on this record.

7                        iv.    Summary: Sproqit Has Not Raised a Substantial Question as to

8                               Obviousness

9          Given the presumption of validity where the prior art was considered by the PTO, Sproqit

10   has not raised a substantial question as to obviousness to rebut that presumption.[8]  *See ATD Corp. v.*

11   *Lydall, Inc.* 159 F.3d 534, 546 (Fed. Cir. 1998) ("Determination of obviousness can not be based on

12   the hindsight combination of components selectively culled from the prior art to fit the parameters of

13   the patented invention. There must be a teaching or suggestion within the prior art, or within the

14   general knowledge of a person of ordinary skill in the field of the invention, to look to particular

15   sources of information, to select particular elements, and to combine them in the way they were

16   combined by the inventor.")

17         3.     Intervening Rights Challenge

18         The Court must also consider whether Visto's infringement claim will likely withstand

19   Sproqit's intervening rights defense.  Sproqit argues that the doctrine of equitable intervening rights

20   permits the continued sale of its products which were developed after expending $8,000,000 in

21   investment and 60,000 to 80,000 man hours before Claim 10 was substantively changed during

22   reexamination.  Opp. at 16.  The doctrine of intervening rights is derived from 35 U.S.C. § 252[9] and

23

24   _____

25         [8]  At oral argument, Sproqit further asked the Court to consider whether Visto followed the
     PTO's regulations for citing prior art, contending that Visto did not properly cite the prior art.  Because
26   this argument had not been raised in the papers, the Court precluded argument on this challenge at the
     hearing on preliminary injunction since it had not been raised in Sproqit's opposition papers.  It was
27   raised for the first time at the hearing.

28         [9]  Section 252 provides as follows:

protects an accused infringer from liability for infringement occurring before the reexamined patent is issued.  It applies where the claim in question in the reissue patent is not substantially identical to the claim in the original patent, *i.e.*, the amendments make a substantive change to the claims. *Seattle Box Co. v. Industrial Crating & Packaging, Inc.*, 731 F.2d 818, 827-28 (Fed. Cir. 1984) ("*Seattle Box I*") (reversing judgment  for damages occurring before patent reissuance where claims in reissued patent were substantively different that those in the original patent).  "The accused infringer may raise the defense of intervening rights only when none of the infringed claims of the reissue patent were present in the original patent."  *BIC Leisure Products, Inc. v. Windsurfing Inter., Inc.*, 1 F.3d 1214, 1220 (Fed. Cir. 1993).

---

The surrender of the original patent shall take effect upon the issue of the reissued patent, and every reissued patent shall have the same effect and operation in law, on the trial of actions for causes thereafter arising, as if the same had been originally granted in such amended form, but in so far as the claims of the original and reissued patents are substantially identical, such surrender shall not affect any action then pending nor abate any cause of action then existing, and the reissued patent, to the extent that its claims are substantially identical with the original patent, shall constitute a continuation thereof and have effect continuously from the date of the original patent.

A reissued patent shall not abridge or affect the right of any person or that person's successors in business who, prior to the grant of a reissue, made, purchased, offered to sell, or used within the United States, or imported into the United States, anything patented by the reissued patent, to continue the use of, to offer to sell, or to sell to others to be used, offered for sale, or sold, the specific thing so made, purchased, offered for sale, used, or imported unless the making, using, offering for sale, or selling of such thing infringes a valid claim of the reissued patent which was in the original patent.  The court before which such matter is in question may provide for the continued manufacture, use, offer for sale, or sale of the thing made, purchased, offered for sale, used, or imported as specified, or for the manufacture, use, offer for sale, or sale in the United States of which substantial preparation was made before the grant of the reissue, and the court may also provide for the continued practice of any process patented by the reissue that is practiced, or for the practice of which substantial preparation was made, before the grant of the reissue, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced before the grant of the reissue.

35 U.S.C. § 252 (1999).

United States District Court

For the Northern District of California

Section 252 provides for two separate and distinct defenses under the doctrine of intervening rights: "absolute" intervening rights and "equitable" intervening rights.  Absolute intervening rights provide "an accused infringer with the absolute right to use or sell a product that was made, used, or purchased before the grant of the reissue patent as long as this activity does not infringe a claim of the reissue patent that was in the original patent." *Id.* at 1220-21.  "This absolute right extends only to anything made, purchased, or used before the grant of the reissue patent.  In other words, it covers products already made at the time of reissue." *Id.* at 1221.

