**MANATT, PHELPS & PHILLIPS, LLP**
RONALD S. KATZ (State Bar No. 85713)
ROBERT D. BECKER (State Bar No. 160648)
GREG T. WARDER (State Bar No. 209966)
1001 Page Mill Road, Building 2
Palo Alto, CA  94304-1006
Telephone:     (650) 812-1300
Facsimile:      (650) 213-0260

*Attorneys for Plaintiff*
VISTO CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT

SAN FRANCISCO DIVISION

| | |
|---|---|
| VISTO CORPORATION, | Case No.  C 04-0651 EMC |
| Plaintiff, | **PLAINTIFF VISTO CORPORATION'S OPENING CLAIM CONSTRUCTION BRIEF UNDER P.R. 4-5(a)** |
| v. | |
| SPROQIT TECHNOLOGIES, INC., | |
| Defendant. | |

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20158204.3

OPENING CLAIM CONSTRUCTION BRIEF OF
PLAINTIFF VISTO CORPORATION
CASE NO. C 04-0651 EMC

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 2

II. BACKGROUND OF THE INVENTIONS ......................................................... 2

III. LEGAL STANDARD ON CLAIM CONSTRUCTION ...................................... 4

IV. DISCUSSION ..................................................................................................... 4

V. VISTO'S PROPOSED CONSTRUCTIONS ....................................................... 8

    A. "independently modifiable copy of the first workspace element" ('131 claims 1, 31-33, 35 and 36; '192 claims 1, 6-8, 10, 11 and 22; '708 claims 1 and 17)....................................................................................................... 8

        1. "independently modifiable copy" ............................................ 8

        2. "workspace element" ............................................................. 10

    B. Version information ('131 claims 1, 16, 31-33, 35 and 36; '192 claims 1, 6-8, 10, 11 and 22)...................................................................................... 11

    C. Examination results ('131 claims 1, 16, 31-33, 35 & 36; '192 claims 1, 6-8 & 22) ............................................................................................................ 13

    D. Generating second examination results from second version information ('192 claims 1, 6, 7, 8 and 22) ...................................................................... 14

    E. Initiating steps ___ and ___ from within the firewall ('192 claims 1, 6, 7, 8 and 22)....................................................................................................... 14

    F. First format/second format ('708 claims 1 & 17) ................................. 17

    G. Global server ('221 claims 1, 4, 6 & 8)................................................... 17

VI. PROPOSED CONSTRUCTION OF MEANS-PLUS-FUNCTION ELEMENTS............ 19

    A. Means for Generating a Preferred Version ('192 claims 10 & 11)....................... 19

    B. Synchronization Means for Synchronizing ('708 claim 1) ................................... 19

    C. Means for translating ('708 claim 33)................................................................... 20

VII. CONCLUSION................................................................................................... 20

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20158204.3

i

OPENING CLAIM CONSTRUCTION BRIEF OF
PLAINTIFF VISTO CORPORATION
CASE NO. C 04-0651 EMC

# TABLE OF AUTHORITIES

**Page**

## CASES

*AbTox, Inc. v. Exitron Corp.*,
122 F.3d 1019 (Fed. Cir. 1997),
*as modified on reh'g*, 131 F.3d 1009 (Fed. Cir. 1997) .............................................................. 7

*Amtel Corp. v. Silicon Storage Tech., Inc.*,
2001 U.S. Dist. LEXIS 25641 (N.D. Cal. 2001) ......................................................................... 5

*Arthur A. Collins, Inc. v. Northern Telecom Ltd.*,
216 F.3d 1042 (Fed. Cir. 2000) ................................................................................................... 7

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*,
334 F.3d 1294 (Fed. Cir. 2003) ................................................................................................. 15

*Electro Medical Sys., S.A. v. Cooper Life Sciences*,
34 F.3d 1048 (Fed. Cir. 1994) ..................................................................................................... 6

*Fin Control Sys. Pty, Ltd. v. OAM, Inc.*,
265 F.3d 1311 (Fed. Cir. 2001) ................................................................................................... 7

*Fuji Photo Film Co. v. ITC*,
386 F.3d 1095 (Fed. Cir. 2004) ................................................................................................... 7

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*,
381 F.3d 1111 (Fed. Cir. 2004) ................................................................................................... 8

*KX Indus., L.P., v. PUR Water Purification Prods., Inc.*,
108 F.Supp. 2d 380 (D. Del. 2000) ............................................................................................. 5

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) ................................................................................................... 13

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) (en banc),
*aff'd*, 517 U.S. 370 (1996) ..................................................................................................... 4, 5

*Mars, Inc. v. H.J. Heinz Co., L.P.*,
377 F.3d 1369 (Fed. Cir. 2004) ............................................................................................. 6, 14

*Natl. Instruments Corp. v. The Mathworks, Inc.*,
2002 U.S. Dist. LEXIS 27577 at 27 (E.D. Tex. 2002) ............................................................. 19

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ................................................................................................... 4

*Raytheon Co. v. McData Corp.*,
2004 WL 952284, 11 (E.D. Tex. 2004) ............................................................................. 6, 7, 14

*Rexnord Corp. v. Laitram Corp.*,
274 F.3d 1336 (Fed. Cir. 2001) ................................................................................................... 7

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
299 F.3d 1313 (Fed. Cir. 2002) ............................................................................................. 6, 11

*Texas Digital Systems Inc. v. Telegenix Inc.*,
308 F.3d 1193 (Fed. Cir. 2002) ................................................................................................. 6, 7

*Transmatic, Inc. v. Gulton Indus., Inc.*,
53 F.3d 1270, 35 U.S.P.Q.2D (BNA) 1035 (Fed. Cir. 1995) ................................................... 18

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20158204.3

ii

OPENING CLAIM CONSTRUCTION BRIEF OF
PLAINTIFF VISTO CORPORATION
CASE NO. C 04-0651 EMC

**TABLE OF AUTHORITIES**
(continued)

Page

*United States Surgical Corp. v. Ethicon, Inc.*,
   103 F.3d 1554 (Fed. Cir. 1997) .................................................................. 8

*Verizon Cal. Inc. v. Ronald A. Katz Tech. Licensing, L.P.*,
   326 F. Supp. 2d 1060 (C.D. Cal. 2003) .................................................... 5

*Vitronics v. Conceptrinic*,
   90 F.3d 1576 (Fed. Cir. 1996) ...................................................... 4, 11, 15

*Zoltar Satellite Sys., Inc.*,
   402 F.Supp.2d 731 (E.D. Tex. 2005) ........................................................ 5

