DORSEY & WHITNEY LLP
Sri K. Sankaran (SBN 236584)
555 California Street, Suite 1000
San Francisco, CA 94104-1513
Telephone: (415) 781-1989
Facsimile: (415) 398-3249

Devan V. Padmanabhan (Admitted *pro hac vice*)
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

Attorneys for Defendant
Sproqit Technologies, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| VISTO CORPORATION | CASE NO.: 04-0651 EMC |
| Plaintiff, | Before The Honorable Edward M. Chen |
| v. | **SPROQIT'S CLAIM CONSTRUCTION BRIEF** |
| SPROQIT TECHNOLOGIES, INC. | |
| Defendant. | |

# TABLE OF CONTENTS

(Page)

Introduction ............................................................................................................. 1

Overview of the Patented Technology ..................................................................... 2

Errors in Visto's Approach ...................................................................................... 2

    I.      Visto Refuses to Construe Key Claim Terms .............................. 2

    II.     Visto Misuses Dictionary Definitions ......................................... 4

    III.    The Written Description of The '708 Patent Cannot Be Used to
           Construe the Claims of The '192 and '131 Patents ..................... 5

Argument on Structural Limitations ........................................................................ 6

    I.      "an independently modifiable copy of the first workspace element" ........ 6

        A.      Workspace Element ............................................................ 6

        B.      Independently Modifiable Copy ......................................... 8

    II.     "Version Information" ................................................................ 10

    III.    "Examination Results" ............................................................... 14

    IV.    "Generating second examination results from second version
           information" ............................................................................... 15

    V.     "Initiating steps __ and __ from within the firewall" ................ 16

        A.      "Initiating . . . from . . . within . . . ." ............................... 16

        B.      "Firewall" ........................................................................ 17

    VI.    "First format"/"Second format" .............................................. 18

        A.      "Format" ......................................................................... 18

        B.      "First"/"Second" ............................................................ 19

    VII.   "Global Server" ......................................................................... 21

Argument on Means-Plus-Function Limitations ................................................... 23

    I.      "Means for translating . . ." ....................................................... 23

    II.     "Synchronization means for functioning . . ." ........................... 24

    III.    "Means for generating a preferred version" ............................... 25

Conclusion ............................................................................................................ 25

## TABLE OF AUTHORITIES

**(Page)**

*Alza Corp. v. Mylan Laboratoriess Inc.*, 391 F.3d 1365 (Fed. Cir. 2004)...........................6

*Competitive Techs., Inc. v. Fujitsu Ltd.*, 333 F. Supp. 2d 858 (N.D. Cal. 2004)................4

*Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158 (Fed. Cir. 2004) ........................................5, 6

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996) ...........................................1

*Omega Engineering, Inc. v. Ratek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003) ......................20

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ...........................................1, 3, 4

*Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243 (Fed. Cir. 1998) ..........1, 4

*Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570 (Fed. Cir.  1995)...........20

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ..............................7

# INTRODUCTION

Claim construction is not a matter of applying selected dictionary definitions to isolated terms extracted from the claims. Claim construction is meant to determine "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention . . . ." Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). The objective is to determine the scope of the claim, by reviewing and analyzing the words of the claim in the context of the whole patent:

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. See Markman v. Westview Instruments, Inc., 517 U.S. 370, 389 (1996). The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction. . . . A claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent.

Renishaw PLC v. Marposs Societa' Per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998). Visto refuses to take a position on the construction of key claim limitations. Where Visto does venture a construction it is often based on an expansive dictionary definition without regard for the context of the claims or the teaching of the written description, and is in some instances based on new matter found in the disclosure of other, unrelated patents. Sproqit's proposed claim construction stays true to the claim language and the intrinsic evidence, and should be adopted.

# OVERVIEW OF THE PATENTED TECHNOLOGY

Each of the four Visto patents addresses the problem of maintaining consistency among multiple independently modifiable copies of a document stored on a computer network. The problem is simple – when there are multiple independently modifiable copies of a document on the network, the copies tend to get independently modified. Different changes are made to different copies, with the result that the "copies" are no longer the same as each other, it is difficult to determine which copy is the most up to date, and inconsistent changes made to different copies must be reconciled. The Visto patents explain:

> Data **consistency is a significant concern** for computer users. For example, **when maintaining multiple independently-modifiable copies of a document**, a user risks using an outdated version. Further,

by the time the user notices the inconsistency, interparty
miscommunication or data loss may have resulted.  The user must then
spend more time attempting to reconcile the inconsistent versions.

'192 Patent, 1:30-35; '131 Patent, 1:34-40.[1]  This same passage, with insignificant differences in wording, is found in the '708 Patent (1:24-40) and the '221 Patent (2:6-21).

The Visto patents address different aspects of the data consistency problem.  **The '192 and '131 Patents** are both entitled "System and Method for Securely Synchronizing Multiple Copies of a Workspace Element in a Network."  The '192 and '131 patents focus on the use of "version information" and "examination results" to synchronize multiple copies of a workspace element and generate a "preferred version."  See, e.g., '192 Patent, 1:60-2:31; '131 Patent, 1:64-2:36.  **The '708 Patent** is entitled "System and Method for Using a Global Translator to Synchronize Workspace Elements Across A Network."  The '708 Patent focuses on the use of a "global translator" to translate between multiple copies of a workspace element maintained in different formats for use with different application programs.  See, e.g., '708 Patent, 1:59-61, 4:11-15.  **The '221 Patent** is entitled "System and Method for Globally and Securely Accessing Unified Information in a Computer Network."  The '221 Patent focuses on the use of a "global server," "a secure globally accessible third party" to provide a roaming user with global and secure access to synchronized workspace elements.  See, e.g., '221 Patent, 2:41-44, 3:55-4:3.

## ERRORS IN VISTO'S APPROACH

### I.     Visto Refuses To Construe Key Claim Terms

Visto fails to offer any construction for important terms that were identified in the Supplemental Joint Claim Construction Statement, including "first" and "second" as they modify version information and examination results, "generating . . . from . . . ," and "initiating from within . . . ."  The terms Visto has refused to construe relate primarily to the '192 and '131 Patents.  The systems and methods claimed in the '192 and '131 Patents recite workspace elements, version information, and examination results.  The terms that Visto refuses to construe are important because they define the

---

[1]      Throughout this brief, patents are cited by column and line.  For example 1:30-45, means Column 1, Lines 30 to 45, and 3:55-4:3 means Column 3, Line 55 to Column 4, Line 3.  Throughout this brief, where words from a patent or file history are emphasized, the emphasis is added.

way that these recited data structures relate to each other, and how these data structures work together in order to achieve synchronization.

