United States District Court

For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VISTO CORPORATION, | No. C-04-0651 EMC |
| Plaintiff, | |
| v. | **ORDER RE CLAIM CONSTRUCTION -- "WORKSPACE ELEMENT" AND "INDEPENDENTLY MODIFIABLE COPY"** |
| SPROQIT TECHNOLOGIES, INC. | |
| Defendant. | **(Docket Nos. 166, 168, and 177)** |

_____/

Plaintiff Visto Corporation has sued Defendant Sproqit Technologies, Inc. for infringement of the '192, '708, '131, and '221 patents. The parties submitted ten terms or phrases to the Court for claim construction. A claim construction hearing was held on July 6, 2006. Having considered the parties briefs and accompanying submissions, the Court hereby issues this opinion to address the phrase "an independently modifiable copy of the first workspace element." While the Court provides a construction for the term "independently modifiable copy," for the reasons explained below, it rejects each party's proposed construction for the term "workspace element," provides a tentative construction to the parties, and orders the parties to further meet and confer to determine whether they can agree on the tentative construction or another similar construction. The Court shall subsequently issue an order addressing the remaining claim terms and phrases.

## I.   FACTUAL BACKGROUND

The four patents at issue are all related to data synchronization systems and methods.

A.   '192 Patent

The '192 patent is titled "System and Method for Securely Synchronizing Multiple Copies of a Workspace Element in a Network." The application for the '192 patent was filed on April 11, 1997. The '192 patent was issued on July 4, 2000.

B.   '708 Patent

The '708 patent is titled "System and Method for Using a Global Translator to Synchronize Workspace Elements Across a Network." The application for the '708 patent was filed on May 29, 1997. The '708 patent was issued on February 8, 2000. The '708 patent states that it is related to and incorporates by reference the application for the '192 patent.

C.   '131 Patent

The '131 patent has the same title as the '192 patent – *i.e.*, "System and Method for Securely Synchronizing Multiple Copies of a Workspace Element in a Network." The application for the '131 patent was filed on October 26, 1998. The '131 patent was issued on October 19, 1999. The '131 patent states that it is a continuation of and incorporates by reference the application for the '192 patent.

D.   '221 Patent

The '221 patent is titled "System and Method for Globally and Securely Accessing Unified Information in a Computer Network." The application for the '221 patent was filed on September 20, 2000. The '221 patent was issued on March 16, 2004. The '221 patent states that it is a continuation of and incorporates by reference another patent application, which is a continuation of several patent applications, including the application for the '192 patent and the application for the '708 patent.

## II.   DISCUSSION

A.   Legal Standard

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). "[T]he words of a claim 'are generally given their ordinary and customary meaning'" -- that is, "the meaning that the term would have to a person of ordinary skill in the art in

United States District Court

For the Northern District of California

1    question at the time of the invention, *i.e.*, as of the effective filing date of the patent application."  *Id.*

2

3             Because the meaning of a claim term as understood by persons of skill
     in the art is often not immediately apparent, and because patentees
4    frequently use terms idiosyncratically, the court looks to "those
     sources available to the public that show what a person of skill in the
5    art would have understood disputed claim language to mean."  Those
     sources include "the words of the claims themselves, the remainder of
6    the specification, the prosecution history, and extrinsic evidence
     concerning relevant scientific principles, the meaning of technical
7    terms, and the state of the art."

8    *Id.* at 1314.

9          The language of the claims, the specification, and the prosecution history are all considered

10   intrinsic evidence.  With respect to the specification, the Federal Circuit has warned that limitations

11   from the specification should not be imported into the claims.  *See id.* at 1323 (discussing

12   "avoid[ing] importing limitations from the specification into the claims").  Even so, the court has

13   also recently reiterated that "the specification is always highly relevant to the claim construction

14   analysis.  Usually, it is *dispositive*; it is the single best guide to the meaning of a disputed term."

15   *Phillips*, 415 F.3d at 1315 (internal quotation marks omitted; emphasis added); *see also id.* at 1317

16   (stating that it is "entirely appropriate for a court, when conducting claim construction, to rely

17   heavily on the written description for guidance as to the meaning of the claims").  While

18            the distinction between using the specification to interpret the meaning
     of a claim and importing limitations from the specification into the
19   claim can be a difficult one to apply in practice . . . the line between
     construing terms and importing limitations can be discerned with
20   reasonable certainty and predictability if the court's focus remains on
     understanding how a person of ordinary skill in the art would
21   understand the claim terms.