The broader doctrine of equitable intervening rights "permits the continued manufacture, use, or sale of additional products covered by the reissue patent when the defendant made, purchased, or used identical products, or made substantial preparations to make, use, or sell identical products, before the reissue date." *Id.* at 1221.  The relevant statutory provision states that "[t]he court ... *may* provide for the continued manufacture, use or sale ... *to the extent and under such terms as the court deems equitable* for the protection of investments made or business commenced...." 35 U.S.C. § 252, ¶ 2, 2nd sentence (emphasis added).  This language permits the Court to protect investments made before reissue, "as dictated by the equities." *BIC Leisure Products*, 1 F.3d at 1221.

Of the two types of intervening rights - absolute and equitable - only equitable intervening rights are at issue here.  Sproqit is not seeking to continue selling accused products made before the change.  Rather, it seeks to defeat an injunction against future sales based on equitable considerations.  "When the doctrine of intervening rights is properly raised, the court must consider whether to use its broad equity powers to fashion an appropriate remedy." *Seattle Box I*, 731 F.2d at 830 (citing 35 U.S.C. § 252, ¶ 2).  Upon weighing the equities of intervening rights, the Court may consider various factors: (1) whether "substantial preparation" was made by the infringer before the reissue; (2) whether the infringer continued manufacturing before reissue on advice of its patent counsel; (3) whether there were existing orders or contracts; (4) whether non-infringing goods can be manufactured from the inventory used to manufacture the infringing product and the cost of conversion; (5) whether there is a long period of sales and operations before the patent reissued from which no damages can be assessed; and (6) whether the infringer has made profits sufficient to recoup its investment. *See Seattle Box Co. v. Industrial Crating & Packing, Inc.*, 756 F.2d 1574,

United States District Court

For the Northern District of California

1    1579 (Fed. Cir. 1985) ("*Seattle Box II*"); *Plastic Container Corp. v. Continental Plastics*, 607 F.2d

2    885, 903 (10th Cir. 1979) ; *Mine Safety Appliances Co. v. Becton Dickinson and Co.*, 744 F. Supp.

3    578, 580-81 (S.D.N.Y. 1990) (on cross-motions for summary judgment, requiring alleged infringer

4    to pay royalties for units sold after reissue date and protecting intervening rights by allowing it to

5    continue it product line); *Wayne-Gossard Corp. v. Sondra, Inc.*, 434 F. Supp. 1340, 1363 (E.D. Pa.

6    1977), *aff'd*, 579 F.2d 41 (3d Cir. 1978).

7         In support of its intervening rights defense, Sproqit contends that in about June 2003, it

8    evaluated the '192 Patent as originally issued and determined that it was invalid and would not be

9    infringed by Sproqit's developing technology because its technology was different from Visto's.

10   Mansour Decl., ¶ 7-11; Roitblat Decl. ¶ 3.  Sproqit states that it relied on the scope of the '192

11   Patent claims and invested about $8,000,000 and 60,000 to 80,000 man hours developing its

12   technology for Sproqit Personal Edition and Sproqit Work Group Edition.  Mansour Decl., ¶ 16.

13        Sproqit further argues that during reexamination, the PTO concluded that Claim 10 of the

14   '192 Patent as originally issued was invalid.  Opp. at 16; Head Decl., Ex. D (Office Action of Feb. 7,

15   2005).  Visto does not dispute that it amended Claim 10 upon reexamination.  *See* Reply at 10 n.10

16   (referring to amendment to Claim 10).  Sproqit contends, and Visto does not dispute, that the

17   amendments to Claim 10 are substantive and significantly alter the scope of the claim as originally

18   issued.  Opp. at 17.  For example, Visto amended Claim 10 to include the limitations of "a

19   communications channel through a firewall comprising one of an HTTP port and an SSL port" and a

20   "smart phone," neither of which were contained in the original patent claims.  Reply at 10 n.10.

21        Visto argues that notwithstanding the amendment of Claim 10, Sproqit fails to meet the

22   factors necessary to establish equitable intervening rights.  The Court agrees and finds Sproqit has

23   not raised a substantial question on the merits of the equitable intervening rights defense for several

24   reasons.