**STATUTES**

35 U.S.C. § 112 (6) ...................................................................................... 19

Patent Rule 4-5(a) ......................................................................................... 2

**OTHER AUTHORITIES**

*Dictionary of Computer and Internet Terms, Sixth Edition* ........................ 17

*Merriam-Webster's Dictionary* .......................................... 8, 9, 10, 12, 13, 14

*The Microsoft Computer Dictionary* (3rd Ed., 1997) ......................... 15, 18

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20158204.3

iii

OPENING CLAIM CONSTRUCTION BRIEF OF
PLAINTIFF VISTO CORPORATION
CASE NO. C 04-0651 EMC

1    Plaintiff Visto Corporation ("Visto") respectfully submits its Opening Claim Construction

2    Brief pursuant to Patent Rule 4-5(a) of the Rules of Practice for Patent Cases before the

3    Honorable Edward M. Chen, United States District Court for the Northern District of California.

4    **I.      INTRODUCTION**

5        The present action is brought by Visto against defendant Sproqit Technologies, Inc.

6    ("Sproqit") for infringement of U.S. Patent Nos. 5,968,131 ("the '131 patent"), 6,023,708 ("the

7    '708 patent"), 6,085,192 ("the '192 patent") and 6,708,221 ("the '221 patent") (Collectively

8    referred to as "the patents in suit").  [Attached as Exhibits A-D, respectively, to the Declaration of

9    Imran A. Khaliq In Support of Visto's Opening Claim Construction Brief Under P.R. 4-5(a)

10   ("Khaliq Decl.")].

11       On April 12, 2006, the parties submitted a Joint Claim Construction and Prehearing

12   Statement ("Joint Statement") in accordance with Patent Rule 4-3.  The parties subsequently filed

13   a Supplemental Joint Statement on May 8, 2006, which, pursuant to the Court's instruction,

14   included ten disputed claim terms and phrases to be considered for claim construction.  Visto

15   respectfully submits this brief in support of its construction of the disputed claim terms and

16   phrases.  To the extent that the Court wishes to construe any other terms, Visto incorporates by

17   reference the Joint Claim Construction and Prehearing Statement filed with the Court on April 12,

18   2006.  *See* Docket No. 143.

19   **II.     BACKGROUND OF THE INVENTIONS**

20       At issue in this case is the technology that enables secure mobile access to business

21   information, now becoming pervasive with the widespread adoption of wireless computing

22   devices such as the BlackBerry®, Palm Pilot®, Pocket PC®, and Treo®, among others ("smart

23   phones").  When the inventions of the patents-in-suit were made roughly ten years ago, the

24   Internet as we know it today was in its infancy.  At that time, local area networks ("LANs") had

25   been developed, as had the capability for personal computer users to browse sites on the Internet

26   and communicate via the Internet with e-mail.  But there were serious impediments to what are

27   now commonplace tasks, such as using smart phones to view and revise email, contacts,

28   calendars, files, and the like ("workspace data").

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20158204.3                                    2                    OPENING CLAIM CONSTRUCTION BRIEF OF
                                                                  PLAINTIFF VISTO CORPORATION
                                                                  CASE NO. C 04-0651 EMC

1    One of the main impediments to such remote access was that most corporate networks had

2    firewalls, which are security systems designed to prevent unauthorized access.  Firewalls

3    typically operate by permitting only specified communications determined by security policies,

4    such as permitting only outbound communications initiated inside the firewall and incoming

5    traffic that has advance authorization.  Communications passing through a firewall use a "port"

6    for communicating between a program inside the firewall and another communications systems

7    or programs outside the firewall.  For Internet traffic, firewalls typically include one or more

8    normally open ports specified to pass messages using the Hyper Text Transfer Protocol

9    ("HTTP"), which is the standard protocol for Internet web communications.

10    In 1996, in fact, enabling remote access to workspace data for smart phones and other

11    remote devices was a very difficult problem.  [*See* Declaration of Sabin Head in Support of

12    Visto's Motion for Preliminary Injunction ("Head Decl.") ¶ 10].  It is generally preferred to

13    minimize the opening of ports in firewalls to reduce security risks.  For this reason, LAN

14    administrators are extremely reluctant to adopt software that requires the opening of additional

15    firewall ports.

16    Plaintiff Visto Corporation ("Visto") developed solutions that overcome these and other

17    impediments and enable the tremendous expansion of wireless business communications seen

18    today.  Visto's inventions are described and claimed in a number of issued and pending U.S.

19    patents that cover technological innovations that others in the industry, including Defendant

20    Sproqit Technologies, Inc. ("Sproqit"), have been quick to imitate.

21    At the heart of Visto's inventions is the use of the normally open HTTP and secure HTTP

22    (a.k.a. HTTPS) firewall ports to communicate with servers and devices outside the firewall,

23    thereby avoiding the need to open additional firewall ports with the attendant security risks.  In

24    one embodiment of the invention, a global server, which may be located within a wireless

25    carrier's infrastructure, stores portions of workspace data and enables communication between

26    the firewall-protected LAN and trusted remote clients such as smart phones.

27    Events such as the arrival of new email at the LAN or the updating of a calendar

28    appointment on a remote client are securely and automatically synchronized to each connected

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20158204.3

3

OPENING CLAIM CONSTRUCTION BRIEF OF
PLAINTIFF VISTO CORPORATION
CASE NO. C 04-0651 EMC

device so that users are always presented with the most up-to-date information regardless of which device is used.  The result is a safe and secure solution for remote access to workspace data.

## III.   LEGAL STANDARD ON CLAIM CONSTRUCTION

Issues regarding claim construction, *i.e.,* the interpretation of claim terms, is a legal issue to be decided by a district court.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).  Claim terms are given their ordinary and customary meaning to one of ordinary skill in the art at the time of the invention.  *Id.* at 1312-1313.  Claim construction is supported by the intrinsic evidence, viz., the patents' specification and file history.  *Id.* at 1315-1317.  When construing a claim, a court should look first to the intrinsic evidence, *i.e.*, the claims themselves, the written description portion of the specification, and the prosecution history if in evidence. *Vitronics v. Conceptrinic*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996)).  Courts may also rely on extrinsic evidence such as dictionary definitions and treatises to aid the court in determining the ordinary and customary meaning of claim terms.  *Phillips*, 415 F.3d 1303 at 1318.  In particular, "technical dictionaries may allow a court 'to better understand the underlying technology' and the way in which one of skill in the art might use the claim terms."  *Id.* at 1318, *citing Vitronics*, 90 F.3d at 1584 n.6.