The terms "first" and "second" are consistently used in the claims to define the relationships between these data structures:  first version information is associated with the first workspace element; second version information is associated with the independently modifiable copy of the first workspace element; first examination results are generated from first version information and relate to the first workspace element; second examination results are generated from the second version information and relate to the independently modifiable copy of the first workspace element.  These simple relationships are clear from the claims, and Visto cannot seriously mean to dispute them.  If Visto does dispute them it should have made that clear in its opening brief.  There is no rule that puts the words "first" and "second" off limits for claim construction.  The words "first" and "second" were repeatedly used throughout the claims to define the relationships between the recited data structures; Visto cannot ignore those words and the relationships they define.

The '192 and '131 Patent claims also require that the recited data structures work together in a very specific way to achieve synchronization.  For example, the patent claims require that second examination results are "generat[ed]. . . from second version information."  Some claims require that the steps of generating first and second examination results be "initiat[ed]. . . from within the firewall."  Yet Visto refuses to take any position with respect to what it means to generate second examination results from second version information, or what it means to initiate steps from within the firewall.

Visto wants to look only at the final result – whether a change to an email on a handheld device is propagated to a desktop computer – and ignore the specific data structures, relationships and actions that the claim requires.  This is improper.  Visto's comment that the language "is clear on its face" and "does not require any definition other than its ordinary meaning," Visto Br. at 14, 16, just dodges the question:  "what is the ordinary meaning?"  Determining the ordinary meaning of a term is a significant part of claim construction.  Sometimes the ordinary meaning of a term is "readily apparent," and sometimes not.  Phillips, 415 F.3d at 1314.  But whether the ordinary meaning is readily apparent or not, the parties and the court must address the issue.  For the Court to find out if the

meaning of a term identified for construction is disputed and then to resolve any dispute, the first step is for the parties to say what they think the term means.

The terms that Visto refuses to construe were identified in the Supplemental Joint Claim Construction Statement pursuant to the Court's Order of May 3, 2006. At that hearing Sproqit identified the importance of construing the verbs in the claims, including "generating . . . from." Sankaran Decl. (submitted herewith) Ex. A. Sproqit reminded Visto of the importance of addressing all the identified limitations before Visto prepared its brief. Sankaran Decl. Ex. B.

Visto should not be allowed to pick and choose what issues it will deign to brief. Nor should Visto be allowed to address these terms for the first time in its reply brief. Sproqit's construction of these terms should be adopted as undisputed. Competitive Techs., Inc. v. Fujitsu Ltd., 333 F.Supp.2d 858, 863 (N.D. Cal. 2004) (declining to consider arguments raised for the first time in a reply brief).

## II.     Visto Misuses Dictionary Definitions

Visto's proposed constructions misuse dictionary definitions. Visto's treatment of "workspace element" is an example. Visto points to no definition for "workspace element" in any dictionary, technical or otherwise. Instead, Visto points to a dictionary definition of "element" as "a constituent part." Visto Br. at 10. The problem with Visto's approach is that picking dictionary definitions without regard for the intrinsic evidence can lead to insensible results. Renishaw, 158 F.3d at 1250 ("Indiscriminate reliance on definitions found in dictionaries can often produce absurd results . . . .") (internal citations and quotations omitted). Following Visto's approach one could look up "workspace" and find it defined as "an area used or allocated for one's work, as in an office." Sankaran Decl., Ex. C (The American Heritage® Dictionary of the English Language: Fourth Edition, 2000 (online edition)). Combining these two dictionary definitions, a "workspace element" is "a constituent part of an area used or allocated for one's work, as in an office" – such as a chair or a reading light. This is the type of absurd result that the Federal Circuit has warned against. Visto's approach ignores the teaching of the patents and runs afoul of the Federal Circuit's admonition that dictionaries, which "by their nature, provide an expansive array of definitions," cannot replace the intrinsic evidence. Phillips, 415 F.3d at 1321-23.

Another example is Visto's construction of the word "copy," where Visto piles one dictionary

-4-

definition on top of another to re-write its claims.  First, Visto cites a dictionary that defines a copy as including an "imitation."  Visto Br. at 8.  Then Visto cites a dictionary definition of "imitation" as "resembling something that is usually of better quality."  Id. at 8-9.  The problem is that the definition of "imitation" that Visto tries to apply is inapplicable to the context of the claim.  The rest of the definition of "imitation," and the sample usage, which Visto did not quote are:  "not real (~ leather)."  See Khaliq Decl. Ex. G.  No one of ordinary skill would read "independently modifiable copy" of a workspace element to mean a "faux" workspace element.  Again Visto demonstrates the errors that can come from the improper use of dictionary definitions.  Moreover, if there was some nuance of linguistic significance between "copy" and "imitation," it was incumbent on Visto to choose the appropriate word during prosecution.  It is improper for Visto to do so after the fact with a series of dictionary definitions.

**III.    The Written Description of the '708 Patent Cannot Be Used to Construe the Claims of the '192 and '131 Patents**

New matter in the '708 Patent cannot, as Visto attempts, be used to construe the claims of the '192 and '131 Patents.  The '192 and '131 Patents are related to each other, but neither is related to the '708 Patent.  The '192 and '131 Patents share the same written description and claim priority to an application filed in April 1996.  The '192 Patent issued directly from the April 1996 application.  The application that resulted in the '131 Patent was filed in October 1998 and was a continuation of the April 1996 application.  The '708 Patent issued from a different patent application filed in May 1997.  The '192 and '131 Patents do not claim priority to the '708 Patent, do not refer to the '708 Patent, and do not incorporate the '708 Patent by reference.  The '708 Patent contains new matter relating to formats and translation not found in the '192 and '131 Patents.  New matter in the '708 Patent cannot be used to construe any term in the '192 and '131 Patents claims.  The Federal Circuit has stated that claim language in one patent cannot be construed based on a disclosure in an unrelated patent.  When patent applications are filed separately, they "lack the formal relationship necessary for free license to use the contents" of one patent in construing the claims of another.  Goldenberg v. Cytogen, Inc., 373 F.3d 1158, 1168 (Fed. Cir. 2004).  "Absent a formal relationship or incorporation during prosecution,

the new-matter content of [the later-filed application] is not available to construe the claims" of a

patent that issued from a previously filed application.  Id.