22   *Id.* at 1323.

23         As for extrinsic evidence, while it "can shed useful light on the relevant art, . . . it is less

24   significant than the intrinsic record in determining the legally operative meaning of claim language."

25   *Id.* at 1317 (internal quotation marks omitted).  Notably, the Federal Circuit has stated that

26   dictionaries "are often useful to assist in understanding the commonly understood meaning of

27   words," *id.* at 1322, but that they should not be elevated to prominence -- particularly with respect to

28

*United States District Court*
For the Northern District of California

the specification -- because they "focus[] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321.

Consistent with the above, the parties agreed that they would rely on intrinsic evidence to construe the claims and that the only extrinsic evidence to be supplied to the Court would be dictionaries and comparable sources.

B.   Legal Issues

Before construing any of the terms or phrases of the patents at issue, the Court addresses two legal issues that are pertinent to this claim construction: (1) whether the Court should defer to the claim construction of Judge T. John Ward of the Eastern District of Texas; and (2) whether the specification for the '708 patent can be used to construe the claims of the '192 and '131 patents.

1.   Judge Ward's Claim Construction Order

Visto brought suit against Seven Networks, Inc. in the Eastern District of Texas for infringement of the same four patents at issue in the instant case. On April 20, 2005, Judge Ward issued a claim construction ruling which addressed many of the same terms and phrases at issue in the instant case. Visto argues that, although Judge Ward's order is not binding on Sproqit because it was not a party in the Texas litigation, the Court should nevertheless adopt the definitions of the terms and phrases construed by Judge Ward. *See* Op. Br. at 5. Visto suggests that this approach is appropriate under stare decisis and for reasons of judicial efficiency.

Stare decisis, of course, does not literally apply. This Court is not bound to follow the decision of another district court. *See Texas Instruments, Inc. v. Linear Techs. Corp.*, 182 F. Supp. 2d 580, 589 (E.D. Tex. 2002) (stating that stare decisis "does not precisely apply"). However, according to Visto, the Supreme Court in *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), "noted that *stare decisis* favors promoting uniformity in claim construction." Op. Br. at 5.

Visto's characterization of *Markman* is not entirely accurate. In *Markman*, the Supreme Court's concern was whether claim construction should be within the province of a jury or within the province of a judge. The Supreme Court provided several reasons as to why claim construction should be a matter for a judge, one of them being "the importance of uniformity in the treatment of a given patent." *Markman*, 517 U.S. at 390. The Supreme Court explained:

4

**United States District Court**

For the Northern District of California

> Uniformity would . . . be ill served by submitting issues of
> document construction to juries.  Making them jury issues would not,
> to be sure, necessarily leave evidentiary questions of meaning wide
> open in every new court in which a patent might be litigated, for
> principles of issue preclusion would ordinarily foster uniformity.  But
> whereas issue preclusion could not be asserted against new and
> independent infringement defendants even within a given jurisdiction,
> treating interpretive issues as purely legal will promote (though it will
> not guarantee) *intrajurisdictional certainty* through the application of
> stare decisis on those questions not yet subject to *interjurisdictional
> uniformity* under the authority of the single appeals court.

*Id.* at 391 (emphasis added).  In other words, while Visto is correct that the Supreme Court took note

of the importance of uniformity of claim construction, Visto ignores the fact that the Supreme Court

also made a distinction between intrajurisdictional uniformity and interjurisdictional uniformity.  In

the instant case, there is no issue of intrajurisdictional uniformity because Judge Ward's opinion

issued from a different district court.  *See Verizon Cal. Inc. v. Ronald A. Katz Tech. Licensing*, L.P.,

326 F. Supp. 2d 1060, 1069 (C.D. Cal. 2003) ("Furthermore, the AT&T Order has limited stare

decisis effect, given that it emanates from a Federal District Court in a separate jurisdiction."); *Texas

Instruments*, 182 F. Supp. 2d at 588 (noting that the Supreme Court in *Markman* praised

"'intrajurisdictional' harmony").  As for interjurisdictional uniformity, there is no indication that

Judge Ward's opinion has been appealed and, even if so, that the Federal Circuit has made any

decision as to the appropriateness of his claim construction.