25        First, there is scant evidence that Sproqit engaged in any substantial preparation in deciding

26   to go forward in the face of the '192 Patent.  Other than its CEO, Mansour's and CTO Roitblat's

27   declarations, Sproqit does not cite to evidence of its invalidity analysis, such as advice of patent

28   counsel or prior art.  They merely state they had concluded all claims of the '192 patent were invalid

**United States District Court**
For the Northern District of California

as claiming techniques that used old art or obvious combinations of old techniques.  Mansour Decl., ¶ 11; Roitblat Decl., ¶ 3.  Their self-serving declarations contain no substantive analysis.  In fact, Mansour's assumption that "all" the claims were invalid was not necessarily born out.  Visto contends other '192 claims (such as claims 6-8) were not substantially amended in the reexamination.  *See* Reply Brief, ¶¶ 10-11.  Nor are the declarations corroborated by any document or other recorded evidence.

The only written evidence submitted to the Court is an e-mail in which Mansour states he considered the Sproqit architecture different than the '192 Patent.  That contention does not address validity of the '192 Patent.  Although Claim 10 was amended during the PTO reexamination, Sproqit has not argued that those amendments materially affect the infringement analysis as applied to Sproqit's accused product.  Hence, it is difficult to discern any reliance interest with respect to Mansour's infringement analysis.

Sproqit has not produced any evidence on the other *Seattle Box* factors except one:  that it spent $8,000,000 and significant man hours in developing the technology for the Sproqit products.  But given the lack of any proof that Sproqit exercised greater diligence in obtaining assurance of the legality of its technology, the factor should be accorded limited weight.

The totality of the *Seattle Box* factors as applied to the present record weighs significantly against Sproqit.  The Court concludes Sproqit has not raised a substantial question on the intervening rights defense.

C.      Irreparable Harm

The second factor Visto must establish on its motion for preliminary injunction is that it will suffer irreparable harm if the preliminary injunction is not granted.  Visto would be entitled to a rebuttable presumption of irreparable harm upon establishing a "strong showing of likelihood of success on the merits coupled with continuing infringement."  *Reebok*, 32 F.3d at 1556.  "This presumption derives in part from the finite term of the patent grant, for patent expiration is not suspended during litigation, and the passage of time can work irremediable harm.  The opportunity to practice an invention during the notoriously lengthy course of patent litigation may itself tempt infringers."  *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 389 (Fed. Cir. 1987)

United States District Court

For the Northern District of California

1    (affirming grant of preliminary injunction).  "The nature of the patent grant thus weighs against

2    holding that monetary damages will always suffice to make the patentee whole, for the principal

3    value of a patent is its statutory right to exclude." *Id.* at 390.  Factors to consider on the issue of

4    irreparable harm include any delay by the patent holder in seeking injunctive relief, and the

5    effectiveness of money damages to compensate a party for market loss. *Nutrition 21 v. U.S.*, 930

6    F.2d 867, 871 (Fed. Cir. 1991).

7         To rebut the presumption of injury, the infringer must show clear evidence that the injury is

8    not irreparable. *H.H. Robertson*, 820 F.2d at 390.  In *Reebok*, for example, the alleged infringer

9    established that Reebok no longer produced the SHAQ I model shoe protected by the patent at issue,

10   and that the shoe was no longer carried in stores.

11        In the case at bar, for the reasons stated above, Visto has not established a "strong showing"

12   of likelihood of success on the merits." *Reebok*, 32 F.3d at 1556.  Sproqit has raised a substantial

13   question on the issue of infringement.  Thus, no presumption of irreparable injury obtains.

14        Loss of sales alone does not in and of itself constitute irreparable harm. *Reebok*, 32 F.3d at

15   1552.  Nonetheless, given the ever-changing nature of the market for wireless technology, Visto

16   argues with some force that it will suffer irreparable harm should a preliminary injunction be denied.

17   *See John Mezzalingua Assoc. v. Arris Intern., Inc.*, 298 F. Supp. 2d 813, 821 (W.D. Wisc. 2003)

18   (granting motion for preliminary injunction).  "Money damages are not sufficient because of the

19   difficulty of determining not just the lost sales over the next few months before this case is resolved

20   but determining the economic effect of breaking into new markets." *Id.*  Here, Visto claims that

21   Sproqit currently markets two infringing products (Sproqit Personal Edition and Sproqit WorkGroup

22   Edition) that compete with Visto's products, and that each Sproqit sale diverts sales from Visto in a

23   market with rapid changes in technology.  Mot. at 20.  It contends the nature of this business is such

24   that it if loses a customer to Sproqit, it will be difficult to convert that customer given the linkage of

25   products and services potentially involved.  Visto also argues that its patent rights are not

26   sufficiently protected by monetary damages if Sproqit is allowed to continue selling infringing

27   products until the case is tried.  Mot. at 22.  Trial is not set until May 7, 2007.