## IV.   DISCUSSION

The claim terms of the patents-in-suit were previously construed in prior litigation in the Eastern District of Texas.  [Khaliq Decl., Exh. E, Claim Construction Order issued April 20, 2005 in *Visto Corp. v. Seven Networks, Inc.*, Civil Action No. 2:03-CV-333 (TJW) ("Judge Ward's Claim Construction Order")].  Although Judge Ward's Claim Construction Order is not binding in this action because Sproqit was not a party in the other case, it addresses the identical issues of claim construction presented here and can be viewed as "persuasive and highly relevant authority."  *Verizon Cal. Inc. v. Ronald A. Katz Tech. Licensing, L.P.*, 326 F. Supp. 2d 1060, 1069

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20158204.3

4

OPENING CLAIM CONSTRUCTION BRIEF OF
PLAINTIFF VISTO CORPORATION
CASE NO. C 04-0651 EMC

(C.D. Cal. 2003).

In *Markman v. Westview Instruments, Inc.,* 517 U.S. 370 (1996), the United States Supreme Court noted that *stare decisis* favors promoting uniformity in claim construction. Even though a court's previous claim construction order does not necessarily collaterally estop a new defendant on issues of claim construction, courts have frequently deferred to a previous claim construction determination if new evidence has not been presented by the defendant. *See KX Indus., L.P., v. PUR Water Purification Prods., Inc.,* 108 F.Supp. 2d 380, 387 (D. Del. 2000)("While the court's previous opinion does not have issue preclusive effect against [Defendant] in this case, to the extent the parties do not raise new arguments, the court will defer to its previous construction of the claims.")

Adopting a prior Claim Construction Order is supported by the interest of maintaining consistency between copending actions, and promotes judicial efficiency. *See, e.g. Zoltar Satellite Sys., Inc.*, 402 F.Supp.2d 731, 737 (E.D. Tex. 2005)("inconsistent claim constructions of the same claims by different courts can create serious problems. ... These problems especially deserve consideration when the same patent is simultaneously being litigated in another district."). *See also*, *Amtel Corp. v. Silicon Storage Tech., Inc.*, 2001 U.S. Dist. LEXIS 25641 (N.D. Cal. 2001)(Court adopted previous claim construction from plaintiff's lawsuit against another party).

Aside from clarifying Judge Ward's construction of the claim term "firewall" to include the more complete definition adopted during the Motion for Preliminary Injunction, Visto respectfully submits that the relevant claim terms are properly construed in Judge Ward's Claim Construction Order and requests that this Court adopt the same to avoid unnecessary use of judicial and party resources. Both the parties and this Court adopted the prior constructions for purposes of Visto's Motion for Preliminary Injunction. Accordingly, Visto takes the position that the definition of any terms and phrases previously construed by the Texas court should be adopted in the present action.

Turning to Sproqit's proposed constructions, many of its definitions include system features or elements that are not recited in the claims, but are instead drawn from exemplary

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20158204.3

5

OPENING CLAIM CONSTRUCTION BRIEF OF
PLAINTIFF VISTO CORPORATION
CASE NO. C 04-0651 EMC

1   embodiments in the specification.  It is well settled, however, that "claims are not to be

2   interpreted by adding limitations appearing only in the specification." *Electro Medical Sys., S.A.*

3   *v. Cooper Life Sciences*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).  Rather, "[c]laim terms take on

4   their ordinary and accustomed meanings unless the patentee demonstrated an intent to deviate

5   from the ordinary and accustomed meaning of a claim term by redefining the term or by

6   characterizing the invention in the intrinsic record using words or expressions of manifest

7   exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa*

8   *N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002).  In the present situation, the intrinsic

9   evidence shows that there has been no clear disavowal of claim scope, and the terms and phrases

10  should be accorded their <u>full range</u> of ordinary meaning as understood by one of ordinary skill in

11  the art.  *Texas Digital Systems Inc. v. Telegenix Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002)).

12          As one example, Sproqit's definitions suggest that when a term or phrase is denoted as

13  "first" or "second," this label imparts distinct structural or functional limitations described in the

14  specification with respect to the exemplary embodiments.  Again, "[u]nless there is an express

15  intent to impart a novel meaning to the claim terms, the words of the claim are presumed to take

16  on the ordinary and customary meanings attributed to them by those of ordinary skill in the art."

17  *Mars, Inc. v. H.J. Heinz Co., L.P.*, 377 F.3d 1369, 1373 (Fed. Cir. 2004) (citations omitted).  The

18  intrinsic evidence shows that the terms "first" and "second" are merely used as labels to designate

19  common terms within a claim, and that there is no express intent to impart a novel meaning.  As

20  such, it is improper to read additional limitations into the claims by way of these terms, and it is

21  unnecessary to provide separate constructions of a term or phrase for both "first" and "second"

22  occurrences.  *See e.g., Raytheon Co. v. McData Corp.*, 2004 WL 952284, 11 (E.D. Tex. 2004)

23  ("The Court believes that only the term "signal" need be construed and that from that construction

24  the jury will be able to determine the meaning of 'first signal,' 'second signal,' 'first command

25  signal,' and 'second command signal.'")

26          Sproqit similarly argues that when the same terms and phrases are recited in different

27  claims or among different patents-in-suit that they should be construed to have different

28  definitions.  Again this is contrary to established law.  *See Fin Control Sys. Pty, Ltd. v. OAM,*

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Palo Alto

20158204.3                                    6                  OPENING CLAIM CONSTRUCTION BRIEF OF
                                                                PLAINTIFF VISTO CORPORATION
                                                                CASE NO. C 04-0651 EMC

1   *Inc.*, 265 F.3d 1311, 1318 (Fed. Cir. 2001)("First, we begin with the presumption that the same

2   terms appearing in different portions of the claims should be given the same meaning unless it is

3   clear from the specification and prosecution history that the terms have different meanings at

4   different portions of the claims."); *see also Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342

5   (Fed. Cir. 2001)("[A] claim term should be construed consistently with its appearance in other

6   places in the same claim or in other claims of the same patent."); *see also AbTox, Inc. v. Exitron*

7   *Corp.,* 122 F.3d 1019 (Fed. Cir. 1997), *as modified on reh'g*, 131 F.3d 1009, 1010 (Fed. Cir.

8   1997)("As issued, both sets of claims still use this term. Although these claims have since issued

9   in separate patents, it would be improper to construe this term differently in one patent than

10  another, given their common ancestry."); *see also Arthur A. Collins, Inc. v. Northern Telecom*

11  *Ltd.*, 216 F.3d 1042, 1044 (Fed. Cir. 2000)("Because two patents "share[d] the same written

12  description," and the second patent "is a continuation of" the first patent, a district court

13  determined that "a common construction" of a limitation in the claims of the two patents "was

14  appropriate.").