## ARGUMENT ON STRUCTURAL LIMITATIONS

**I.   "an independently modifiable copy of the first workspace element"**

| Sproqit's Construction | Visto's Construction |
|---|---|
| A workspace element is the basic unit of workspace data, for example, an e-mail in the case of e-mail data, a file in the case of file data, or a calendar entry in the case of calendar data. | *workspace element*: A subset of workspace data such as an e-mail, file, bookmark, calendar, or applications program which may include version information. "First" is used as a label to denote one of one or more claim elements and does not require construction. |
| An independently modifiable copy of the first workspace element must include all the components of the first workspace element and may be changed independently of and to the same extent that the first workspace element could be changed. | *independently modifiable copy*: A copy of a workspace element capable of being modified independent of the workspace element. The copy of the workspace element does not have to be in the same format as the workspace element. |

### A.   Workspace Element

Workspace element is a term without any ordinary meaning, and as such its meaning to one of

ordinary skill must be determined from the intrinsic evidence.  Alza Corp. v. Mylan Labs. Inc., 391

F.3d 1365, 1370 (Fed. Cir. 2004).

The '192, '131 and '708 Patents each describes and sets out to address the problem of

maintaining consistency among multiple independently modifiable copies of a document.  See above at

1-2.  In each of the patents, the first meaning ascribed to the term "workspace element" is by analogy

to a "document":

> Therefore, a system and method are needed for providing users with data
> consistency, and more particularly for synchronizing multiple copies of **a**
> **workspace element such as a document** . . . .

'192 Patent, 1:46-49; '131 Patent, 1:50-53; '708 Patent, 1:53-56.

The '192 and '131 Patents each define a "workspace element" as an email in the case of email

data, a file in the case of file data, a calendar entry in the case of calendar data, and so on:

> It will be further appreciated that the e-mail data 165, file data 170,
> calendar data 175 and user data 180 may each be divided into workspace
> elements, wherein each workspace element is identified by particular

version information 255 (described below with reference to FIG. 2).
**Accordingly, each e-mail, file, calendar entry, etc. may be referred to**
**as "a workspace element in workspace data."**

'192 Patent, 3:26-32; '131 Patent, 3:32-39.[2]  See <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (noting that the "specification acts as a dictionary when it expressly defines terms used in the claims").  There is no suggestion anywhere in the '192 or '131 Patents that a portion, or an individual field, of an email is a "workspace element."

The later-filed '708 Patent adopts a slightly different definition of workspace element.  The difference is that '708 Patent explains that a **folder** of workspace elements, such as a **folder** of emails, a **folder** of bookmarks, a **folder** of documents, and so on, can also be considered a workspace element:

It will be further appreciated that the e-mail folder 138, file folder 142, calendar folder 140 and bookmark folder 144 may each be divided into workspace elements, wherein each workspace element folder or each workspace element individually is identified by particular version information 255 (described below with reference to FIG. 2). **Accordingly, each e-mail _or e-mail folder_, file _or file folder_, calendar _or calendar folder_, bookmark _or bookmark folder_, document _or document folder_, etc. may be referred to as "a workspace element."**

'708 Patent, 3:20-29.  Apart from this difference, the '708 Patent defines a workspace element as an email in the case of email data, a file in the case of file data, and so on.  Consistent with this definition, the '708 Patent states that:

The synchronization means may synchronize **workspace elements individually, e.g., specific word processor documents**, or may synchronize workspace element folders, e.g., a bookmark folder.

'708 Patent, 4:31-34.  But again, there is nothing in the '708 Patent to suggest that a portion, or an individual field, of an email, or a bookmark, etc., is a workspace element.

Each of the '192, '131 and '708 Patents teaches that the smallest possible unit of a "workspace element" is an email in the case of email data, a file in the case of file data, a calendar entry in the case of calendar data, and so on.  As noted above, each patent set out to solve problems of data consistency

---

[2]    There is one difference between the written descriptions of the '192 and '131 Patents.  In the highlighted sentence the '192 Patent omits the word "entry" after calendar.  When the word "entry" was added to the '131 Patent during prosecution, Visto acknowledged the word "entry" added no new matter to what was disclosed in the '192 Patent application.  Sankaran Decl. Ex. D (Preliminary Amendment at 7) ("No new matter is being added.").

-7-

when a computer network maintained multiple independently modifiable copies of a workspace element such as a document. The copies are intelligible and can be independently accessed and modified because they are complete and are not simply data fragments. As the written description of each patent explains, the type of data defines the smallest level of document or workspace element. This is exactly what each patent teaches and what one of ordinary skill would understand a workspace element to be. Indeed, Visto admitted as much when it previously argued – supported by the sworn testimony of its expert, Dr. Head – that the entire email was the workspace element:

> Accordingly, a workspace element can be represented by either an e-mail folder or an individual e-mail. [Head Decl. ¶ 28]. The term "e-mail" refers to the message headers, the message body, status indicators (such as (opened/unopened, deleted/undeleted, and other parameters such as urgency, and other message or system dependent parameters, etc.). [Id.]

Sankaran Decl. Exs. E, F (brackets in original). If Visto had wanted workspace element to mean any bit of data, it could have adopted that definition or used a term like "data bit" in the claim, but Visto did not.

There is nothing in the intrinsic evidence to support Visto's argument that a portion of an email (or bookmark, etc.) or a single field of an email (or book mark, etc.) constitutes a workspace element. If the term "workspace element" was meant in include a **portion** of an email, a **portion** of a bookmark or a **portion** of a document, as Visto now argues, the time to make this clear was during prosecution. Yet Visto did not adopt that definition during prosecution. In the later-filed '708 Patent application, Visto went so far as to explain that a workspace element could be **more** than a single email, a single bookmark or a single document, but Visto did nothing to indicate that **less** than a single email, a single bookmark or a single document could be a workspace element. Visto's proposed construction is contrary to the intrinsic evidence and Visto's own prior arguments and should be rejected.