As for the other authorities cited by Visto in support of its position, it is largely

distinguishable or, as above, of limited support.  For example, in *Zoltar Satellite Systems, Inc. v. LG

Elecs. Mobile Communications Co.*, 402 F. Supp. 2d 731 (E.D. Tex. 2005), the court did say that

"inconsistent claim constructions of the same claims by different courts can create serious

problems," which "especially deserve consideration when the same patent is simultaneously being

litigated in another district."  *Id.* at 737.  However, the court in *Zoltar* made this statement in

connection with its decision as to whether the case before it should be transferred to another district

where a judge had already done substantial work on a patent infringement case involving many of

the same patents.  In *Atmel Corp. v. Silicon Storage Tech., Inc.*, No. C 96-0089 SC, 2001 U.S. Dist.

LEXIS 25641 (N.D. Cal. June 20, 2001), the court did rely on a claim construction ruling that issued

from the plaintiff's lawsuit against another party but that claim construction ruling had issued from

1    another court in the same district.  In other words, intrajurisdictional uniformity was at issue.

2    Moreover, the court indicated that it was appropriate to rely on the claim construction ruling because

3    the defendant in the case at bar had called that claim construction ruling well reasoned and correct

4    and even sought to have it adopted in litigation before the U.S. International Trade Commission.  *See*

5    *id.* at \*22.  Finally, in *KX Indus., L.P. v. PUR Water Purification Prods., Inc.*, 108 F. Supp. 2d 380

6    (D. Del. 2000), the court did make note of deference to a previous claim construction ruling but that

7    was a ruling that had issued from the very same judge.  Moreover, the court highlighted that it would

8    defer to the prior ruling only "to the extent the parties do not raise new arguments," *id.* at 387, and

9    the court actually revisited at least one of its earlier constructions and corrected it.  *See id.* at 389

10   ("After reviewing Degen and the specification of the '311 patent, the court finds that its earlier

11   opinion . . . about the scope of Koslow's disclaimer was wrong.").

12       Taking into account all of the above, the Court concludes that it will take into consideration

13   Judge Ward's claim construction order as, per *Markman*, uniformity in claim construction is

14   important.  However, because Judge Ward's order is outside of this jurisdiction, this Court has

15   discretion in determining the degree of deference accorded his order.  The Court concludes that order

16   such as Judge Ward's is entitled to "reasoned deference," with such deference turning on the

17   persuasiveness of the order; "in the end, [however, the Court] will render its own independent claim

18   construction."  *Innovations, L.P. v. Intel Corp.*, No. 2:04-CV-450, 2006 U.S. Dist. LEXIS 41453, at

19   \*13 (E.D. Tex. June 21, 2006) (stating that claim construction ruling from outside the jurisdiction

20   would be taken into account "as a thoughtful and thorough analysis of the parties' arguments

21   involving the same patent and the same claim" but that court would "in the end . . . render its own

22   independent claim construction"); *see also Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,

23   2003 U.S. Dist. LEXIS 13900, at \*8-9 (N.D. Ill. Aug. 8, 2003) (stating that, even though claim

24   construction order from outside the jurisdiction was "persuasive," at times, the court might "not

25   agree with that court and *Markman* . . . is not to the contrary").

26       2.    Use of '708 Specification to Interpret '192 and '131 Claims

27       In its claim construction brief, Sproqit contends that the specification for the '708 patent

28   cannot be used to construe the claims of the '192 and '131 patents.  In response, Visto argues that

United States District Court

For the Northern District of California

1    Sproqit's argument has no merit because the '708 patent is related to the '192 and '131 patents. *See*

2    Reply Br. at 4.  The '708 patent states that it is related to and incorporates by reference the '192

3    patent.  The '131 patent in turn is a continuation of the '192 patent.  In addition, the specification for

4    the '708 patent has a great deal of overlap with the specifications for the '192 and '131 patents

5    (which are identical).

6         There is no doubt that the three patents are all related in some fashion.  Moreover, Sproqit

7    probably would not contest the use of the '192 and '131 specifications to construe the claims of the

8    '708 patent because the '708 patent specifically states that it is related to the application for the '192

9    patent and the specification for the '131 patent is identical to that for the '192 patent.  But the issue

10   presents the converse – *i.e.*, whether the specification for the '708 patent can be used to construe the

11   claims of the '192 and '131 patents.