28

1    However, Visto's showing of irreparable harm, which is not presumed given its showing on

2    the merits, is not particularly compelling.  Sproqit contends that its small operations do not pose a

3    threat to Visto.  Sproqit's primary customer for Personal Edition is Bell Mobility in Canada, which

4    generates about $3,000 in revenue.  Sproqit's marketing efforts for Work Group Edition in the

5    United States are limited and only a few customers have purchased that product.  Opp. at 20-21.

6    Moreover, in at least one other infringement lawsuit brought to vindicate the patent in suit, Visto has

7    settled with the defendant for terms which include a royalty-bearing license.  Sankaran Decl., Exh.

8    A.  But given the direct competition posed by Sproqit and others, the rapidly changing nature of the

9    technology and market, and the structure of the industry where sales could establish long-term

10   relationships, the Court concludes Visto has established irreparable harm for purposes of preliminary

11   injunction.

12   D.    Balance of Hardships

13   The third factor the Court must consider is the balance of (1) the harm that will occur to the

14   moving party from the denial of the preliminary injunction with (2) the harm that the non-moving

15   party will incur if the injunction is granted.  *Hybritech v Abbott Laboratories*, 849 F.2d 1446, 1457

16   (Fed. Cir. 1988).  The balance must be examined even where irreparable injury is established.  *H.H.*

17   *Robertson*, 820 F.2d at 391.  In particular, the Court must balance, on the one hand, the harm to the

18   patent holder from the denial of an injunction wherein the defendant will be able to continue to

19   exploit its infringing products and obtain business that might have gone to the patent holder, and, on

20   the other, defendant's inability to market a product which it contends is non-infringing and desirable

21   to customers.  *See Mezzalingua*, 298 F. Supp. 2d at 821 (finding that neither party had a clear

22   advantage in the balance of hardships, but enjoining defendant based on findings on other three

23   factors).  *See also PPG Industries, Inc. v. Guardian Industries Corp.*, 75 F.3d 1558, 1567 (Fed. Cir.

24   1996) (affirming preliminary injunction where district court concluded that plaintiff "would suffer

25   significant harm from the denial of an injunction, while an injunction would be less burdensome for

26   Guardian, as it would require only a temporary interruption in Guardian's production and sale" of its

27   product).

28

United States District Court
For the Northern District of California

1   Visto contends that denial of an injunction would result in loss of good will and potential

2   revenue to Visto, and would permit Sproqit to continue conducting business around the infringement

3   of Visto's technology.  Mot. at 22-23.  It cites the irreparable injury discussed above.

4   Sproqit argues, on the other hand, that an injunction would have a devastating impact on its

5   business and would essentially shut down operations in the United States.  In contrast, its relatively

6   small sales do not threaten Visto.

7   The Court finds that the balance of hardships tips in favor of Sproqit, and disfavors a

8   preliminary injunction.  While Visto might suffer irreparable injury should the injunction be denied,

9   as noted above, its showing was not compelling.  While Sproqit competes directly, it does not at this

10   point have a significant market share.  *Cf. Hybritech*, 849 F.2d at 1456 (Defendant "has a very large

11   presence in this field.").  Indeed, according to Sproqit's evidence, its market share appears rather

12   meager.  Its primary customer is in Canada and generates only $3,000 in revenue.  Conversely, Visto

13   has not produced any evidence that currently it is suffering any significant financial impact resulting

14   from the sales of Sproqit's accused products.  As noted above, there is evidence that Visto has

15   granted a royalty-bearing license to another company.  The harms Visto points to in order to

16   establish irreparable harm appear more theoretical or potential than actual or proven at this point.  In

17   contrast, neither parties appear to dispute that issuance of the preliminary injunction would devastate

18   Sproqit's business.

19   Although "small parties have no special right to infringe patents simply because they are

20   small," *Bell & Howell Document Management Products, Co. v. Altek Systems*, 132 F.3d 701, 708

21   (Fed. Cir. 1997), the fact that Visto "would sustain only minimal damage if a preliminary injunction

22   did not issue, and that [Sproqit] would be put out of business if a preliminary injunction did issue" is