15          Finally, Sproqit has attempted to import limitations from the specification by requesting

16  that entire claim elements be construed with distinct definitions.  It is well established that "an

17  accused infringer cannot overcome the heavy presumption that claims should be given their

18  ordinary meaning simply by pointing to the preferred embodiment or other structures or steps

19  disclosed in the specification."  *Fuji Photo Film Co. v. ITC,* 386 F.3d 1095, 1105 (Fed. Cir. 2004)

20  (citations omitted).  In the instant case, the terms and phrases of the asserted claims should

21  generally be afforded their full range of meaning, which can be easily understood by reference to

22  the claims themselves, as well as to technical and non-technical dictionaries where necessary.

23  *See Raytheon*, 2004 WL 952284 at 3 ("courts may consult dictionaries, encyclopedias and

24  treatises in determining the ordinary and customary meanings of claim terms")(citing *Texas*

25  *Digital*, 308 F.3d at 1204-1205).

26

27

28

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Palo Alto

20158204.3

7

OPENING CLAIM CONSTRUCTION BRIEF OF
PLAINTIFF VISTO CORPORATION
CASE NO. C 04-0651 EMC

1

**V.      VISTO'S PROPOSED CONSTRUCTIONS**

2

**A.      "independently modifiable copy of the first workspace element" ('131 claims
        1, 31-33, 35 and 36; '192 claims 1, 6-8, 10, 11 and 22; '708 claims 1 and 17)**

3

The claim element "independently modifiable copy of the first workspace element"

4

requires construction of only two terms that were previously addressed by the Texas court:

5

"independently modifiable copy" and "workspace element."  The remaining language of the

6

claim element is easily understood by reference to the ordinary meaning of the words, and does

7

not require any special definition by the Court.  See, for example, *United States Surgical Corp. v.*

8

*Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997):

9

10

11

12

> The Markman decisions do not hold that the trial judge must repeat or restate every claim
> term in order to comply with the ruling that claim construction is for the court. Claim
> construction is a matter of resolution of disputed meanings and technical scope, to clarify
> and when necessary to explain what the patentee covered by the claims, for use in the
> determination of infringement.  It is not an obligatory exercise in redundancy.

13

Judge Ward's construction of the terms "independently modifiable copy" and "workspace

14

element" should, therefore, be adopted as set forth below.  The remaining language of the claim

15

element is clear on its face, and does not impart any further limitation beyond its ordinary

16

meaning.  As previously discussed, for example, the word "first" is merely used as a label to

17

designate common terms within a claim, and there is no express intent to impart a novel meaning.

18

As such, it is improper to read additional limitations into the claim, and it is unnecessary to

19

provide separate construction.  "[P]articular embodiments appearing in the written description

20

will not be used to limit claim language that has broader effect."  *Innova/Pure Water, Inc. v.*

21

*Safari Water Filtration Sys.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004).

22

**1.      *"independently modifiable copy"***

23

The proper construction of the term "independently modifiable copy" is: ***a copy of a***

24

***workspace element capable of being modified independent of the workspace element.  The copy***

25

***of the workspace element does not have to be in the same format as the workspace element.***

26

The ordinary meaning of the term "copy" is "an imitation, transcript, or reproduction of an

27

original work."  [*See* Khaliq Decl., Exh. F, Webster's Dictionary at 256].  An imitation or

28

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Palo Alto

20158204.3

8

OPENING CLAIM CONSTRUCTION BRIEF OF
PLAINTIFF VISTO CORPORATION
CASE NO. C 04-0651 EMC

1  reproduction does not have to have to an exact copy of the original. [*See* Khaliq Decl., Exh. G,

2  Webster's New Collegiate Dictionary definition of "imitation": *resembling* something else that is

3  usu. genuine and of better quality.")(emphasis added)].

4      As recited in the asserted claims, the term is directed to a copy of a "workspace element"

5  that is "independently modifiable" of the workspace element. According to the written

6  descriptions of the patents-in-suit, the term "copy" as used in the claims does not require an exact

7  copy of all fields of a given e-mail, calendar or contact entry, but may be in a different format.

8  *See, e.g.*, the '708 patent (Khaliq Decl., Exh. B), which states: "The system includes a first store

9  for storing a first workspace element in a first format, [and] a second store for storing a second

10 workspace element which is an independently modifiable copy of the first workspace element in a

11 second format." *Id.* '708 patent, Abstract.

12     The '708 patent clearly illustrates that an independently modifiable copy of a workspace

13 element need not include the same fields of the original workspace element. Taking the example

14 of a bookmark as a workspace element (used in web browsers) the '708 patent discusses a

15 bookmark created at a desktop computer, using Netscape Navigator®, and maintained in format

16 A. *Id.* '708 patent, col. 3, ll. 29-40. The bookmarks on a remote terminal which are periodically

17 synchronized with the bookmarks at the LAN computer are created using a different application

18 program such as Internet Explorer® and stored in format B. *Id.* '708 patent, col. 3, ll. 48-51.

19     The patent recognizes that each workspace element and its copy may have different fields

20 which require a global translator to incorporate all the fields across the different platforms. *Id.*

21 '708 patent, col. 8, ll. 47-62:

22     The global translator 122 incorporates all the information needed by both formats
23  (Format A and Format B) to create the Global Format. For example, if a bookmark
     in Format A needs elements X, Y and Z and a bookmark in Format B needs
24  elements W, X and Y, the global translator 122 incorporates elements W, X, Y and
     Z to create a bookmark in the Global Format. Further, the global translator 122
25  incorporates the information which is needed by the synchronization means such
     as the last modified date. Accordingly, a bookmark in the Global Format includes
26  a user identification (ID) 605, an entry ID 610, a parent ID 615, a folder ID flag
     620, a name 625, a description 630, the Uniform Resource Locator (URL) 635, the
27  position 640, a deleted ID flag 645, a last modified date 650, a created date 655
     and a separation ID flag 660 (emphasis added).

28     The figure below of a bookmark workspace element in a global format shows the

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20158204.3                    9                    OPENING CLAIM CONSTRUCTION BRIEF OF
                                                   PLAINTIFF VISTO CORPORATION
                                                   CASE NO. C 04-0651 EMC

1   inclusion of several fields, all of which, as demonstrated by the above cited portion of the

2   specification, need not be present in the independently modifiable copy of the workspace element

3   on the second device.