Sproqit's proposed construction should be adopted.

### B. Independently Modifiable Copy

The '192, '131 and '708 Patents each teach that a "copy" should include all the components of the original. The '192 and '131 Patents explain the nature of a "copy" in the context of workspace data:

> An independently modifiable copy of the workspace data 185, referred to

-8-

> herein as workspace data 123, is stored on the global server 120 for easy access by a user from the remote terminal 105.  Being **a copy**, the workspace data 123 includes independently modifiable copies of **each workspace element in workspace data** 185 and an independently modifiable copy of version information 255 (Fig. 2), referred to herein as version information 124.

'192 Patent, 3:32-40; '131 Patent, 3:40-47.  The '708 Patent has a similar passage:

> The global server 106 stores independently-modifiable copies of selected portions of the workspace data 136 and 116, collectively referred to herein as workspace data 120.  Accordingly, the workspace data 120 **includes an independently-modifiable copy of each workspace element** in the selected portions of the workspace data 136 and 116 **and an independently-modifiable copy of each corresponding version information** 255 (FIG. 2) and 150.

'708 Patent, 3:66-4:7.  Accordingly, just as the patents teach that a "copy" of workspace data must include all the components of that workspace data, a "copy" of a workspace element must include all the components of that workspace element.  This is consistent with the dictionary definition proffered by Visto:  a copy is an "imitation, transcript, or reproduction of an original work."

Visto's argument that a "copy" need not be "an exact" copy, Visto Brief at 8-9, should be rejected.  As an initial matter, Judge Ward already rejected this exact argument when Visto made it in the Texas litigation, because it would improperly expanding the scope of the claim.  Texas Claim Construction Order, at 16-17 (Khaliq Decl. Ex. E).  More fundamentally, Visto is simply trying to add qualifiers into the claims where none exist.  Visto is trying to use claim construction to turn the word "copy" into "partial copy."  Visto had the opportunity to put qualifiers like "partial" in front of the word "copy" during patent prosecution, but did not.  Visto need not have used the word "copy" in its claims at all.  Visto could have referred to an independently modifiable "portion" of the first workspace element, or an independently modifiable "variant" of the first workspace element.  But Visto did not.  Instead, Visto chose to use the word copy, without adding qualifiers like "partial" or "incomplete."  Visto cannot now re-write its claim to require a "partial" copy.

The written description of the '708 Patent does not support Visto's attempt to re-write the term "copy" either.  (As discussed above, the new matter in the '708 Patent cannot be used to construe claim terms in the '192 and '131 Patents.)  The '708 Patent addresses the situation where different application programs (e.g., Netscape Navigator and Microsoft Internet Explorer) use different

-9-

languages or formats to store data. The '708 Patent uses the example of a bookmark which requires elements W, X and Y in Format A and elements X, Y and Z in Format B. Two of the three elements in each bookmark are identical. Although Element W and Element Z are not identical these could well be the same data in a different file format or language. At the most, the '708 Patent teaches that a workspace element and a copy can have the differences required to represent the same data structure in the different formats required by different application programs. There is nothing in the '708 Patent which teaches that a portion of a workspace element is a "copy" of a workspace element. For example, there is nothing in the '708 Patent which suggests that Element W is a "copy" of the bookmark composed of Elements W, X and Y.

Sproqit's proposed construction should be adopted.

## II.   "Version Information"

| Sproqit's Construction | Visto's Construction |
| --- | --- |
| Version information is information associated with each workspace element that: a) indicates, and can be examined to determine whether, the workspace element has been changed; b) can be used to place the workspace element in sequence (i.e., before or after) other versions of that workspace element; and c) can be used to generate a preferred version.<br><br>Each workspace element has version information associated with it, but the version information is distinct from the workspace element and is not the change to the workspace element itself.<br><br>First version information is associated with, and relates to, the first workspace element.<br><br>Second version information is associated with, and relates to, the independently modifiable copy of the first workspace element. | Information that can be used to determine the version of a workspace element. |

Sproqit's proposed construction of version information is consistent with the claim language and the specification, which make clear that "version information" has several basic properties, each of which discussed in turn.

-10-

1   **Each workspace element is associated with version information**:  The patent claims require

2   that each workspace element or copy is associated with version information.  See, e.g., '192 Patent,

3   Claim 1 ("first version information which indicates whether a first workspace element . . . has been

4   modified").  The written descriptions of the patents also explain that each workspace element is

5   associated with version information:  "[E]ach workspace element is identified by version information

6   255 . . . ."  '192 Patent, 3:28-29; '131 Patent, 3:34-35.  Similarly, each independently modifiable copy

7   of a workspace element has an independently modifiable copy of version information.  '192 Patent,

8   3:35-39; '131 Patent, 3:42-46.

9   **First and Second Version Information Relate to the First Workspace Element and the**

10  **Copy, Respectively:**  As discussed above, the claims and written description make clear that first

11  version information is associated with, and relates to, the first workspace element, and that second

12  version information is associated with, and relates to, the independently modifiable copy of the first

13  workspace element.

14  **Version information is distinct from the workspace element**:  The patent claims distinguish

15  between the workspace element or copy and version information.  All the claims separately call out the

16  workspace element or copy and the associated version information.  See, e.g., '131 Patent, Claim 1

17  ("first memory storing a first workspace element and first version information for identifying any

18  modifications to made to the first workspace element . . . . ")  Although each workspace element has

19  version information associated with it, the version information is a data structure distinct from the

20  workspace element.  The '192 and '131 Patents carefully distinguish between the workspace element

21  and the version information associated with it.  The terms "workspace element" and "version

22  information" are not used interchangeably; just the opposite is true.  The workspace element and the

23  "version information" are distinct data structures separately recited in the claims.  The version

24  information contains fact or data about the version of the workspace element.  Because version

25  information is a data structure required by the claim, the version information cannot be the absence of

26  such a structure.  Because version information is a required structure that indicates whether a document

27  has been modified, the modification within the document cannot be the version information.  That is,

28

-11-

version information is a preexisting structure associated with each workspace element and copy and it is not the change in the workspace element itself.