12        In *Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158 (Fed. Cir. 2004), the Federal Circuit stated

13   that, "[i]n the absence of an incorporation into the intrinsic evidence, this court's precedent takes a

14   narrow view on when a related patent or its prosecution history is available to construe the claims of

15   a patent at issue and draws a distinct line between patents that have a familial relationship and those

16   that do not."  *Id.* at 1167.  In the instant case, although the '708 patent incorporates by reference the

17   application for the '192 patent, neither the '192 patent nor the '131 patent makes any reference to the

18   '708 patent or its application.  Moreover, the '708 patent was not part of the parentage or the

19   prosecution history of the '192 or '131 patents.  *See id.* at 1168 (examining whether there was a

20   "formal relationship" between two patents or whether one patent incorporated the other during

21   prosecution).  In fact, (1) the application for the '708 patent was not filed until *after* the application

22   for the '192 patent and (2) the specification for the '708 patent contains *new matter* not contained in

23   the specification for the '192 patent (and therefore the identical specification for the '131 patent).[1]

24        In *Goldenberg*, the Federal Circuit addressed the issue of subsequently added new matter.

25   The patent at issue was the '559 patent.  The '559 patent issued from the '662 patent application,

26   _____

27        [1] For purposes of convenience, for the remainder of this section, the Court focuses on the
     relationship between the '708 patent and the '192 patent only.  The '131 patent does not need to be
28   discussed because it, as noted above, is a continuation of the '192 patent and has the same specification
     as the '192 patent.  Therefore, it should not matter that the '708 patent came before the '131 patent.

United States District Court

For the Northern District of California

1   which was a continuation of the '261 patent application.  At the time the patent holder filed the '261

2   patent application, it also filed the '262 patent application.  The '262 patent application led to the

3   '729 patent application, which then resulted in the '744 patent.  In short:

4          '261 patent application –> '662 patent application (continuation) –> '559 patent

5

6          '262 patent application –> '729 patent application (continuation in part) –> '774 patent

7   *See id.* at 1161.  Notably, after the patent holder filed the '261 and '262 patent applications, the PTO

8   – in a first office action – rejected certain claims of the '261 patent application on the grounds of

9   double patenting over the '262 patent application.  *See id.*

10         One of the issues in *Goldenberg* was whether the district court erred in relying on the '744

11  patent and its prosecution history when construing the claims of the patent at issue, *i.e.*, the '559

12  patent.  The Federal Circuit said both "yes" and "no."  According to the court, it was proper for the

13  district court to rely on the '262 patent application as it existed when the patent holder distinguished

14  the '262 application from the '261 application in response to the PTO's office action.  This was

15  because the response "constitutes part of the prosecution history of the *'261 application*, which is a

16  parent application to the '559 patent, and therefore part of the '559 patent's prosecution history."  *Id.*

17  at 1167 (emphasis in original).  However, the district court erred in relying on the specification of the

18  '744 patent to construe the claims of the '559 patent because

19             [t]he relevant passages from the '744 patent . . . were added during a
               continuation-in-part of the '262 application.  These passages are
20             therefore new matter added to the content of the '262 application
               subsequent to when it was distinguished in the [patent holder's] office
21             action response.  *While the content of the '262 application at the time
               it was distinguished from the '261 application constitutes part of the
22             prosecution history of the '559 patent, subsequently added new matter
               is not similarly incorporated.*
23

24  *Id.* (emphasis added).

25         In the case at bar, no part of the '708 patent or its prosecution history is part of the '192 or

26  '131 prosecution history.  Under *Goldenberg*, the '708 patent would, in the first instance, have no

27  bearing on the construction of the '192 or '131 patents.

28

To be sure, there may be narrow circumstances where a later patent may be looked to in construing an earlier subject patent even where it is not part of the subject patent's prosecution history. In *Microsoft Corp. v. Multi-Tech Systems, Inc.*, 357 F.3d 1340 (Fed. Cir. 2004), the Federal Circuit concluded that it was permissible for a court to rely on the prosecution history of a sibling patent to construe the claims of another patent even though the subject patent was issued earlier and its prosecution history did not reference the sibling patent. However, in that case, the specifications for the two patents were exactly the same, and it was the accused infringer who was trying to use the later-issued sibling patent to limit the scope of the earlier-issued patent. Evidently, when identical language is used and there is no new matter, the identical nature of the specification provides a basis for seeking parallel constructions. However, particularly in connection with the phrase at issue in this Order, the specifications for the '192 and '708 patents differ in material respects. The '708 addresses translation across formats; the '192 does not. Moreover, unlike *Microsoft*, in the instant case, it is Visto as the patent holder, not the accused infringer, who is trying to use the later-filed '708 patent to expand the scope of the earlier-filed '192 patent.