23   a "proper factor to be considered." *Id.*

24   The balance of hardships tips in Sproqit's favor.

25   E.   Public Interest

26   The fourth factor to consider is the impact of the injunction on the public interest; that is,

27   whether there exists some critical public interest that would be injured by the grant of preliminary

28   relief.  *Hybritech*, 849 F.2d at 1458.  This factor balances the deprivation to the public by the

United States District Court

For the Northern District of California

1  unavailability of the accused products against "the strong public policy favoring the enforcement of

2  patent rights."  *See PPG*, 75 F.3d at 1568.  Sproqit argues that any injunction would prevent Sproqit

3  from serving its customers, which notably include the Seattle firefighters, and would interfere with

4  their public service if Sproqit could not continue operating its business.  Opp. at 21.  *See Hybritech*,

5  849 F.2d at 1458 (affirming preliminary injunctive order which excluded cancer and hepatitis test

6  kits from injunction).  However, Sproqit has not shown with any particularity what impact of a

7  preliminary injunction would have on that department and its ability to protect public health and

8  safety.

9          The Court concludes this factor does not weigh strongly in favor of either party.

10 F.     Summary

11         Based on Visto's inability to demonstrate a substantial likelihood of success on the merits,

12 the fact that Visto's showing of irreparable injury is not particularly compelling, the fact that the

13 balance of hardships tips in Sproqit's favor, and the relative neutrality of the public interest factor,

14 the Court denies Visto's request for preliminary injunction.[10]

15                           **III.  VISTO'S OBJECTIONS**

16         The parties did not conduct discovery prior to Visto's filing of the motion for preliminary

17 injunction on November 22, 2005.  On January 5, 2006, Visto counsel contacted Sproqit counsel to

18 set dates for depositions of Sproqit's employees Mansour and Roitblat and third party expert

19 Weinstein, asking for dates before the motion hearing on January 18.  Sproqit declined Visto's

20 proposal, and Visto noticed the depositions for Jan. 13 (giving 7 days notice), with accompanying

21 subpoena for Weinstein.  On January 12, 2006, Sproqit notified Visto that its employees would not

22 appear for the depositions and filed a motion for protective order.

23         Visto argues that because Mansour and Roitblat were not made available for deposition,

24 Sproqit should not be permitted to rely on Mansour and Roitblat's declarations in opposition to the

25

26         [10]  The Court notes that the inability of Visto to establish a likelihood of success on the merits
    alone could constitute grounds for denying a preliminary injunction without regard to the other three
27  factors.  *See Helifix Ltd. v. Blok-Lok Ltd.*, 208 F.3d 1339, 1351-1352 (Fed. Cir. 2000).  *Helifix*, however,
    appears inconsistent with *Amazon.com*'s directive that the four factors "taken individually, are not
28  dispositive" and must be weighed against each other.  *Amazon.com*, 239 F.3d at 1350.  Given the
    apparent ambiguity left by *Helifix* and *Amazon.com* on this point, the Court has analyzed all the factors.

**United States District Court**
For the Northern District of California

1  motion for preliminary injunction.  Visto Corp.'s Objection to Decl. of Peter Mansour and Barry

2  Roitblat at 4 (filed 1/13/06).  Sproqit argues that Visto refused to continue the hearing date on its

3  motion for preliminary injunction to give both parties time to conduct some discovery, and should

4  not be permitted to conduct unilateral expedited discovery in advance of that hearing.  Sproqit's

5  Mot. for Prot. Order at 4.

6        At the hearing on the motion for preliminary injunction, Visto conceded that it would not

7  pursue expedited discovery in advance of the Court's ruling on the motion, and that it would rely on

8  its papers in support of the motion.  Both parties were prepared to submit on the papers.  Sproqit has

9  withdrawn its motion for a protective order (Docket No. 121).  The Court OVERRULES the

10  objections to the Mansour and Roitblat declarations (Docket No. 124).  This does not necessarily

11  preclude discovery from now moving forward as a matter of course.

12        The hearing on Sproqit's motion for a protective order set for February 22, 2006 is hereby

13  VACATED.

14                            **IV.   CONCLUSION**

15  Visto's motion for preliminary injunction is DENIED.

16  This order disposes of Docket Nos. 97 and 124.

17

18        IT IS SO ORDERED.

19

20  Dated:  February 7, 2006

21                                                    _____

22                                                    EDWARD M. CHEN
                                                      United States Magistrate Judge

23

24

25

26

27

28