U.S. Patent        Feb. 8, 2000        Sheet 6 of 7        6,023,708

605 — User ID
610 — Entry ID
615 — Parent ID
620 — Is Folder?
625 — Name
630 — Description
635 — URL
640 — Position
645 — Is Deleted
650 — Last Modified Date
655 — Created Date
660 — Separation After?

FIG. 6
(Global Format Bookmark
Example)

21      **2.**      *"workspace element"*

22      The proper construction of the term "workspace element" is: ***a subset of workspace data***

23   ***such as an e-mail, file, bookmark, calendar, or applications program which may include***

24   ***version information***.

25      The ordinary meaning of "element" is simply "a constituent part." It is synonymous with

26   "one of the parts of a compound or complex whole." [*See* Khaliq Decl., Exh. H, Merriam-

27   Webster's Collegiate Dictionary, Tenth Edition (1993)]. Nothing in the claim language suggests

28   that the patentee intended to depart from the ordinary meaning of the claim term. Moreover,

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20158204.3

10

OPENING CLAIM CONSTRUCTION BRIEF OF
PLAINTIFF VISTO CORPORATION
CASE NO. C 04-0651 EMC

1    nothing in the claim language suggests that the term "workspace element" should be limited to

2    encompass all components or fields, as Sproqit suggests.

3    Visto's proposed definition is consistent with its use in the specifications of the patents-in-

4    suit. According to the '708 patent, for example, "each e-mail or e-mail folder, file or file folder,

5    calendar or calendar folder, bookmark or bookmark folder, document or document folder, etc.

6    may be referred to as 'a workspace element.'" ['708 patent, col. 3, ll. 26-29, Khaliq Decl., Exh.

7    B]. The '192 patent further states that workspace data such as e-mail data, file data, calendar data

8    and user data "may each be divided into workspace elements." ['192 patent, col. 3, ll. 25-28,

9    Khaliq Decl., Exh. C]. "Such intrinsic evidence is the most significant source of the legally

10   operative meaning of disputed claim language." *Vitronics*, 90 F.3d at 1582.

11   According to Judge Ward's Claim Construction Order, a workspace element is a "a *subset

12   of workspace data . . .*" [Khaliq Decl., Exh. E, "Claim Construction Order" at 20 (emphasis

13   added)]. "Workspace data" was defined by the court as: "data, including corresponding version

14   information, *which may include e-mail data, file data, calendar data, user data, etc...*" See *Id*. at

15   19 (emphasis added). There is no requirement that a workspace element include all components

16   of a file as Sproqit suggests. If a workspace element is a subset of workspace data, which includes

17   "e-mail data" (a broad category of information), a workspace element may comprise individual e-

18   mail fields, which are simply a part of the larger collection of "e-mail data." Absent words or

19   expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope, a

20   claim term should be given the full range of its meaning. *Teleflex*, 299 F.3d at 1327.

21   Accordingly, "an independently modifiable copy" of a workspace element can be a copy

22   of certain data fields of an e-mail, and thus be in a different format as contemplated by the

23   patents-in-suit. These fields are workspace elements because they are a "subset of workspace

24   data." An e-mail with less than all its fields, is still an e-mail, and hence a workspace element.

**B.    Version information ('131 claims 1, 16, 31-33, 35 and 36; '192 claims 1, 6-8, 10, 11 and 22)**

25

26

27   The proper construction of the term "version information" is: *information that can be

28   used to determine a version of a workspace element*.

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Palo Alto

20158204.3                                11                OPENING CLAIM CONSTRUCTION BRIEF OF
                                                           PLAINTIFF VISTO CORPORATION
                                                           CASE NO. C 04-0651 EMC

1   The ordinary meaning of "information" is broadly defined as "the communication or

2   reception of knowledge or intelligence," "knowledge obtained from investigation, study or

3   instruction [e.g.] ... FACTS, DATA," or "the attribute inherent in and communicated by one of

4   two or more alternative sequences or arrangements of something (as ... binary digits in a

5   computer program)." [Khaliq Decl., Exh. I, Webster's Dictionary at 599]. The information may

6   be "a signal or character (as in a communications system or computer)." *Id*. A "version" is

7   defined as "a translation from another language" or "a form or variant of a type or original."

8   [Khaliq Decl., Exh. J,. at 1313].

9       As recited in the asserted claims, "version information" relates to information about a

10  version of a workspace element that may be used to determine whether the workspace element

11  has been modified. For example, claim 1 of the '192 patent recites "first version information

12  which indicates whether a first workspace element stored at a first store within a firewall has been

13  modified." [*See* Khaliq Decl., Exh. K, Claim 1, '192 Patent Reexamination Certificate].

14      The specifications of the patents-in-suit are consistent with the ordinary meaning of the

15  claim terms and the construction set forth above. The written description, for example, states that

16  "each workspace element folder or each workspace element individually is identified by

17  particular version information." [Khaliq Decl., Exh. B, '708 patent, col. 3, ll. 23-25]. Version

18  information may be compared with a last synchronization signature, or with other version

19  information "to determine if only one or both versions of a particular workspace element have

20  been modified." [Khaliq Decl., Exh. C, '192 patent, col. 5, ll. 55-59]. "This comparison may

21  include comparing the date and time of last modification with the date of last synchronization, or

22  may include a comparison between the current status and the previous status as of the last

23  interaction." [Khaliq Decl., Exh. B, '708 patent, col. 9, ll. 33-37].

24      The prior art references cited during the prosecution of the patents also refer to version

25  information in a manner consistent with the proposed construction. *See, e.g.*, U.S. Patent No.

26  5,386,564, col. 4, ll. 40-42 ( "Version[:] Contains the file format version number, which also

27  serves as a signature.") (Khaliq Decl., Exh. L); U.S. Patent No. 4,875,159, Abstract (describing

28  using information in the form of "sync-complete control bits" to determine whether a version of a

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Palo Alto

20158204.3                                         12                OPENING CLAIM CONSTRUCTION BRIEF OF
                                                                    PLAINTIFF VISTO CORPORATION
                                                                    CASE NO. C 04-0651 EMC

1   data set has been modified) (Khaliq Decl., Exh. M); and, U.S. Patent No. 5,600,834), col. 7, ll.

2   15-24 ("As time passes, a file with the same name will have different versions, which can be

3   distinguished by their different timestamps.") (Khaliq Decl., Exh. N).