**Version information indicates, and can be examined to determine whether, the workspace element has been changed:** Each asserted claim of the '192 and '131 Patents requires that version information indicates and can be examined to determine whether the first workspace element or its copy has been modified. For example Claims 1, 21, and 22 of the '192 Patent recite "generating first examination results from first version information which indicates whether a first workspace element . . . has been modified." Similarly, Claims 1, 16, 31, and 42 of the '131 Patent recite "first version information for identifying any modifications made to the first workspace element." This requirement is also clear from the written description which explains that:

> The present system includes a general synchronization module . . . for **examining first version information to determine whether a first workspace element has been modified**. The system further includes . . . . **second version information which indicates whether an independently-modifiable copy of the first workspace element has been modified** . . . .

'192 Patent, 1:60-2:2; '131 Patent, 1:64-2:6.

**Version information can be used to place the workspace element in sequence (i.e., before or after other versions of that workspace element:** Version information, by its very nature allows each version to be placed in sequence relative to others. One example of version information is a date-time stamp. The written description explains that

> The service data 250 includes version information 255 indicating the date and time of the last modification. The service engine 245 operates to update the version information 255 whenever modifications are made.

'192 Patent, 4:31-35; '131 Patent, 4:37-41.

A "version," according to Visto's dictionary definition, is "a particular issue or release of a hardware product or software title." Sankaran Decl. Ex. G (Microsoft Press Computer Dictionary, Third Edition, at 493.)[3] Consistent with that definition, "version information," is information about the

---

[3]     Visto cited this definition in the Supplemental Joint Claim Construction Statement Exhibit B, page 2.

particular issue or release of a hardware product or software title.  The classic example is the version or release number of a software program, e.g., Microsoft Word Version 6.0, Microsoft Word Version 7.0, etc.  The version information allows the user to place the versions in sequence.  For example, the version information tells us that Microsoft Word Version 7.0 came after Microsoft Word Version 6.0.  In the context of the '192 and '131 Patent "version information" relates not to hardware or software, but to workspace elements.  Accordingly, version information is information about the particular issue or release of a workspace element or its copy and should allow the different issues or releases to be placed in sequence.

**Version information can be used to generate a preferred version:**  The claims make clear that version information plays a role in generating a preferred version.  A preferred version may be generated directly from comparison of version information (e.g., 192 Patent, Claim 10), or through the generation of examination results (e.g., 192 Patent, Claim 1).  The written description also explains that version information can be used to generate a preferred version.

> The system further includes means for generating a preferred version from the first workspace element and from the copy by comparing the first version information and the second version information . . . .

'192 Patent, 2:5-9; '131 Patent, 2:8-12.  Because version information indicates and can be examined to determine whether a workspace element has been modified, and because version information can be used to place multiple versions in sequence, it is natural that version information can be used to generate a preferred version from multiple workspace elements.

Visto's construction, that "version information" is any information that can be used to determine the version of a workspace element, should be rejected.  Visto's construction is really no construction at all.  Rather, it simply uses the terms "version" and "information" to define version information, without ever explaining what "version information" is.  One might examine the content of a workspace element to see if it was changed from a previous version.  Under Visto's construction, the text of a workspace element itself is "version information" because it can be used to determine whether the workspace element has been modified.  Visto's construction is so broad that it essentially writes "version information" out of the claim.  Version information is a data structure recited in the claims for each workspace element.  The mere possibility that version information could be generated does not

-13-

1 | constitute version information.

2 |     Sproqit's proposed construction should be adopted.

3 | **III.**   **"Examination Results"**

| **Sproqit's Construction** | **Visto's Construction** |
|---|---|
| Examination results are generated from version information and determine whether a workspace element has been changed. The examination results are not the change itself.<br><br>First examination results are generated from the first version information and relate to the first workspace element. Second examination results are generated from second version information and relate to the independently modifiable copy of the first workspace element. | Information regarding one or more workspace elements obtained by examining those workspace elements. |

An examination result is the result of an examination or analysis. As recited in the claims of the '192 and '131 Patents, the examination results are the results of an examination of version information. As discussed above, the version information indicates whether a workspace element or copy has been modified. The version information is analyzed and the results of that analysis determine whether the workspace element has been modified.

> The present invention includes a general synchronization module. . . for **examining first version information to determine whether a first workspace element has been modified**

'192 Patent, 1:60-63; '131 Patent, 1:64-67. The analysis of version information may include a comparing the version information against the date and time of last synchronization. '192 Patent, 5:50-55, 7:8-13; '131 Patent, 5:57-62, 7:15-20.

The examination results are a data structure resulting from the examination of version information. Examination results are a data structure distinct from the workspace element or copy and distinct from the version information. Just as version information is not the workspace element itself, or a change to the workspace element, neither are the examination results. All are called out separately in the patent claims. The claims make clear that the first examination results determine whether the

first workspace element has been modified and are generated from the first version information. The second examination results determine whether the independently modifiable copy of the first workspace element has been modified and are generated from second version information.

Visto's proposed construction is inconsistent with the claim language. Visto argues that the "examination result" is "obtained by analyzing workspace elements." Visto Br. at 13. But the claims make clear that the examination result is generated from, or obtained by analyzing, version information, not workspace elements:

> "generating first examination results **from** first version information" ('192 Patent claims 1, 6-8, 22)
>
> "generating second examination results **from** second version information" ('192 Patent claims 1, 6-8, 22)
>
> "generating **from** the first version information a first examination result" ('131 Patent claims 1, 31)
>
> "generating **from** the second version information a second examination result" ('131 Patent claims 1, 33).

Visto similarly misses the mark when it argues that examination results relate to more than one specific workspace element. Visto never explains the basis for its construction. Contrary to Visto's argument the patent claims specify separate examination results for the first workspace element and the copy. The "first examination result" relates to the "first workspace element" and the "second examination result" relates to the "second workspace element." Thus, the claims do not contemplate more than one workspace element for each examination result.[4]

Sproqit's proposed construction should be adopted.