B.    Construction of "an independently modifiable copy of the first workspace element"[2]

Having addressed the legal issues above, the Court now turns to construction of the claim phrase "an independently modifiable copy of the first workspace element." Claim 1 of the '192 patent is a representative claim with respect to the use of this phrase. It provides as follows:

1.    A computer-based method comprising the steps of:

(a)    establishing a communications channel through a firewall using an HTTP port or an SSL port;

(b)    generating first examination results from the first version information which indicates whether a first workspace element stored at a first store within the firewall has been modified;

(c)    generating second examination results from second version information which indicates whether **an independently-modifiable copy of the first workspace element** has been modified, the copy being

---

[2] See claims 1, 31-33, 35, and 36 of the '131 patent; claims 1, 6-8, 10, 11, and 22 of the '192 patent; and claims 1 and 17 of the '708 patent.

United States District Court

For the Northern District of California

stored at a second store on a smart phone outside the
firewall;

(d)      initiating steps (b) and (c) from within the firewall
through the communications channel when
predetermined criteria have been satisfied;

(e)      generating a preferred version from the first workspace
element and from the copy based on the first and
second examination results, wherein if only one of the
first workspace element and the copy has been
modified, then the step of generating includes selecting
the one as the preferred version; and

(f)      storing the preferred version at the first store and at the
second store.

Khaliq Decl., Ex. K ('192 patent reexamination certificate, cols. 2-3) (emphasis added).  Like the

parties, the Court shall address the claim phrase in two parts: (a) workspace element and (b)

independently modifiable copy.

       a.    "workspace element"

"[T]he person of ordinary skill in the art is deemed to read [a] claim term not only in the

context of the particular claim in which the disputed term appears, but in the context of the entire

patent, including the specification."  *Phillips*, 415 F.3d at 1313.  Here, with respect to the claim term

"workspace element," the specifications for the '192 and '131 patents state:

It will be further appreciated that the e-mail data 165, file data 170,
calendar data 175 and user data 180 are exemplary and collectively
referred to herein as "workspace data 185.  Those skilled in the art will
recognize that "workspace data" may include other types of data such
as application programs.  It will be further appreciated that the e-mail
data 165, file data 170, calendar data 175 and user data 180 may each
be divided into workspace elements, wherein each workspace element
is identified by particular version information 255 . . . .  Accordingly,
each e-mail, file, calendar, etc. may be referred to as "a workspace
element in workspace data."

'192 patent, Col. 3; ''131 patent, col. 3.

The specification for the '708 patent is similar, stating:

It will be appreciated that the e-mail folder 138, file folder 142,
calendar folder 140 and bookmark folder 144 or portions thereof may
be stored at different locations such as on the desktop computer 134.
The e-mail folder 138, file folder 142, calendar folder 140 and
bookmark folder 144 are exemplary, grouped by like information and

are collectively referred to herein as "workspace data" 136. Those skilled in the art will recognize that the workspace data 136 may include other types of data such as an application program such as Microsoft Work 6.0.1 TM word processor and the documents created using them. It will be further appreciated that the e-mail folder 138, file folder 142, calendar folder 140 and bookmark folder 144 may each be divided into workspace elements, wherein each workspace element folder or each workspace element individually is identified by particular version information 255 . . . . Accordingly, each e-mail or e-mail folder, file or file folder, calendar or calendar folder, bookmark or bookmark folder, document or document folder, etc. may be referred to as "a workspace element."

708 patent, col. 3.

The parties agree that, per the specifications, a workspace element can be an e-mail, a file, a calendar, and so forth. For the '708 patent, a workspace element can also be an e-mail folder, a file folder, a calendar folder, and so forth. The parties disagree, however, as to whether a *portion* of an e-mail (or file, calendar, etc.) can be a workspace element. According to Sproqit, a workspace element must be, *e.g.*, the entire e-mail, that is, each and every field making up the e-mail. According to Visto, a workspace element can be any part of an e-mail, even a single field of an e-mail. Visto relies on Judge Ward's order to support its position, *see* Ward Order at 22 (defining the term "workspace element" as "a *subset* of workspace data such as an e-mail, file, bookmark, calendar, or applications program which may include version information") (emphasis added), as well as a dictionary definition for the term "element." *See* Op. Br. at 10 (noting that Merriam-Webster's Collegiate Dictionary (10th ed. 1993) defines "element" as "simply 'a constituent part'"). As the Court previously indicated in its order denying Visto's motion for a preliminary injunction, each party has taken an extreme position.