4       Contrary to Sproqit's proposed construction, there is no limitation in the patents-in-suit of

5   what "version information" may comprise. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d

6   898, 906 (Fed. Cir. 2004)("Even when the specification describes only a single embodiment, the

7   claims of the patent will not be read restrictively unless the patentee has demonstrated a clear

8   intention to limit the claim scope using 'words or expressions of manifest exclusion or

9   restriction.'").

10  **C.   Examination results ('131 claims 1, 16, 31-33, 35 & 36; '192 claims 1, 6-8 & 22)**

12      The proper construction of the term "examination results" is: ***Information regarding one***

13  ***or more workspace elements obtained by examining those workspace elements.***

14      This construction is apparent from the ordinary meaning of the terms. "Examination" is

15  defined as "the act or process of examining." [Khaliq Decl., Exh. O, Webster's Dictionary at

16  403]. "Result" is defined as "something obtained by calculation or investigation." [Khaliq Decl.,

17  Exh. P, Webster's Dictionary at 999].

18      In the context of the asserted claims, the "examination results" are recited as relating to

19  information generated from "version information" which indicates whether a workspace element

20  or an independently modifiable copy thereof has been modified. [*See e.g.,* Khaliq Decl., Exh. C,

21  '192 patent, claim 1 ("generating first examination results from first version information which

22  indicates whether a first workspace element stored at a first store within the firewall has been

23  modified.")].

24      The specification of the patents-in-suit do not limit what information may be obtained

25  from the examination results. Therefore, Visto's proposed definition, as construed by Judge

26  Ward is consistent with the intrinsic and extrinsic evidence of record.

27

28

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20158204.3

13

OPENING CLAIM CONSTRUCTION BRIEF OF
PLAINTIFF VISTO CORPORATION
CASE NO. C 04-0651 EMC

D.    **Generating second examination results from second version information ('192 claims 1, 6, 7, 8 and 22)**

This claim element should be construed consistent with terms "examination results" and "version information" as discussed above.  The remaining language of the claim element is clear on its face, and does not require any definition other than its ordinary meaning.

The term "second" within the context of "examination results" and "version information" does not need to be separately construed.  Again, as Judge Ward properly noted, "[t]he terms 'first' and 'second' require no construction."  [*See* Khaliq Decl., Exh. E, Claim Construction Order at 14].  *See also, Raytheon Co. v. McData Corp.*, 2004 WL 952284, 11 (E.D. Tex. 2004) ("The Court believes that only the term "signal" need be construed and that from that construction the jury will be able to determine the meaning of 'first signal,' 'second signal,' 'first command signal,' and 'second command signal.'")  Likewise, the intrinsic evidence shows that there has been no deviation from the ordinary meaning of the term "generating."  (*See, e.g.*, "generate: 1: to bring into existence." [Khaliq Decl., Exh. U, *Merriam-Webster's Dictionary, Tenth Edition* at 485].)  Accordingly, the remaining language of the claim element does not require further construction.  "Unless there is an express intent to impart a novel meaning to the claim terms, the words of the claim are presumed to take on the ordinary and customary meanings attributed to them by those of ordinary skill in the art."  *Mars, Inc.*, 377 F.3d at 1373.

E.    **Initiating steps      and      from within the firewall ('192 claims 1, 6, 7, 8 and 22)**

The term "firewall" is the only language in this claim element that requires construction, and should be defined as: ***software and/or hardware for protecting an organization's network against external threats, such as hackers, coming from another network, such as the Internet. A firewall prevents computers in the organization's network from communicating directly with computers external to the network and vice versa by routing all communications through a proxy server outside of the organization's network for a determination whether a particular message or file will be permitted to pass through to the organization's network.***

The ordinary meaning of the term "firewall" is well known in the art and is defined in a

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20158204.3                           14                    OPENING CLAIM CONSTRUCTION BRIEF OF
                                                            PLAINTIFF VISTO CORPORATION
                                                            CASE NO. C 04-0651 EMC

1    technical dictionary, contemporaneous with the filing date of the patents-in-suit as:

2

> A security system intended to protect an organization's network against external
> threats, such as hackers, coming from another network, such as the Internet. A
> firewall prevents computers in the organization's network from communicating
> directly with computers external to the network and vice versa. Instead, all
> communication is routed through a proxy server outside of the organization's
> network, and the proxy server decides whether it is safe to let a particular message
> or file pass through to the organization's network.

3

4

5

6    [Khaliq Decl., Exh. Q, *The Microsoft Computer Dictionary* (3rd Ed., 1997) at 197]. Visto's

7    proposed construction, based on a technical dictionary that was publicly available

8    contemporaneously with the filing of the patents-in-suit sets forth the appropriate construction.

9    *See Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.,* 334 F.3d 1294 (Fed. Cir. 2003) (noting the

10    relevance of dictionary definitions that are contemporaneous with the patent's filing and

11    issuance); *see also Vitronics*, 90 F.3d at 1584 n.6 ("technical dictionaries may allow a court 'to

12    better understand the underlying technology' and the way in which one of skill in the art might

13    use the claim terms.").

14        Although Judge Ward adopted only the first sentence of this definition of "firewall," the

15    definition must be read in its entirety, which clearly excludes validation and authentication

16    features because, among other reasons, validation and authentication features when used alone

17    do not prevent direct communications between internal and external computers by routing

18    communications through a firewall or proxy server outside of the network for a determination of

19    whether to permit the communications. [*See* Khaliq Decl., Exh. Q, *The Microsoft Computer*

20    *Dictionary* (3rd Ed., 1997) at 197].

21        Moreover, it would be legally erroneous to construe "firewall" in such as way as to

22    include validation and authentication features because the '192 patent expressly distinguishes

23    firewalls from other security services like validation and authentication.[1,2] The originally-filed

---

[1]   This issue was not raised during the claim construction proceedings before Judge Ward. It is being
raised here for the first time.

[2]   There are numerous other passages in the Patents-in-Suit that similarly distinguish between firewalls and
identification/authentication features. [See, e.g., '192 patent col. 5, lines 4-9 ("The communications
module 405 may further include routines for applying Secure Socket Layer (SSL) technology and user
identification and authentication techniques (i.e., digital certificates) to establish a secure
communication channel through the corporate firewall 130 and through the global firewall 126.
Examples of communications modules 405 may include TCP/IP stacks or the AppleTalk® protocol");

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20158204.3

15

OPENING CLAIM CONSTRUCTION BRIEF OF
PLAINTIFF VISTO CORPORATION
CASE NO. C 04-0651 EMC

1    specification of U.S. Patent Application Serial No. 08/841,950 (the "'950 Application"), which is

2    incorporated by reference into the '192 patent, expressly distinguishes between a firewall and

3    these other security features:

• "The most popular of the current security techniques is a firewall, which
  includes an intermediate system positioned between a trusted network and the
  Internet.  The firewall represents an outer perimeter of security for preventing
  unauthorized communication between the trusted network and the Internet.  A
  firewall may include screening routers, proxy servers and application-layer
  gateways."  [Khaliq Decl., Exh. R, '950 App. at 2].