## IV.    "Generating second examination results from second version information"

| Sproqit's Construction | Visto's Construction |
|---|---|
| Analyzing second version information to obtain second examination results which determine whether an independently modifiable copy of the first workspace element has been changed. | [None. Visto merely repeats its constructions of "version information" and "examination results"] |

---

[4]    The one exception is Claim 16 of the '131 Patent, which covers a situation in which there are multiple first workspace elements and multiple copies. In that case the examination results "indicate which first workspace elements" and "which copies" have been modified.

-15-

The term "generating second examination results from second version information" means analyzing second version information to obtain second examination results. The second examination results, as discussed above, determine whether an independently modifiable copy of the first workspace element has been changed. While Visto has proposed a construction for "examination results" and "version information," Visto has not proffered a construction for "generating second examination results from second version information." The claim language specifically requires the "second examination results" to be "generated. . . from" second version information. An examination or analysis of the second version information is required to bring the second examination results into existence.

Sproqit's proposed construction should be adopted as undisputed.

## V.   "Initiating steps __ and __ from within the firewall"

| Sproqit's Construction | Visto's Construction |
|---|---|
| Causing the referenced steps to be executed by sending an instruction from within the firewall. | [None] |
| A firewall is a system or group of systems that enforces an access control policy between two networks. | *firewall*: Software and/or hardware for protecting an organization's network against external threats, such as hackers, coming from another network, such as the Internet. A firewall prevents computers in the organization's network from communicating directly with computers external to the network and vice versa by routing all communications through a proxy server outside of the organization's network for a determination whether a particular message or file will be permitted to pass through to the organization's network. |

### A.   "Initiating. . . from . . . within . . . ."

"Initiating steps __ and __ from within the firewall" means causing the recited steps to be executed by sending an instruction from within the firewall. The steps recited in the claims are the generation of first examination results and the generation of second examination results. Visto refuses to take a position on the construction of this phrase other than the word "firewall."

-16-

The plain language of the '192 Patent claims requires that the recited steps are initiated from within the firewall.  For example, claim 1 of the '192 Patent recites:  "initiating steps (b) and (c) from within the firewall."  Claims 6-8 and 22 of the '192 Patent recite "initiating steps (a) and (b) from within the firewall."  The '192 Patent explains the technical importance of this approach:

> Since synchronization is initiated from within the firewall, the typical firewall, which prevents in-bound communications, does not act as an impediment to workspace data synchronization.

'192 Patent, 2:45-48.  The referenced steps, performed by software, are initiated by an instruction sent from within the firewall.  The instruction is sent from within the firewall because the "typical firewall" prevents "in-bound communications."  Id.

The '192 Patent specification describes initiation from within the firewall:

> The synchronization start module 420 [which is located in base system 190 which is within the firewall as shown in Fig. 1] includes routines for determining when to initiate synchronization of workspace data 123 [shown within the firewall in Fig. 1] and workspace data 185 [shown in the global server outside the firewall in Fig. 1]. . . .  The synchronization-start module 420 **initiates data synchronization by instructing** the general synchronization module 425 to begin execution of its routines.  It will be appreciated that communications with synchronization agent 126 preferably initiate from within the corporate LAN 1135 [sic], because the typical corporate firewall 130 prevents in-bound communications and allows outbound communications.

'192 Patent, 5:35-49.

Sproqit's proposed construction should be adopted as undisputed.

**B.    "Firewall"**

Sproqit's construction of the term "firewall" should also be adopted.  A firewall is an electronic boundary between networks that are linked together.  See Sankaran Decl. Exs. H, I (Morse, Cyber Dictionary (1996); Freedman, The Computer Desktop Encyclopedia (1996)).  A simple definition found in the literature is that a firewall is a system or group of systems that enforce an access control policy between two networks.  See Sankaran Decl. Exs. J, K.  The patent does not specifically require the use of "proxy server" or any other device in implementing a firewall.  In fact, the specification supports Sproqit's construction not Visto's because the only characteristic of firewalls referenced by the patent is its ability to prevent inbound communications not outbound communications:

-17-

> "the typical corporate firewall 130 prevents inbound communications and allows outbound communications."
>
> \*\*\*
>
> the typical firewall, which prevents inbound communications . . . ."

'192 Patent, 5:47-49; 2:46-47.  Sproqit's construction is consistent with the '192 Patent specification, which does not address restrictions on outbound communications.  Visto, however, improperly attempts to construe "firewall" to limit outbound communications:  "A firewall prevents computers in the organization's network from communicating directly with computers **external to the network** . . . ."  Visto. Br. at 14.  The '950 Application on which Visto relies says that a firewall "**may** include" a proxy server, not that a proxy server is required.  <u>See</u> Visto Br. at 16 (last sentence of first bullet point) (emphasis added).  Visto improperly attempts to limit "firewall" to a particular implementation that is not required by the claims or described in the '192 Patent specification.  Visto's proposed construction was rejected in the Texas litigation.  Khaliq Decl. Ex. E at 14-15.

Sproqit's proposed construction should be adopted.

## VI.    "First format"/"Second format"

| Sproqit's Construction | Visto's Construction |
|---|---|
| A format is the structure or appearance of a unit of data. The arrangement of data within a document file that that typically permits the document to be read or written by a certain application. Many applications can store a file in a more generic format, such as plain ASCII text. | *format*:<br><br>Any method of arranging information that is to be stored or displayed. The format of a workspace element refers to the way the information is stored in it. |
| The first format is one system or protocol (i.e., language) for representing data. In the context of the '708 Patent claims, the second format is a different system or protocol (i.e., a different language) for representing the same data. | The terms "first" and "second" are used as labels to denote one of one or more claim elements and do not require construction. |

### A.    "Format"

A format is the structure or appearance of a unit of data; the arrangement of data within a document file that that typically permits the document to be read or written by a certain application. Sankaran Decl. Ex. L (Microsoft Press Dictionary of Computer Terms, 3d Edition (1997)).

-18-

This definition is consistent with the written description of the '708 Patent.  In defining the
problem addressed, the '708 Patent explains that the use of different formats for different application
programs would require translation:

> Data consistency problems may also arise when using application
> programs from different vendors.  For example, the Netscape
> Navigator™ web browser and the Internet Explorer™ web browser each
> store bookmarks for quick reference to interesting web sites.  However,
> since each web browser uses different formats and stores bookmarks in
> different files, the bookmarks are not interchangeable.  In addition, one
> web browser may store a needed bookmark, and the other may not.  A
> user who, for example runs the Internet Explorer™ web browser at home
> and runs the Netscape Navigator™ web browser at work risks having
> inconsistent bookmarks at each location.