Visto's claim that any part of an e-mail (or file, calendar, etc.) can be a workspace element is untenable. First, Visto's reliance on a dictionary definition for the term "element" is not appropriate. The problem with Visto's approach is that it "focuses the inquiry on the abstract meaning of [a] word[] rather than on the meaning of [a] claim term[] within the context of the patent." *Phillips*, 415 F.3d at 1321. Visto would have the Court look at the term "element" in isolation but the actual term to be construed is "workspace element." Second, Visto's reliance on Judge Ward's order is unavailing because Judge Ward's construction of the term "workspace element" was not intended to

-- nor did it address -- the specific issue here, *i.e.*, whether a portion of an e-mail can be a workspace element.

Furthermore, Visto's preferred construction of the term "workspace element" is not supported by the specifications of the patents at issue. Nowhere in the specifications is it suggested that a portion of an e-mail can be considered a workspace element. Simply because the specifications state that workspace data may be divided into workspace elements does not mean that a workspace element may be divided into bits. In discussing a workspace element, the specifications repeatedly refer to the larger -- and complete -- data structure of an e-mail.

▸     "*[E]ach* e-mail, file, calendar entry, etc. may be referred to as 'a workspace element in workspace data,'" '192 patent, col. 3 (emphasis added); '131 patent, col. 3 (emphasis added).

▸     "*[E]ach* e-mail or e-mail folder, file or file folder, calendar or calendar folder, bookmark or bookmark folder, document or document folder, etc. may be referred to as 'a workspace element.'" '708 patent, col. 3 (emphasis added).

▸     "Therefore, a system and method are needed for providing users with data consistency, and more particularly for synchronizing multiple copies of a workspace element such as *a document* in the secure network environment." '192 patent, col. 1 (emphasis added); '131 patent, col. 1 (emphasis added); '708 patent, col. 1 (emphasis added).

*Cf. Honeywell Internat'l, Inc. v. ITT Indus., Inc.*, No. 05-1407, 2006 WL 1703376, at *5 (Fed. Cir. June 22, 2006) (concluding that claim term "fuel injection system component" was limited to a fuel filter in light of the specification, which referred to the fuel filter at least four times as "'this invention' or 'the present invention'"; adding that the fuel filter was not "merely a preferred embodiment" as it "was the only component of an EFI system that the written description disclosed as having a polymer housing with electrically conductive fibers interlaced therein").

Moreover, given the nature of the inventions claimed in the '192, '131, and '708 patents, it is implausible that any subpart or element (including, *e.g.*, a single e-mail field) that is insufficiently complete to make the invention useful could itself be a workspace element. As indicated above, all three patents are designed to address the problem of data inconsistency, more specifically, when multiple copies of "a *document*" are maintained at different network locations. *See* '192 patent, col.

**United States District Court**

For the Northern District of California

1   ("[W]hen maintaining multiple independently-modifiable copies of a document, a user risks using

2   an outdated version. . . . [¶] The problem of data inconsistency is exacerbated when multiple copies

3   of a document are maintained at different network locations."); '131 patent, col. 1 (same); '708

4   patent, col. 1 (same).  As Sproqit argues, "[t]he copies are intelligible and can be independently

5   accessed and modified *because* they are complete and are not simply data fragments."  Resp. Br. at 8

6   (emphasis added); *see also Honeywell*, 2006 WL 1703376, at *5 (noting that "[t]he written

7   description's detailed discussion of the prior art problem addressed by the patented invention, *viz.*,

8   leakage of non-metal fuel filters," supported limitation of the claim term "fuel injection system

9   component" to a fuel filter).  The nature of the invention as described in the specifications clearly

10   contemplates that a workspace element be sufficiently complete and independently coherent so that

11   there is utility to the synchronization of the workspace elements contemplated by the patents.