• "With proper authentication, the user is allowed to pass through the firewall into
  the local network, but is typically limited to a predetermined set of services such
  as e-mail, FTP, etc."  *Id.* at 3.

• "Another security technique for protecting computer networks is the issuance
  and use of a public key certificates ... Examples of authentication and key
  distribution computer security systems include the Kerberos security system."
  *Id.* pp. 3-4.

• "These security techniques do not solve problems associated with the roaming
  (traveling) user.  For the roaming user, maintaining identification and
  authentication information such as passwords, certificates, keys, etc. is a
  cumbersome process.  Further, accessing multiple systems requires multiple
  keys, which often are too complex to track and use.  Also, direct access to
  systems behind firewalls compromises security."  *Id.* at 4-5.

15         Therefore, Visto respectfully submits that this Court adopt Visto's proposed construction

16   of the term "firewall" which is consistent with the intrinsic and extrinsic evidence of record.  The

17   remaining language of the claim element is clear on its face, and does not require construction by

---

'131 patent, col. 5, lines 10-17 ("The communications module 405 may further include routines for
applying Secure Socket Layer (SSL) technology and user identification and authentication techniques
(i.e., digital certificates) to establish a secure communication channel through the corporate firewall 130
and through the global firewall 126.  Examples of communications modules 405 may include TCP/IP
stacks or the AppleTalk® protocol.");

'708 patent col. 6, lines 30-35 ("The communications module 405 may further include routines for
applying Secure Socket Layer (SSL) technology and user identification and authentication techniques
(i.e., digital certificates) to establish a secure communication channel through the global firewall 112.
Examples of communications modules 405 may include TCP/IP stacks or the AppleTalk® protocol.");

'221 patent col. 8, lines 41-54 ("For example, when a client 165 attempts to access the global server 115,
the security engine 384 determines whether the global server 115 accepts in-bound communications
from a particular port.  If so, the security engine 392 allows the communications engine 382 to open a
communications channel 345 to the client 165.  Otherwise, no channel will be opened.  After a channel
is opened, the security engine 392 forwards an authentication security applet 362 to the remote terminal
105 to poll the user for identification and authentication information such as for a user ID and a
password.  The authentication security applet 362 will generate and forward a response back to the
global server 115, which will use the information to verify the identity of the user and provide access
accordingly.").

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Palo Alto

20158204.3                                    16                OPENING CLAIM CONSTRUCTION BRIEF OF
                                                                PLAINTIFF VISTO CORPORATION
                                                                CASE NO. C 04-0651 EMC

1    the Court.

2        **F.**    **First format/second format ('708 claims 1 & 17)**

3        The proper construction of the term "format" is: ***any method of arranging information***

4    ***that is to be stored or displayed. The format of a workspace element refers to the way the***

5    ***information is stored in it.***  As discussed above, the terms "first" and "second" do not require

6    separate construction.

7        The ordinary meaning of the term "format" is defined as: "Any method of arranging

8    information that is to be stored or displayed. 1. The format of a file (or of any storage medium)

9    refers to the way the information is stored in it." [*See* Khaliq Decl., Exh. S, Dictionary 186 at

10   *Dictionary of Computer and Internet Terms, Sixth Edition*].

11       Visto's proposed construction of the term "format" is consistent with the specification of

12   the '708 patent.  For example, the '708 patent notes that the format of workspace data at the LAN

13   is "maintained in a predetermined format, referred to as Format A, which is based on the service

14   engine that created it." [*See* Khaliq Decl., Exh. B, '708 patent, col. 3, ll.29-33].  Similarly, when

15   referring to the format of workspace data/workspace elements at the remote terminal, the patent

16   states: "[t]he workspace data 116 is maintained in a format, referred to as format B, *which may* be

17   different from Format A.  Format B is also based on the service engines 154 that create the

18   workspace elements." [*See* Khaliq Decl., Exh. B, '708 patent, col. 33, ll. 45-48 (emphasis

19   added)].

20       Sproqit's proposed construction of "format", which includes the unnecessary qualifier of

21   "first" and "second" seeks a definition where the "first format" and "second format" must be in

22   different formats.  *See* Joint Claim Construction Statement at 6.  This construction is inconsistent

23   with the specification which clearly states that the formats "may be different" but imposes no

24   qualifier that they "must" be different.  Therefore, Visto respectfully requests that the Court adopt

25   its proposed, and proper construction of the term "format."

26       **G.**    **Global server ('221 claims 1, 4, 6 & 8)**

27       The proper construction of the term "global server" is: ***a server accessible from remote***

28   ***locations which stores independently modifiable copies of selected portions of workspace data.***

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Palo Alto

20158204.3

17

OPENING CLAIM CONSTRUCTION BRIEF OF
PLAINTIFF VISTO CORPORATION
CASE NO. C 04-0651 EMC

1    The ordinary meaning of the term "server" is defined as "a computer running

2 administrative software that controls access to the network and its resources."  [Khaliq Decl.,

3 Exh. T, *The Microsoft Computer Dictionary* at 430].  "[A] file server may contain an archive of

4 data or program files."  *Id.*

5    The specification of the '221 patent states that "a server can be any computer which is

6 polled by a client."  [Khaliq Decl., Exh. D, '221 patent, col. 16, ll. 52-53].  A "global server" is

7 generally described as a server that allows a remote user to access services or data on a computer

8 network.  *Id*, Abstract.  "The global server is configured to identify and authenticate a user

9 attempting to access it from a remote terminal, and is configured to provide access based on the

10 client configuration either to the first set of workspace data stored on the client or to the second

11 set of workspace data stored on the global server."  *Id,* col. 2, ll. 57-63.  In other words, the global

12 server is a structure that mediates the connection between the remote user and the computer

13 network, and may store data.

14    Moreover, any storage of data at the global server may be transitory.  This is made clear,

15 for example, by claim 5 of the '221 patent, which further requires that storage "is continued after

16 sending."  Because claim 5, which is dependent on claim 1, states that storage of differences at

17 the global server "is continued after sending," the doctrine of claim differentiation mandates that

18 a persistent storage limitation cannot be read into the independent claim.  *See, e.g., Transmatic,*

19 *Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1277, 35 U.S.P.Q.2D (BNA) 1035, 1041 (Fed. Cir.