'708 Patent, 1:41-52.    In other words, different applications programs use different protocols or
languages for representing data, and it is necessary to translate between the different formats.

The '708 Patent states that the global translator translates between two different formats
thereby making merging information from two different application programs possible:

> Since the system and method include format translation, merging of
> workspace elements between different application programs and
> different platforms is possible.

'708 Patent, 2:31-34.  In short, the translator, as described by the '708 Patent, maintains a global
format from which it translates to different formats:

> FIG. 6 illustrates an example bookmark workspace element in the global
> format.  The global translator 122 incorporates all the information
> needed by both formats (Format A and Format B) to create the Global
> Format.

'708 Patent, 8:47-50.

**B.**    **"First"/"Second"**

In the context of the '708 Patent, the "first format" and the "second format" are different
protocols or languages for representing the same data.  The asserted independent claims of the '708
Patent claims recite a workspace element in a "first format," a copy of the first workspace element in a
"second format," and " **translating between** the first format and the second format."  '708 Patent,
Claims 1 and 17 (emphasis added).  Because the claims recite translation between the first and second

-19-

formats, the formats cannot be the same.  There can be no translation between a workspace element and its copy, when both are stored in the same language or format.

Visto's reliance on a statement from the specification that suggests that the two formats "may be" different is misplaced.  Visto could have drafted a claim in which format differences are optional (e.g., "storing a first workspace element; storing a second workspace element; and a translator for translating if the first workspace element and the copy are stored in different formats).  But Visto did not claim such an embodiment.  Instead, every asserted claim of the '708 Patent provides for translation between the first format and the second format, and thereby defines the first and second formats as different.

The prosecution history supports Sproqit's construction.  In order to obtain allowance of the claims, Visto distinguished its claims based in part on the "translating" requirement:

> [C]laims 1 and 17 include language "translating between the first format and the second format."  Translation is needed when a first workspace element is in a different format than a second workspace element.

Sankaran Decl. Ex. M (Response to Office Action at 3).

The only way Visto's construction could make sense is if workspace elements in the same format are translated into a "global format" and then back to their original format.  Visto's construction would need to be amended, however, to include the "global translator" and "global format" as claim limitations.  This construction of the '708 Patent claims has support in the prosecution history.  During prosecution  in order to distinguish art and overcome the rejection of Claims 1 and 17, Visto limited its claims to the use of a global translator:

> [I]ndependent claims 1 and 17 recite a system and method, respectively, for synchronizing two versions of a workspace element across a network **using a global translator**.

Sankaran Decl. Ex. M (Response to Office Action at 3) (emphasis added).  This is prosecution history disclaimer.  Omega Engineering, Inc. v. Raytek Corp., 334 F.3d 1314, 1323-24 (Fed. Cir. 2003).  Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers.  Southwall Technologies, Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir.

1   1995).  Visto further noted that this limitation is incorporated in to all claims that depend on Claims 1

2   and 17.  Id.  The '708 Patent explains that "[t]he global translator 122 incorporates all the information

3   needed by both formats (Format A and Format B) to create the Global Format."  '708 Patent, 8:48-50.

4       Sproqit's proposed construction should be adopted, and to the extent that the claims are

5   construed to cover workspace elements stored in the same format, then consistent with the prosecution

6   history, the asserted claims of the '708 Patent should be limited use of a global translator and global

7   format.

8   **VII.   "Global Server"**

| **Sproqit's Construction** | **Visto's Construction** |
|---|---|
| A global server is a secure globally accessible third party computer or computer network outside the corporate LAN. The global server is accessible through a network such as the Internet. The global server stores an independently modifiable copy of selected portions of the first workspace data. The global server is configured to identify and authenticate users attempting to access it from a remote terminal and is configured to provide access either to the workspace data stored on the client or to the workspace data stored on the global server. The global server has a memory for storing data. | A server accessible from remote locations which stores independently modifiable copies of selected portions of workspace data. |

18      The term "global server" does not have an ordinary meaning.  The specification defines the

19  global server as a secure, globally accessible third party:  "The system and method of the present

20  invention advantageously provide a secure globally accessible third party, i.e. the global server."  '221

21  Patent, 3:55-57.  The '221 Patent did not use "e.g.," meaning for example, but rather used "i.e." which

22  means "that is."  The global server authenticates users seeking to access data:

23          The global server is configured to identify and authenticate a user
24          attempting to access it from a remote terminal, and is configured to
            provide access based on the client configuration either to the first set of
25          workspace data stored on the client or to the second set of workspace
            data stored on the global server.
26

27  '221 Patent, 2:57-63.  Consistent with this definition, Figure 1 from the '221 Patent shows that the

28  "global server" is positioned outside the corporate LAN.

-21-

The '221 Patent makes clear that the global server has the ability to synchronize workspace data stored at the global server with the workspace data at the LAN:

> The global server 115 also includes synchronization agent 145 [shown as a box at the global server in Fig. 1] for examining the workspace elements of workspace data 163 [shown at the global server]. More particularly, the base system 170 [shown at the LAN] and the synchronization agent 145 . . . cooperate to synchronize the workspace data 163 [shown at the global server] with the selected portions of the workspace data 180 [shown at the LAN].

'221 Patent, 6:42-47. For this reason, the storage of data at the global server, while not necessarily permanent, must be more than ephemeral.

Devices outside the LAN, such as the "Remote Terminal" and "Client" – shown as boxes 105 and 167 in Figure 1 – communicate with the global server <u>not</u> directly with the LAN. To the extent, a client wants to communicate with the LAN, the '221 Patent discloses enabling such through the global server:

> Using the present invention, the user can operate any remote client 105 connected to the Internet to access the global server 115, and thus to access the services and the workspace data on or accessible by the global server 115.

'221 Patent, 7:6-9. The patent defines the term "global server" to be a "third party" that is outside the LAN and "globally accessible" which means it will be accessible to all users, unlike a corporate LAN.