12           On the other hand, Sproqit's argument -- *i.e.*, that anything less than an e-mail complete with

13   all its fields and ancillary data is not a workspace element -- is equally unpersuasive.  Under

14   Sproqit's reasoning, if an e-mail were missing just one field, no matter how insignificant relative to

15   all the other information, the e-mail could not be a "workspace element."  Again, the nature of the

16   invention revealed by the specifications is not necessarily be defeated simply because a single field is

17   not synchronized and replicated as between a remote device such as a smart phone and a local area

18   network.  As Visto pointed out at the hearing, a local area network  is likely to have a much larger

19   capacity (and thus is capable of accommodating more fields) than a remote device.

20           For the foregoing reasons, the Court rejects both extreme positions taken by Visto and

21   Sproqit.  Moreover, as noted above, the Court does not adopt Judge Ward's construction of the term

22   "workspace element" because his construction does not address the issue at bar.  In addition, under

23   Judge Ward's construction, a workspace element could be an application program even though the

24   specifications for the '192, '131, and '708 identify an application program as a type of workspace

25   data, not a type of workspace element.  As for Judge Ward's construction that a workspace element

26   "may include version information," the Court shall address the relationship between a workspace

27   element and version information when it construes the term "version information."

28

13

**United States District Court**

For the Northern District of California

1    Accordingly, for the '192, '131, and '708 patents, the Court is inclined to construe the term

2  consistent with this Court's order denying the preliminary injunction (and along the lines implicitly

3  recognized by Visto's expert Dr. Head who stated that "the term 'e-mail' refers to the message

4  headers, the message body, [and] status indicators (such as opened/unopened, deleted/undeleted, and

5  other parameters such as urgency, and other message or system dependent parameters, etc.)").  Head

6  Decl. ¶ 28 (located at Docket No. 100).

7    For the '192 and '131 patents, the tentative construction for the term "workspace element" is

8  as follows: A basic unit of workspace data such as an e-mail, file, bookmark, or calendar.  While a

9  portion of a basic unit is not necessarily a workspace element, a basic unit is still a workspace

10  element so long as all significant or important components of that unit are present.  For example, a

11  single field of an e-mail is not a workspace element, but an e-mail is still a workspace element even

12  if it does not contain each and every field present; in other words, an e-mail is still a workspace

13  element so long as all significant or important fields are present.

14    For the '708 patent, the tentative construction is as follows: A basic unit of workspace data

15  such as an e-mail or e-mail folder, file or file folder, calendar or calendar folder, or bookmark or

16  bookmark folder.  While a portion of a basic unit is not necessarily a workspace element, a basic unit

17  is still a workspace element so long as all significant or important components of that unit are

18  present.  For example, a single field of an e-mail is not a workspace element, but an e-mail is still a

19  workspace element even if it does not contain each and every field present; in other words, an e-mail

20  is still a workspace element so long as all significant or important fields are present.

21    The Court orders the parties to meet and confer regarding the above tentative constructions to

22  determine whether they can agree on those constructions or on other similar constructions.  If the

23  parties are able to come to an agreement, then they should file a joint letter by August 14, 2006,

24  stating what the agreement is.  If the parties cannot come to an agreement, then each party should

25  provide a brief (no longer than 5 pages) which (1) states whether the party will agree to the tentative

26  constructions; (2) if not, provides comments on the tentative constructions; and (3) submits

27  alternative constructions.  Each brief should also comment on the alternative constructions (if any)

28

United States District Court

For the Northern District of California

1    proposed by the opposing party.  (Such alternative constructions should be discussed at the meet and

2    confer.)  The briefs should be filed by August 14, 2006.

3                    b.    "independently modifiable copy"

4          Visto contends that Judge Ward's construction of the term "independently modifiable copy"

5    should be adopted.  According to Judge Ward, the term "independently modifiable copy" means "[a]

6    copy of a workspace element capable of being modified independent of the workspace element.  The

7    copy of the workspace element does not have to be in the same format as the workspace element."

8    While Sproqit proposes a construction different from that of Judge Ward, it does not dispute the

9    accuracy of his construction.  Instead, Sproqit's main argument is that, even if the copy of the

10   workspace element does not have to be in the same format as the workspace element, the copy is

11   otherwise an *exact* copy of the workspace element.  Visto argues to the contrary, even though Judge

12   Ward expressed concern with that very argument.  *See* Ward Order at 16-17 (rejecting Visto's claim

13   that a copy does not have to be an exact copy).