20 1995)("The doctrine of claim differentiation embodies the notion that language in one claim

21 should not be interpreted so as to make another claim, often a dependent claim, superfluous.").

22 Therefore if the term "global server" is construed in a way that requires copies of workspace data

23 to be maintained there after sending, the other claims would be rendered superfluous.

24    The specification of the '192 patent, which is incorporated by reference into the '221

25 patent, also states that "although the global server is illustrated as a single device, the global

26 server may include several computers networked together."  [Khaliq Decl., Exh. C, '192 patent,

27 col. 7, ll. 62-65].  According to the specification, there is no requirement that the "global server"

28 be a single computer or that there be any spatial restrictions on its location as Sproqit suggests.

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Palo Alto

20158204.3    18    OPENING CLAIM CONSTRUCTION BRIEF OF
PLAINTIFF VISTO CORPORATION
CASE NO. C 04-0651 EMC

1    Thus, Visto respectfully requests that this Court adopt the true and correct construction of "global

2    server" as advanced here and as previously construed by Judge Ward.

3    **VI.    PROPOSED CONSTRUCTION OF MEANS-PLUS-FUNCTION ELEMENTS**

4          When a claim term is expressed as a "means-plus-function" limitation, the "claim shall be

5    construed to cover the corresponding structure, material, or acts described in the specification and

6    equivalents thereof." *See* 35 U.S.C. § 112 (6).

7          The specifications of the patents-in-suit describe embodiments of software as

8    implemented on an exemplary computer network. As such, what is shown and described is a

9    software architecture comprised of functional modules interrelated in a certain way. Therefore,

10   the structure that corresponds to the recited functions is the software itself, not the hardware on

11   which it is installed. *See, e.g.*, Judge Ward's holding in *Natl. Instruments Corp. v. The*

12   *Mathworks, Inc.*, 2002 U.S. Dist. LEXIS 27577 at 27 (E.D. Tex. 2002), indicating corresponding

13   structures comprise software: "the corresponding structure are various control or software

14   modules."

15         **A.    Means for Generating a Preferred Version ('192 claims 10 & 11)**

16         The corresponding structure is: *general synchronization module 425 of the '192 patent*

17   *and equivalents thereof.*

18         Support in the specification for this structure is found in column 5, ll. 55-61 of the '192

19   patent (Khaliq Decl., Exh. C):

20         The general synchronization module 425 further includes routines for comparing
           the version information 124 and the version information 255 to determine if only
21         one or both versions of a particular workspace element have been modified and
           routines for performing an appropriate synchronizing responsive action.
22

23         **B.    Synchronization Means for Synchronizing ('708 claim 1)**

24         The corresponding structure is: *the base system 400 (and 146) and the synchronization*

25   *agent 124 as illustrated in Fig. 4 of '708 patent and equivalents thereof. The base system*

26   *includes all modules shown in Fig. 4.*

27         Support in the specification for this structure is found in column 4, ll. 23-30 of the '708

28   patent (Khaliq Decl., Exh. B):

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Palo Alto

20158204.3                          19                    OPENING CLAIM CONSTRUCTION BRIEF OF
                                                         PLAINTIFF VISTO CORPORATION
                                                         CASE NO. C 04-0651 EMC

1    Network 100 further comprises synchronization means, which includes a base
     system 146 stored within the LAN 110 and for example on the desktop computer
2    134 . . . . The base system 146 and the synchronization agent cooperate to
     synchronize selected portions of the workspace data 136 with the workspace data
3    120.

4    **C.    Means for translating ('708 claim 33)**

5    The corresponding structure is: ***software routines or code that convert information or***

6    ***data in one format to information or data in a second format.***

7    There is no limitation in the specification of the '708 patent for the structure that performs

8    the task of translating.  For example, col. 4, ll. 38-41 states: "It will be appreciated that the global

9    translator 122 cooperates with the synchronization means to translate data formats to and from the

10   global format."  The patent also contemplates that the computational work, including

11   synchronization and translation can be spread across the different structures depending on the

12   processing power of the computer involved. *See id e.g.,* col. 4, ll. 55-67:

13   Sometimes, primarily when the remote terminal 102 is a relatively less
     computationally powerful device (such as a smart phone or a PDA), most of the
14   actual computationally intensive work will occur within the synchronization agent
     124 in the global server 106. In other situations, for example, when the remote
15   terminal 102 is a fully configured PC, most of the computationally intensive work
     will occur locally on the base system 118 in the remote terminal 102.

16

17   Accordingly, as specified in the written description of the '708 patent, the translation

18   function can occur across different software modules and need not be restricted to a specific

19   location.  Therefore, Visto respectfully requests that the Court adopt its proposed construction of

20   the term "means for translating" which is consistent with structures and functions described in the

21   specification.

22   **VII.    CONCLUSION**

23   Visto's proposed constructions are fully supported by the intrinsic and extrinsic evidence

24   cited herein and have also been previously construed by Judge Ward in the Eastern District of

25   Texas.  In the interest of maintaining judicial uniformity and giving consistency to the

26   interpretation of Visto's patents in the various district courts throughout the country, Visto

27   requests that this Court adopt, unless noted otherwise, the constructions as defined in Judge

28   Ward's Claim Construction Order.  Accordingly, for the reasons discussed above, and on the

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20158204.3                                      20          OPENING CLAIM CONSTRUCTION BRIEF OF
                                                            PLAINTIFF VISTO CORPORATION
                                                            CASE NO. C 04-0651 EMC

1   basis of the evidence presented, Visto respectfully requests that the Court interpret the disputed

2   terms and phrases from the asserted claims as proposed herein.

3

4   Dated:  May 30, 2006                              Respectfully submitted,

5                                                     MANATT, PHELPS & PHILLIPS, LLP

6                                                     /s/Robert D. Becker
                                                      Ronald S. Katz
7                                                     CA State Bar No. 085713
                                                      Robert D. Becker
8                                                     CA State Bar No. 160648

9                                                     1001 Page Mill Road, Building 2
                                                      Palo Alto, CA  94304
10                                                    Telephone:  650-812-1300
                                                      Facsimile:  650-213-0260
11
                                                      *Attorneys for Plaintiff*
12                                                    *Visto Corporation*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20158204.3

21

OPENING CLAIM CONSTRUCTION BRIEF OF
PLAINTIFF VISTO CORPORATION
CASE NO. C 04-0651 EMC