Sproqit's construction is also consistent with Visto's statements in a related patent. The '221 Patent is a continuation-in-part of the U.S. Patent Application No. 08/841,950 ("the '950 Application"). In the '950 Application, Visto explained that providing "direct access to systems behind firewalls compromises security." Sankaran Decl. Ex. N ('950 Application at 4-5). During prosecution of the '950 Application, Visto explained that "[a]s shown, the 'Global Server' is a server that is accessible from any connected site in the world." Sankaran Decl. Ex. O (Response to Office Action, at 10) (emphasis added). In the same office action response, Visto explained:

> Applicant's invention is directed at a secure system and method for maintaining **a central site, i.e. a global server**, which stores downloadable connection information, a key and downloadable interface information to many services. An authorized user can access the server from any remote site having a browser, and an request a connection to one of the services.

-22-

1    Id. (emphasis added).

2         Finally, as recited in the asserted independent claims, the global server stores differences

3    between first workspace data and second workspace data.  The data must be stored until the roaming

4    user connects to the global server.  Accordingly, this storage, while not necessarily permanent, must be

5    more than ephemeral.

6         Visto's proposed construction focuses on connecting to a global server from remote locations,

7    but fails to address the location of the global server.  In the context of the '221 Patent, the global server

8    must be outside the corporate LAN.  A global server cannot be located within the corporate LAN

9    because that would be contrary to the '221 Patent specification, which defines the global server as "a

10   secure globally accessible third party."  '221 Patent, 3:55-57.  See also '221 Patent, Fig. 1 (showing the

11   global server separate from the corporate LAN).  Furthermore, the claims make clear that the global

12   server is separate from "a first device" and a "second device."  The first and second devices could be

13   represented by the corporate LAN.  However, the specification would not support any construction in

14   which the global server could be part of the corporate LAN.

15        Sproqit's proposed construction should be adopted.

16                    **ARGUMENT ON MEANS-PLUS-FUNCTION LIMITATIONS**

17   **I.    "Means for translating. . ."**

18        A table showing each party's proposed construction is attached as Sankaran Declaration

19   Exhibit P.  The structure disclosed in the '708 Patent for performing the function of "translating

20   between the first format and the second format" includes the global translator which translates between

21   the Global Format, Format A and Format B.  "FIG. 7 [of the '708 Patent] is a flowchart illustrating a

22   method 7000 for using a global translator 122 to synchronize multiple copies of a workspace element

23   in a secure network."  '708 Patent, 8:63-65.  In Figure 7 of the '708 Patent, the box labeled number

24   750 specifically reads "Translate Changes To Corresponding Stores Format(s)."  As described in the

25   '708 Patent, the global translator translates between formats.  In particular, if only one version of a

26   workspace element was changed, then the global translator translates the changes to be consistent with

27   the format used in storing in the other device:

28

SPROQIT'S CLAIM CONSTRUCTION BRIEF
CASE NO. C-04-0651 EMC

> If only one version has been modified, then the corresponding general synchronization module 425 or 515 in step 745 determines the changes made. As stated above, determining the changes made may be implemented by comparing the current status of the workspace element against the previous status of the workspace element as of the last interaction therebetween. If the changes were made only to the version in workspace data 120 [which is shown in Fig. 1 as the data in the Global Server], then the global translator 122 in step 750 translates changes to the format used in the other store . . . ."

'708 Patent, 9:49-57. However, if both versions have been modified, then the global translator is called after the synchronization routines including the content-based synchronization module have performed tasks to determine the preferred version. '708 Patent, 10:5-24. Visto's construction fails to even mention the global translator which is the structure described in the written description that performs the recited function and must be included in the recited "means for translating."

Sproqit's proposed construction should be adopted.

## II.   "Synchronization means for synchronizing..."

A table showing each party's proposed construction is attached as Sankaran Declaration Exhibit Q. The parties appear to be largely in agreement on the construction of this term. Sproqit's proposed construction lists many modules of that are part of the recited means; the last synchronization module should also be included. Visto also includes those modules them but instead of listing them, notes that they are shown in the drawings.

There appear to be only two areas of possible disagreement. <u>First</u>, it is unclear whether Visto's construction includes the two structures shown in Figure 5 of the '708 Patent that perform the synchronization function. The claim recites synchronization means for "synchronizing the first workspace element and the second workspace element." To perform this function, the synchronization agent as shown in Figure 5 with its communications module and its own general synchronization module are required, and must be included in the recited means. <u>Second</u>, Sproqit's construction includes a statement as to the meaning of the function. As described above, the '708 Patent attempts to solve the problem of data consistency. The function claimed required examination of the workspace elements to ensure that they both contain the same data and to resolve any conflicts using the disclosed structures.

III.   **"Means for generating a preferred version"**

A table showing each party's proposed construction is attached as Sankaran Declaration Exhibit R.  Both Visto and Sproqit agree that the "means for generating a preferred version" includes the general synchronization module.  Sproqit specifies the routines included in the general synchronization module for performing the recited function of generating a preferred version, including routines for:  comparing version information for the first workspace element and the copy; determines if only one or both versions of the workspace element have been modified; if only one of the workspace element and the copy has been modified, then the general synchronization module selects the one that was modified.  See '192 Patent, 5:50-64, 7:8-15, 7:31-34, Fig. 6.

That construction, however, is incomplete, if Claim 10 of the '192 Patent is read to cover situations in which a workspace element and its copy have both been modified.  The '192 Patent specifies the use of a "content-based synchronization module" to generate a preferred version when a workspace element and its copy have both been modified:

> If more than one version has been modified, then the general synchronization module 425 in step 640 [shown in Fig. 6] instructs the content-based synchronization module 430 to reconcile the modified versions.

'192 Patent, 7:38-42 and Fig. 6.  If Claim 10 is read to cover situations in which the workspace element and its copy have both been modified, then the content-based synchronization module is necessary structure disclosed in the written description for performing the recited function.

**CONCLUSION**

For the reasons stated above, Sproqit's proposed claim construction should be adopted.

Respectfully submitted,

/s/ Sri K. Sankaran
Sri K. Sankaran
CA State Bar No. 236584
Attorney for Defendant

4846-7116-3393.1

-25-