14         The patents at issue do not explicitly define the term "copy."  However, as pointed out by

15   Sproqit, the specifications for the '192 and '131 patents do give context to the word, stating that

16                    [a]n independently modifiable copy of the workspace data 185,
17                    referred to herein as workspace data 123, is stored on the global server
                     120 for easy access by a user from the remote terminal 105.  *Being a*
18                   *copy*, the workspace data includes independently modifiable copies of
                     *each* workspace element in workspace data and an independently
19                   modifiable copy of version information 255 . . . , referred to herein as
                     version information.

20   '192 patent, col. 3; '131 patent, col. 3 (emphasis added).  The '708 specification contains similar

21   language.  *See* '708 patent, col. 3 ("[T]he workspace data 120 includes an independently modifiable

22   copy of *each* workspace element in the selected portions of the workspace data 136 and 116 and an

23   independently-modifiable copy of each corresponding version information 255 . . . and 150.")

24   (emphasis added).  If a "copy" of workspace data must contain *each* workspace element making up

25   the workspace data, then it logically follows that a "copy" of a workspace element must contain each

26   subpart making up the workspace element -- in other words, a copy must replicate all the information

27   that comprises the workspace element.

28

United States District Court

For the Northern District of California

1   Visto contends still that there is support for its position in the specification for the '708

2   patent.  However, as discussed above, the specification for the '708 patent should not be used to

3   construe the claims of the '192 and '131 patents, at least with respect to new matter contained in the

4   '708 specification.  Visto relies on that part of the '708 specification that constitutes new matter.  As

5   noted above, the '708 patent addresses translation across different formats, thus potentially adding a

6   new dimension to "copy" not addressed by the '192 and '131 patents.

7   Even if the Court could consider the new matter in the '708 specification, Visto's argument is

8   not convincing.  The part of the '708 specification on which Visto relies states as follows:

9   FIG. 6 illustrates an example bookmark workspace element in the
global format.  The global translator 122 incorporates all the
10   information needed by both formats (Format A and Format B) to
create the Global Format.  For example, if a bookmark in Format A
11   needs elements X, Y and Z and a bookmark in Format B needs
elements W, X and Y, the global translator 122 incorporates elements
12   W, X, Y and Z to create a bookmark in the Global Format.  Further,
the global translator 122 incorporates the information which is needed
13   by the synchronization means such as the last modified date.
Accordingly, a bookmark in the Global Format includes a user
14   identification (ID) 605, an entry ID 610, a parent ID 615, a folder ID
flag 620, a name 625, a description 630, the Uniform Resource Locator
15   (URL) 635, the position 640, a deleted ID flag 645, a last modified
date 650, a created date 655 and a separation ID flag 660.
16
'708 patent, col. 8.
17
18   According to Visto, the above statement "clearly illustrates that an independently modifiable

19   copy of a workspace element need not include the same fields of the original workspace element."

Op. Br. at 9.  The problem for Visto is that the statement above concerns differences *due to different*

20   *formats*.  In other words, as argued by Sproqit, there may be differences between the copy and the

21   original workspace element because the applications have different formats, but, if the applications

22   are the same, then the copy should be a complete copy of the original workspace element.

23   Accordingly, for the '192 and '131 patents, the Court adopts the following construction for

24   the term "independently modifiable copy": A copy of a workspace element capable of being

25   modified independent of the workspace element.  A copy of a workspace element is a complete

26   replication of all the information comprising the workspace element.

27

28

16

**United States District Court**

For the Northern District of California

1       For the '708 patent, the Court adopts the following construction: A copy of a workspace

2  element capable of being modified independent of the workspace element.  A copy of a workspace

3  element is a complete replication of all the information comprising the workspace element unless the

4  copy and workspace element are in different formats.  In that case, there may be some differences

5  between the copy and workspace element, but those differences are due to formatting only.

6                  **III.**    **CONCLUSION**

7       Accordingly, the parties shall by August 14, 2006, submit either a stipulated construction of

8  "workspace element" or briefs addressing respective proposed constructions consistent with this

9  order.

10

11       IT IS SO ORDERED.

12

13  Dated:  August 4, 2006

14

15                               EDWARD M. CHEN
                                United States Magistrate Judge

16

17

18

19

20

21

22

23

24

25

26

27

28